**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TALENTHUB WORLDWIDE, INC., | |
| Plaintiff, | Case No. 24-cv-6264 |
| - against - | |
| TALENTHUB WORKFORCE, INC.; ERIC GOLDSTEIN; STANDARD CONSULTING, INC.; DIANE POREMBSKI; PATRICIA KAMPEL; TANYA WILSON (WELLARD); JEANNINE TRIOLO; VALERIE WEST; JOSEPH LIPINSKI; and J COMPUTER PRO, INC. | **COMPLAINT** |
| Defendants. | |

Plaintiff Talenthub Worldwide, Inc., by its attorneys, Kagen, Caspersen & Bogart PLLC, as and for its Complaint against defendants Talenthub Workforce, Inc.; Eric Goldstein; Standard Consulting, Inc.; Diane Porembski; Patricia Kampel; Tanya Wilson (Wellard); Jeannine Triolo; Valerie West; Joseph Lipinski; and J Computer Pro, Inc. allege as follows for its Complaint.

## NATURE OF THE ACTION

1.       This case arises from the willful misappropriation of Talenthub Worldwide Inc.'s confidential information and trade secrets by Talenthub Workforce Inc. (and the individual defendants identified below, all currently employed at Talenthub Workforce Inc.), a direct competitor of Talenthub Worldwide Inc. Rather than compete legally, Talenthub Workforce Inc. intentionally and unlawfully obtained, possesses, and is using Talenthub Worldwide Inc.'s confidential information and trade secrets, which Talenthub Workforce Inc. and the individual defendants acquired in their prior work at and consulting for Plaintiff Talenthub Worldwide Inc.

1

2.      In or around January 2022, Defendant Eric Goldstein – a convicted felon – abruptly stopped his work as a consultant for Worldwide, a role in which he obtained substantial amounts of proprietary and trade secret information, discussed herein, and joined Workforce. At the same time, several other Worldwide employees, including longtime Worldwide employees Kampel and Porembski (collectively with Goldstein, the "Departed Defendants"), abruptly left their positions as officers and employees of Worldwide and joined Workforce on a full-time basis.

3.      As detailed herein, Talenthub Workforce Inc. has admitted in filings in a separate litigation in New York State Court that the Defendants stole Talenthub Worldwide Inc's trade secrets and the computer equipment on which those trade secrets were stored.  Furthermore, they have used that pilfered information to illegally divert to themselves more than a million dollars in accounts receivable owed to Worldwide by clients for services that Worldwide (not Workforce) provided to those clients.

4.      Plaintiffs bring this action for damages and injunctive relief related to Defendants' intentional illegal diversion of Plaintiff's clients and employees through improper conduct and the misappropriation of Plaintiff's confidential information and trade secrets, alleging claims the include Defendants' violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA") and the Computer Fraud & Abuse Act, 18 U.S.C. § 1030 ("CFAA"); misappropriation of trade secrets under New York common law; unfair competition under New York common law; breach of fiduciary duty and violation of the faithless servant doctrine; unjust enrichment; and conversion.

**PARTIES**

5.      Plaintiff Talenthub Worldwide Inc. ("Worldwide") is a staffing company

organized in 2013 and existing as a Subchapter S Corporation ("S Corporation") under the laws of the State of New York with its offices located in New York, New York.

6.      Defendant Talenthub Workforce Inc. ("Workforce") is a corporation formed in 2021 under the laws of the State of New York with its principal place of business in New York, New York.

7.      Defendant Eric Goldstein ("Goldstein") is an individual who at all relevant times has been domiciled in New York City, and is a former consultant who performed services to Worldwide and, upon information and belief, a current officer and employee of Workforce.

8.      Upon information and belief Defendant Standard Consulting Inc. is a corporation formed by Defendant Goldstein under the laws of the State of Delaware with its principal place of business in New York, New York.  Beginning in or around July 2018, Standard Consulting Inc. began performing services for Worldwide through its owner and agent Goldstein.

9.      Defendant Diane Porembski ("Porembski") is an individual who at all relevant times has been domiciled in New York City, and is a former officer and employee of Worldwide and, upon information and belief, a current officer and employee of Workforce.

10.      Defendant Patricia Kampel ("Kampel") is an individual who at all relevant times has been domiciled in New York City, and is a former officer and employee of Worldwide and, upon information and belief, a current officer and employee of Workforce.

11.      Defendant Tanya Wilson (Wellard) ("Wilson") is an individual who at all relevant times has been domiciled in New York City, and is a former employee of Worldwide and, upon information and belief, a current employee of Workforce.

12.      Defendant Jeannine Triolo ("Triolo") is an individual who at all relevant times has been domiciled in New York City, and is a former employee of Worldwide and, upon

information and belief, a current employee of Workforce.

13.     Defendant Valerie West ("West") is an individual who at all relevant times has been domiciled in New York City, and is a former employee of Worldwide and, upon information and belief, a current employee of Workforce.

14.     Defendant Joseph Lipinski ("Lipinski") is an individual who at all relevant times has been domiciled in New York City, and is a former IT consultant to Worldwide who, upon information and belief, is a current IT consultant to Workforce.

15.     Upon information and belief Defendant J Computer Pro Inc. ("J Computer Pro") is a corporation formed by Defendant Lipinski under the laws of the State of New York with its principal place of business in New York, NY.  J Computer Pro performed services to Worldwide through its owner and agent Lipinski.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332(a)(1) and 1367(a).

17.     This Court has personal jurisdiction over Workforce pursuant to N.Y. CPLR 301, because, upon information and belief, Workforce transacts business within New York and/or contracts to supply services within the State of New York, including but not limited to employing people (including Goldstein) who work for Workforce in locations within the State.

18.     This Court has personal jurisdiction over Standard Consulting Inc. pursuant to N.Y. CPLR 301, because, upon information and belief, Standard Consulting Inc. transacts business within New York and/or contracts to supply services within the State of New York, including but not limited to employing people (including Goldstein) who work for Standard Consulting Inc. in locations within the State.

19.     This Court has personal jurisdiction over J Computer Pro, Inc. pursuant to N.Y. CPLR 301, because, upon information and belief, J Computer Pro, Inc. transacts business within New York and/or contracts to supply services within the State of New York, including but not limited to employing people (including Lipinski) who work for Standard Consulting Inc. in locations within the State.

20.     Personal jurisdiction exists over each of the individual Defendants under N.Y. CPLR 301 because, upon information and belief, Goldstein, Porembski, Kampel, Wilson, Triolo, West and Lipinski are each domiciled in New York; each has a physical presence in New York; and each transacts business in New York.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3).

## FACTUAL ALLEGATIONS

### I.     Gary Glass and His Son Oren Glass Form Worldwide, Which Grows Into a Multimillion-Dollar Business

22.     Worldwide is an employment staffing agency.  It was formed in 2013 by Gary Glass ("Glass") and his son Oren Glass ("Oren"), each of whom has been an officer of Worldwide since its formation.  Glass and Oren formed Worldwide on December 2, 2013, by filing Articles of Incorporation with the New York Department of State.

23.     At all relevant times, Glass and Oren have been the sole owners of Worldwide, with Glass owning owned 80% of the company and Oren owning 20%, except for one temporary investor whom Gary and Oren bought out after a six-month holding period ending in 2014.

24.     From Worldwide's founding in 2013 until the Defendants began stealing its trade secrets and clients in late 2021 and into 2022, Glass and Oren grew Worldwide from a startup into a successful multimillion-dollar business in the competitive temporary staffing industry, by

diligently working to obtain and retain a large base of staffing clients and investing massive amounts of their own time and money into Worldwide's success. Since Gary and Oren are both Certified Public Accountants, they assumed responsibility for all of the company's tax and accounting issues, including but not limited to payroll taxes, unemployment insurance, and income taxes.

25.     As of the end of 2014, Gary and Oren Glass had invested a combined total of $420,000 of their own funds to finance Worldwide's operations. Later, in 2016 and thereafter, Gary and Oren Glass provided additional personal funds for Worldwide's operations, loaning Worldwide $500,000.

26.     Thus, between investments and loans Glass and Oren contributed a combined total of $920,000 to fund the operations of Worldwide, all of which they put at risk of loss if the company did not succeed. Except for an individual who briefly invested in the company and was bought out by Gary and Oren in 2014, and some temporary bank financing the Company obtained from 2014 to 2016 which was repaid in full with interest, no one else has ever contributed to or invested funds in Worldwide. Furthermore, none of the Defendants have ever contributed any funds to Worldwide at any time.

27.     As the Company grew, it was able to pay back its loans including all interest.

28.     Due to hardships caused by COVID resulting in a significant revenue decline in 2020, on May 1, 2020, and April 1, 2021, Worldwide obtained two Payroll Protection Program (PPP) loans from the Small Business Administration, each for $1,078,757 (totaling $2,157,514). Because Worldwide spent enough on eligible expenses in the allowable time frame (i.e., payroll and rent), the SBA subsequently granted full forgiveness on both loans.

29.     By late 2021, Glass and Oren had grown Worldwide into a multimillion-dollar

business providing hundreds of Temporary Employees to more than seventy-five (75) Clients, which included multimillion-dollar national companies as well as smaller businesses.

30.    From 2014 to 2021, upon and information and belief, Worldwide's average annual gross revenue was approximately $6.4 million.  As detailed further below, however, the exact amount of Worldwide's revenues is unknown to Plaintiffs because Defendants stole Worldwide's computer equipment containing all of Worldwide's QuickBooks accounting records and have refused Plaintiffs' demands to return the Worldwide QuickBooks Software electronic data file.  In fact, in response to a Glass shareholder litigation lawsuit against workforce, Goldstein then filed his own lawsuit against Glass and Worldwide on September 13, 2023.  In that petition, Goldstein attached as Exhibit T a general ledger detail printout for both Glass's and Oren's distribution accounts from *Worldwide*.  The layout of the exhibit shows it was clearly extracted directly from the Worldwide QuickBooks data file, and Goldstein did so on August 19, 2022 at 3:00PM.  This is more than seven months since he had resigned from Worldwide.

31.    Companies in various industries including healthcare facilities, media agencies, retailers, banks, law firms, and others (hereinafter referred to as Worldwide's "Clients" or "Customers") retained Worldwide to provide these Clients with temporary staffing by recruiting, hiring, and providing administrative support for Temporary Employees to work for the Clients ("Temporary Employees").

32.    Specifically, Worldwide's services to its Clients included recruiting Temporary Employees for Clients to fill the specific staffing needs they requested.  Worldwide did so by placing advertisements on job placement platforms including Craigslist, Career Builder, Monster, LinkedIn, and Dice.com among others, at an average cost to Worldwide of

approximately $11,600 per month. Worldwide handled all payroll, payroll tax payments, unemployment insurance, worker's compensation insurance, health insurance, and all other administrative matters for the Temporary Employees, so that the Clients did not need to handle any of these matters.

33.    Worldwide paid the Temporary Employees' salaries (as the employer of record) and provided them health insurance, subsequently collecting funds from Clients to cover these expenses that Worldwide advanced.

34.    In exchange for these services, Clients paid Worldwide a markup for each Temporary Employee that ranged from 30% to 50% of the Temporary Employee's wages paid by Worldwide. Thus, as a hypothetical example (leaving aside health insurance), if a Client retained Worldwide to hire one Temporary Employee, Worldwide would (1) hire that Temporary Employee directly and put the Temporary Employee on Worldwide's own payroll as a W-2 employee of Worldwide; (2) pay the Temporary Employee's $1,000 per week salary; (3) bill the Client, on account, approximately $1,300 to $1,500 for this staffing service that Worldwide provided; and (4) the Client would then pay Worldwide's bill, usually on invoice terms of 30, 60, or 90 days.

35.    The delay between Worldwide's paying the Temporary Employees and later collecting the associated costs and markup from its Clients required Worldwide to have significant working capital of hundreds of thousands of dollars in liquidity at all times. Until Worldwide was able to achieve this liquidity from its operations, Glass and Oren made significant capital contributions and loans to the Company to meet its need for liquid working capital.

**II.    Worldwide's Trade Secrets**

36.　　In its operations, Worldwide created and maintained confidential and proprietary information, including but not limited to:

a.　　Worldwide's business model and Client lists;

b.　　Lists of the Temporary Employees that Worldwide recruited and provided to Clients, which included the Employees' personal confidential information such as social security numbers and addresses;

c.　　Worldwide's weekly sales reports, delineating by Client name the volume of sales and the hours worked by Temporary Employees placed at each Client (with those hours broken out between regular hours, overtime hours, other hours, and which Worldwide employee was responsible for the placement at the Client);

d.　　Worldwide's accounts receivable aging reports, which delineated by Client name each of the invoices still outstanding, providing for each invoice the invoice number, invoice date, due date, invoice amount, any payments on account applied against the invoice to date, and days past due; and

e.　　Worldwide's weekly, quarterly, and annual payroll reports, which delineated each Temporary Employee's name, social security number, and wage information (including federal and state payroll and tax withholdings).

37.　　Worldwide maintained additional proprietary information that it gathered for each of the Temporary Employees it placed at its Clients, including "onboarding information" (which included salary withholding elections and direct deposit information), background check information, resumes, skillsets, references, emergency contacts, and COVID vaccination cards, among many other items.  Worldwide kept all of this information confidential, granting access only to employees who needed it for their duties, and to Clients.

38.    Worldwide also maintained other proprietary information regarding each of its Clients, including proposal letters, invoices, contact information, contracts, progress reports, notes from Client update calls and discussions with Temporary Employee candidates, marketing materials, references, and other Worldwide internal documents.

39.    The information described above in paragraphs 36 to 38, and other confidential and proprietary financial and other information, constituted trade secrets of Worldwide (collectively, the "Worldwide Trade Secrets").

40.    The Worldwide Trade Secrets contains detailed and personalized information and analytics specific to each Temporary Employee candidate that Worldwide was hired to assess and recruit. This included each Temporary Employee's past work experience for Worldwide clients and information detailing their relevant skills.

41.    Worldwide invested thousands of hours developing this confidential information by interviewing candidates, assessing their fit and eligibility for various roles at its Clients based on known needs and/or temporary projects, and maintaining detailed records of Temporary Employee assignments, including which Clients they worked for, when, and on what project(s). These projects were often recurring on a monthly or annual basis.

42.    Gary Glass, majority owner of Worldwide, was responsible for and developed all of the Worldwide Trade Secrets over the many years Worldwide was actively operational (from 2013 through 2021), with such information not made available to the public.

43.    As detailed below, Worldwide's Trade Secrets were produced and stored in a software program called Avionté ("Avionté"), in a secure web-based portal with restricted access, and/or saved on Worldwide's secure computer server located in its leased office space (the "Worldwide Server").

44.     All of the information contained on Worldwide's computer, IT, e-mail and other document management systems or contained in Worldwide's online accounts, including but not limited to Avionté, belonged to Worldwide, exclusively, and not to any individual employee or consultant of Worldwide.   Any and all proprietary information contained on Worldwide computers that was used by the Defendants in their capacity as Worldwide employees or consultants was only authorized by Worldwide to be saved on the secure Worldwide Server located in its leased office space.

## III.    Defendants' Roles at Worldwide

### *Eric Goldstein*

45.     Eric Goldstein served as a consultant to Worldwide from its formation in 2013 until early January 2022.  In this role, Goldstein presided over client accounts and had direct, regular and continuous access to all Worldwide Trade Secrets, including but not limited to all Client information, Client invoicing and collections, deposits of client checks, addresses and contacts, invoicing Client preferences, accounts receivable aging reports, and access to Avionté which also included payroll for employees Worldwide placed at its Clients.  Goldstein also presided over the staff of Worldwide on a daily basis, recruited and hired new employees and Clients, and presided over Worldwide's advertising and all other budgets and financial information, all of which gave him direct access to Worldwide's critical business trade secrets.

46.     During his employment with Worldwide, Goldstein worked with over 100 Worldwide Clients, placing large numbers of Temporary Employees at these Clients, ranging from one to 25 Temporary Employees at a time.  In that role, he had access to all information related to Temporary Employees and Clients, and other Worldwide Trade Secrets, through his access to Avionté.

### *Goldstein's Criminal History*

47.    Goldstein's theft of Worldwide's clients and data is consistent with his substantial felony criminal history, which has led to him owing millions of dollars in restitution. Plaintiff is unaware at this time how much of this criminal restitution obligation remains outstanding.

48.    In 2010 Goldstein was convicted of attempted insurance fraud ("PL 110-176.30 CF Insur Fraud-1st> $1 million (Attempted).")

49.    A New York State Unified Court System Criminal History Record Search (CHRS) shows that Goldstein was arrested on May 17, 2010 and charged in a May 17, 2010 Indictment in New York County Supreme Criminal Court (*People of the State of New York v. Eric Goldstein*, Indictment No. 2184/2010) with five crimes: Insurance Fraud in the First Degree (in violation of Penal Law § 176.30); Forgery in the Second Degree (in violation of Penal Law § 170.10(1)); two counts of Offering a False Instrument for Filing in the First Degree (in violation of Penal Law § 175.35), and Penalties for Fraudulent Practices (in violation of Workers Compensation Law § 96).

50.    The CHRS record further shows that on November 14, 2012, Goldstein pleaded guilty to felony Attempted Insurance Fraud in the First Degree (*i.e.*, insurance fraud involving over $1 million), and was sentenced to five years of probation and ordered to pay $5 million in restitution.

51.    The scope of Goldstein's fraud was so significant that on May 17, 2010, the date of Goldstein's arrest, the *New York Post* published an article with the headline "Prosecutors go after temp-agency owner for bilking state out of $25M."

52.    The article stated that according to prosecutors, Goldstein "tricked the state out

of a whopping $25 million, money he should have paid into the workers' comp system over the past decade." It further stated that prosecutors said that "Goldstein began outrunning the New York State Insurance Fund, which administers worker's comp, after the fund kicked him out ten years ago for getting in the arrears on premiums. Barred by the fund from participating -- and apparently reluctant to pay for the mandatory coverage himself -- over the past decade he simply created some 50 subsidiary companies under his umbrella temp agency, GT Systems. He'd have his subsidiaries' employees fill out paperwork falsely denying any connection to him or GT Systems. He'd lie about the size of the subsidiaries' payrolls. When the state tried to audit his payrolls or raise his initially low premiums, he'd shuffle the workers into new subsidiaries under new names."

53. Notably, upon information and belief, Goldstein committed this felonious conduct by abusing and manipulating the corporate records of his prior company -- his "umbrella temp agency, GT Systems" – another staffing agency, just like Worldwide.

54. A New York State Insurance Fund (NYSIF) publication for July-September 2010 listed Goldstein's crime as its "Largest Premium Fraud Indictment" on the cover page and contained an article stating that "Manhattan DA Cyrus Vance R. Jr., charged Eric Goldstein, 61, of Manhattan, in a five-count indictment with insurance fraud, forgery, offering a false instrument for filing, and fraudulent practices under the New York Workers' Comp Law on May 17."

55. The NYSIF publication stated that the "charges follow a joint investigation by the DA's Office and NYSIF's Division of Confidential Investigations into Mr. Goldstein's ownership of GT Systems, a company operating 50 temporary placement agencies. Over several years, GT Systems allegedly established one insurance policy after another under different

pseudonyms allowed policies to cancel for non-payment, and misclassified workers to avoid paying premium on more than $400 million in payroll.  DA Vance said that the indictment against Mr. Goldstein represents the largest premium fraud case our office has seen to date."

56.    The January 30, 2013 Restitution/Reparation Order in the criminal matter stated: "Ordered, that the defendant, having been convicted of Attempted Insurance Fraud in the First Degree on November 14, 2013 **[sic; should be 2012]**, in Part 42 before Judge Maxwell Wiley, in Supreme Court, New York County, is hereby directed, pursuant to C.P.L. Section 420.10, ***to pay reparations in the amount of $5,000,000***." (emphasis added).  The Restitution Order required the $5 million to be fully paid to the New York State Insurance Fund by January 2018. *Id.  As stated above,* Plaintiff is unaware at this time how much of Goldstein's  $5 million criminal restitution obligation remains unpaid and outstanding.

57.    Goldstein's transgressions continued.  In the New York State Department of Taxation and Finance's January 2022 report of the most delinquent taxpayers in the State, Goldstein ranked 23rd in the state for delinquency, with 14 separate outstanding liabilities totaling $2,404,499.16 (one of which includes an assessment against a company of his, Personal Touch Inc.).

58.    That website also showed that as of June 29, 2024, Goldstein had 15 outstanding docketed tax warrants against him, for a total of $4,929,447.83 including interest and penalties. Included in these were the identical 14 outstanding liabilities with the same warrant ID referenced above totaling a base tax of $2,404,499.19, before interest and penalties.  Upon information and belief, this confirms that the liabilities listed for Goldstein in the January 2022 report were still open as of June 29, 2024.

59.    The CHRS report also indicates that Goldstein was arrested on February 11,

2000, pleaded guilty in New York Criminal Court (Index No. 2000NY042441) to petit larceny ("PL 155.25 AM Petit Larceny") and was sentenced to a Conditional Discharge (1 year).

60.     Finally, Goldstein has also been assessed five separate tax liens by the Internal Revenue Service, totaling $5,690,768.52.  It is unknown at this time how much of this remains outstanding.

### Patricia Kampel

61.     Kampel was President of Worldwide from 2013 to early January 2022. In that role, she worked closely with Porembski to place employees at Clients and also had access to Worldwide Trade Secrets, including but not limited to Temporary Employee information, Client lists, Client information, invoices, and accounts receivable aging reports.

### Diane Porembski

62.     Porembski was Executive Vice President and Chief of Staff of Worldwide from 2013 to early January 2022. In that role, she worked closely with Kampel to place Temporary Employees at Clients and had access to Worldwide Trade Secrets including but not limited to Temporary Employee information, Client lists, Client information, invoices, and accounts receivable aging reports.

### Jeannine Triolo

63.     Triolo was, from at least 2015 through early January 2022, a high-level employee who also placed Temporary Employees with Clients and worked closely with Wilson. In that role, she had access to Worldwide Trade Secrets including but not limited to Temporary Employee records.

### Tanya Wilson (Wellard)

64.     Wilson was, from at least 2015 through early January 2022, a high-level

employee who also placed Temporary Employees with Clients and worked closely with Triolo. In that role, she had access to Worldwide Trade Secrets including but not limited to Temporary Employee records.

### Valerie West

65.    West was, from 2015 through early January 2022 a Payroll Manager. In that role, she had access to Worldwide Trade Secrets including but not limited to Temporary Employee and Client information because she, like Goldstein, had complete access to Avionté.

### Joseph Lipinski

66.    Lipinski was, from 2013 through early January 2022, an IT consultant who maintained Worldwide's entire IT operation, including but not limited to its computers, server, email domains, company website, and program software packages.  During that time, Lipinski also had access to Worldwide Trade Secrets.

67.    Lipinski was also responsible for purchasing and maintaining all of Worldwide's computer equipment.  On December 2, 2013, Lipinski emailed Goldstein regarding the initial equipment he had purchased on behalf of Worldwide to date, which consisted of four computers. Lipinski subsequently purchased and installed numerous other computers and software programs on behalf of Worldwide from 2014-2018.

## IV.    Worldwide Safeguarded and Protected Its Confidential and Proprietary Information

68.    As stated above, in its operations, Worldwide created, maintained, and used in its business substantial amounts of confidential and proprietary, *i.e.*, the Worldwide Trade Secrets.

69.    As also stated above, all of the Worldwide Trade Secrets were produced and

stored in a software program called Avionté, and/or saved on the Worldwide Server.

70.    Worldwide used Avionté for its billing and payroll.  That software gave Worldwide's senior management secure access and the ability to input data and retrieve company sales reports, Client lists, invoices, accounts receivable aging reports, employee lists, and payroll reports, among a myriad of other items.

71.    While Avionté generated invoices to be sent to its Worldwide's Clients, some Clients had specific formatting preferences for invoices which Worldwide made in Adobe Acrobat.

72.    Worldwide had login credentials for each authorized user of Avionté, and never shared login credentials with anyone outside of Worldwide.

73.    Indeed, the login credentials for Avionté were restricted within Worldwide and not shared with anyone other than Defendants Eric Goldstein and Valerie West, who were the only Worldwide personnel authorized by Worldwide to access Avionté.

74.    During their employment at Worldwide, only West and Goldstein had the login information for Avionté, and were never authorized to -- and to the knowledge of Plaintiffs never did -- share the login information with anyone else during their employment at Worldwide.

75.    Goldstein' ability to log into Avionté enabled him to access all of Worldwide's Trade Secrets for the sole and exclusive purpose of performing his duties as a consultant to of Worldwide while he was performing that role for Worldwide.  Goldstein's Avionté access provided him access to Worldwide's customer lists, customer information, sales reports showing the level of volume of sales with each customer, employee data, payroll, accounts receivable reports, invoices, onboarding information for all Temporary Employees placed at Clients of

Worldwide, among many other Worldwide Trade Secrets.

76.    West had a special level of access to Avionté called "Super Admin Login," which enabled her the same access rights as Goldstein, as well as access to payroll for the office staff and the ability to modify Worldwide's login information for Avionté and to modify or remove user rights and credentials for Goldstein's access.  The office staff information in Avionté was stored in a section called the Admin Branch Payroll, which was separate from the information for Temporary Employees placed at Clients.

77.    The Worldwide Avionté account was first set up by West when she was employed by Worldwide as its payroll manager.  Upon information and belief, West is currently the payroll manager of Defendants Workforce.

78.    Worldwide last executed a contract with Avionté on October 16, 2017.

79.    As part of the software implementation process for Worldwide, Avionté emailed West a special hyperlink to a "Secure Remote Application Gateway" not available to anyone without the secure link.

80.    That link provided access to an "Avionté Application Portal" on which a user created a unique username and password, which after initial setup then allowed the user to connect to the Avionté software via remote connection through the Secure Remote Application Gateway.

81.    Going forward, to access the Worldwide Avionté account online, a user was required to log into his or her Avionté account on the Avionté website, and then choose to connect via the Secure Remote Application Gateway.  A separate dialog box would open on the user's computer screen asking the user to allow permission for remote access.  The user then had to click connect on that screen to enter into the Avionté software application.

**A. Information that Worldwide Obtained From Its Clients Was Confidential Information that Worldwide Was Required to Protect From Unauthorized Disclosure**

82.     To obtain Worldwide's services, each Client was required to execute a Temporary Staffing Agreement ("Temporary Staffing Contract") with terms that included Worldwide's duties, its status as the employer of record for the Temporary Employees, the fees paid by the Client to Worldwide, Worldwide's status as an independent contractor to the Clients, a fee schedule for conversion from a Temporary Employee of Worldwide to a permanent employee of the Client, and the terms under which the Clients could terminate Worldwide's services.

83.     All Temporary Staffing Contracts were signed on behalf of Worldwide by one of the Defendants in their capacities as Worldwide officers, managers, consultants and/or employees.  All Temporary Staffing Contracts included a confidentiality provision (Section 6), which stated that "all data, documents, and information which agency [*i.e.*, Worldwide] has access to, in connection with this Agreement, including the subject matter of this Agreement, shall be conclusively deemed to be confidential information.  Agency agrees and acknowledges that the confidential information be provided to it by Client Company, pursuant to this Agreement, in whatever form, is confidential and proprietary to client company and shall remain client company's sole property."

84.     Section 6 of the Temporary Staffing Contracts further stated that "Agency shall safeguard the Confidential Information to prevent unauthorized disclosure of it to third parties, including those of Agency's Employee's without a need to know."

85.     Thus, Worldwide's Temporary Staffing Contracts with its Clients prohibited Worldwide and its officers, managers, employees, and consultants from unauthorized disclosure

of the confidential Client information that Worldwide obtained to anyone else – including, of course, Workforce, a separate company that was not party to Worldwide's Temporary Staffing Contracts with its Clients.

**B. The Temporary Employees Whom Worldwide Recruited and Provided to Its Clients Were Also Required to Protect the Confidential Client Information They Obtained From Worldwide or Its Clients**

86.     As a further measure to protect its proprietary Client information, Worldwide required each Temporary Employee, before starting work at a Worldwide Client, to sign a Confidentiality Form ("Temporary Employee Confidentiality Agreement") stating that the Temporary Employee would not disclose any information whatsoever about the particular Worldwide Client at which the Temporary Employee was placed, or the nature of the job they were performing there.

87.     Specifically, the Temporary Employee Confidentiality Agreement stated that each Temporary Employee "hereby recognize[s] and accept[s] my responsibilities and duties as an employee of Talenthub Worldwide, with regard to information and knowledge obtained about any temporary client company I am assigned to."  Temporary Employees further agreed that they "completely understand that my duties and responsibilities at the client company, as a Temporary Employee bar me from publishing or disclosing any information and knowledge to others in any form (including but not limited to oral, written, and electronic media), as well as making any other use of such information or knowledge obtained from the client company."

88.     The Temporary Employee Confidentiality Agreement further required each Temporary Employee to "agree not to use, disclose, or discuss any client company confidential information, and not authorize anyone else to use, disclose or discuss such information."

89.     Thus, Temporary Employee Confidentiality Agreement prohibited the

Temporary Employees that Worldwide recruited and hired from unauthorized disclosure of the confidential Client information that Worldwide obtained to anyone else – which, again, included Workforce.

**V.    During Their Employment at Worldwide, Defendants Downloaded Worldwide's Trade Secrets from Avionté Onto their Local Computers, Which Were Secured at Worldwide's Offices**

90.    During their employment at Worldwide, Goldstein and West accessed Avionté to generate reports containing Worldwide's Trade Secrets.  They saved or shared this information onto Worldwide's desktop computers, laptops, and other peripherals, including the computers assigned to Goldstein, Porembski, Kampel, Wilson, Triolo, and West (collectively the "Worldwide Computer Equipment"), all of which was networked to, and stored all of this information on, the Worldwide Server.

91.    For example, Defendants West and Goldstein downloaded sales reports and payroll reports which were saved on their computers and thereby on the secure Worldwide Server.

92.    From the time Worldwide was formed in 2013 throughout the entire time Goldstein was employed at Worldwide (until Goldstein's theft of computer equipment, described below), all of the Worldwide Computer Equipment was always kept securely at Worldwide's office premises.

93.    Plaintiffs never authorized the removal of any of the Worldwide Computer Equipment from its offices.

94.    As far as Plaintiffs are aware, prior to 2021, none of the Worldwide Computer Equipment ever left Worldwide's offices, even temporarily.

95.    From 2013 until 2019, all of the Worldwide Computer Equipment was located at

Worldwide's leased office space at 220 East 42nd Street, Suite 407, New York, New York 10017.

96.     Beginning in 2019, all of the Worldwide Computer Equipment was securely relocated to and kept securely at Worldwide's leased office space on 52 Vanderbilt Avenue, Suite 1410, New York, New York, 10017.

97.     Each of Worldwide's leased office spaces (220 East 42nd Street and 52 Vanderbilt Avenue) had 24-hour building security, restricting access to Worldwide's offices to Worldwide employees with building ID badges or visitors who received Worldwide's specific approval at the lobby security front desk.

98.     Once admitted to the office floors of the building, visitors could only access Worldwide's office suite via a key which unlocked the front door (which remained locked at all times), or by being buzzed in by the front desk secretary during business hours.

99.     Worldwide's Trade Secrets and other data were further secured because each of the Departed Defendants' desktop computers required a Microsoft Windows login to access the computer itself, in addition to separate logins for all software that contained trade secrets and other confidential business information (including Avionté as detailed above).

**VI.    Talenthub Workforce Inc. Is Created**

100.     In May 2021, Gary Glass, Kampel and Porembski formed Talenthub Workforce Inc. -- Workforce -- as a separate company.

101.     Glass was a minority 10% shareholder (holding 20 of Workforce's 200 total outstanding shares) and an officer (Secretary/Treasurer) of Workforce.

102.     Kampel and Porembski each owned 45% of Workforce (holding 90 shares each). Kampel was President and Porembski was Executive Vice President of Workforce.

103.    Workforce was established as a minority/women's owned business that ultimately obtained Minority and Women Owned Business Enterprise (MWBE) certification to service any Clients requesting that the temporary staffing agencies they retained had this certification.

104.    The only existing client that requested MWBE certification at the time Workforce was formed was Client A, which was Worldwide's largest customer.[1]

105.    On May 27, 2021 Worldwide loaned $2,000 into Workforce's newly created Chase bank account.  These funds were paid out of Worldwide's Chase bank account ending in #0690.

106.    On June 24, 2021 and June 25 2021, Worldwide loaned $1,000 each to Porembski and Kampel respectively.  Porembski and Kampel then each contributed these funds into Workforce's Chase bank account on their own behalf.  As a result, Porembski and Kampel owed Worldwide $1,000 each, which they have never repaid to Worldwide.  These funds were paid out of Worldwide's Sterling bank account ending in #3558.

107.    On August 13, 2021 Worldwide loaned Workforce a total of $50,000 into Workforce's Chase bank account (in two separate transactions of $40,000 and $10,000), which Workforce has never repaid to Worldwide.  The funds for the loan of $40,000 were paid out of Worldwide's Sterling bank account ending in #3558.  The funds for the loan of $10,000 were paid out of Worldwide's Chase bank account ending in #0690.

108.    Workforce did not have enough capital to front the costs of its temporary staffing for its Client Client A, because the Client was billed on account and therefore Workforce would not be paid for months.  Therefore, the parties agreed that *Worldwide* would provide and fund

---

[1] Because the identities of this and other Clients are Worldwide Trade Secrets, they are not identified by name herein, but referred to as "Client A" and, below, Clients 1-4.

the salaries and related costs for the Temporary Employees to be placed at Client A, and upon being paid by Client A, Workforce would then reimburse Worldwide for the costs of the funds it fronted in this arrangement.  These costs included all payroll related expenses and any associated overhead for the Temporary Employees placed at Client A.

109.    Porembski and Kampel became employees of Workforce in May 2021, but did not resign from Worldwide

110.    In late November and December 2021, due to irregularities in the Worldwide bank statements that conflicted with Worldwide's accounts receivable aging reports, Glass began to suspect that Defendants were intentionally delaying collections of Worldwide's accounts receivable by telling Worldwide customers not to pay Worldwide at the time due.

111.    As it turned out, that is precisely what Workforce did, so that Defendants could later make misrepresentations to Worldwide's Clients by instructing them to pay to Workforce the money owed to Worldwide on Worldwide's outstanding invoices.

112.    In late November 2021, Glass – despite being a part-owner of Workforce -- was removed as a signer of Workforce's bank account, and therefore lost access to review what was transpiring in the account.

113.    Despite repeated demands from Glass and his counsel during late 2021 and thereafter, Workforce refused to reimburse Worldwide for approximately $2,000,000 in costs it covered for Workforce. These costs included salaries for the Temporary Employees placed at Client A, the associated payroll taxes, unemployment insurance, and all other related overhead expenses.

114.    Given Workforce's refusal to reimburse Glass for the funds Worldwide had advanced for payroll for the Temporary Employees placed at Client A, Glass informed

Workforce that he would have to stop providing such advances.

115.    Absurdly, Defendants demanded that Worldwide continue to cover all payroll costs for Client A, as well as any related overhead costs, endlessly funding the costs for Workforce's operations, receiving nothing in return while Workforce misappropriated Glass's money and company.

116.    At the same time, Workforce refused to give Glass access to any of its books and records or to substantiate any claims regarding the amounts that Workforce admitted they owed Worldwide for the payroll expenses Worldwide had advanced for the salaries for the Temporary Employees placed at Client A.

117.    In January 2022, Goldstein and other Worldwide employees, including longtime Worldwide employees Kampel and Porembski ("Departed Defendants"), abruptly left Worldwide and joined Workforce on a full-time basis.

118.    In their resignation email dated January 6, 2022, Kampel and Porembski specifically stated that they were leaving Worldwide "in order to devote our full-time professional efforts to Talenthub Workforce, Inc."

119.    That same day, on January 6, 2022, Porembski stated in another email to Glass that "while we have resigned from Talenthub Worldwide today and expect that clients from Talenthub Worldwide *will follow* us to Talenthub Workforce, *we want to assure you in writing that your economic interest and Oren's economic interest in the fruits of any such business that does follow us to Workforce will be the same as if that business were conducted at Worldwide. Our move is not motivated at all by a desire to change the economics of the business.*"

120.    Porembski thereby admitted that she and the other Defendants were stealing Worldwide's Clients and taking them to Workforce.  Porembski also, however, promised that

Glass and Oren would still retain 100% of the stolen Clients.  That promise was false.

**VI.    As Defendants Have Admitted in Correspondence and Court Filings, They Have Misappropriated the Worldwide Trade Secrets and Have Used – and Continue to Use -- the Worldwide Trade Secrets to Misappropriate Worldwide's Clients and Fraudulently Deceive Worldwide Clients to Pay Workforce Substantial Fees Owed to Worldwide for Temporary Employee Placements**

**A. Defendants Misappropriated Worldwide Trade Secrets from Worldwide Computer Equipment**

121.    Prior to their departures from Worldwide, each of the Departed Defendants accessed information which constituted Worldwide Trade Secrets. They used this information to steal Worldwide's Clients, have continued to service those Clients, and continue to illegally divert to themselves the fees earned by and owed as accounts receivable to Worldwide.  They achieved this by using both Worldwide's computer equipment -- including the Worldwide Server – that they stole from Worldwide's offices, as well as continuing to access Worldwide's Avionté account without authorization, in violation of the Computer Fraud and Abuse Act.

122.    Defendants' misappropriation of Worldwide's trade secrets is established by, among other evidence, a forensic review of the computer equipment and server that Defendants stole from Worldwide and later returned with information deleted; a review of the history of Defendants' access to the Avionté software; the Defendants' own statements in emails and sworn affidavits submitted in New York State Court; and the Defendants' counsel's own statements in emails and filings in New York State Court.

123.    Workforce obtained Worldwide's confidential trade secrets and proprietary information, including but not limited to Worldwide's Client information, from a computer hard drive and server that Goldstein illegally stole from Worldwide's offices at 52 Vanderbilt Street on or about January 6, 2022, and brought to Workforce's office at 295 Madison Avenue.

124.    Prior to this theft by Goldstein, Worldwide had been careful to protect its trade

secrets and other proprietary information by not allowing its hard drives and servers out of its offices.

125.    In a September 27, 2023 email to Plaintiff's counsel, Workforce's counsel stated:

> While clearing out its offices at 295 Madison Avenue due to the expiration if its lease, Talenthub Workforce Inc. ("Workforce") discovered two pieces of computer equipment belonging to Talenthub Worldwide Inc. in a storage closet located just outside Workforce's rented space. Specifically, a HP ProLiant MicroServer and a Dell OptiPlex 3020 Desktop Computer. The equipment has not been operated for nearly two years, since January 2022. We have sent the equipment to your office via overnight delivery. Please let us know if you have any questions.

126.    The claim that Defendants happened to "discover" the Worldwide Computer Equipment in a storage closet right outside of Workforce's office suite was patently false, because Workforce and Worldwide operated out of separate office spaces.  Worldwide's office space was located at 52 Vanderbilt Street, while Workforce's office space was located at 295 Madison Avenue, a full 0.3 miles away.  Worldwide's Computer Equipment could not have ended up at Workforce's office space unless it was taken there by the defendants.

127.    For nearly two years before the Defendants' September 27, 2023 email, Glass through his prior counsel repeatedly demanded that Workforce return all of the above-referenced computer equipment, and all other property that Workforce stole from Worldwide.  These demands included a letter to Workforce on July 11, 2022 and emails on July 15, 2022, September 2, 2022, and October 3, 2022.

128.    Glass's July 11, 2022 letter specifically advised Workforce that its ongoing conduct gave rise to claims against Workforce for its misappropriation of Worldwide's confidential information and trade secrets, stating:

> [I]mportantly, it has very recently been discovered that a valuable, external hard drive, owned by Worldwide and containing thousands of Worldwide e-mails, documents, financial and customer records -- much of it confidential information and certainly some of it trade secrets -- has been taken from, stolen or otherwise

misappropriated from the former offices of Worldwide. … As is already transparently clear from the investigation, Porembski and Kampel, and Goldstein as well, undoubtedly, misappropriated Worldwide's business model, customer lists, trade secrets, and other confidential and proprietary information [which] gave Porembski and Kampel an advantage over other competitors who do not know, use, or have access to Worldwide's information.

129.    Glass's July 11, 2022 letter also laid out Worldwide's claims against Workforce's for violation of the Computer Fraud & Abuse Act, stating:

Porembski and Kampel resigned their employment from Worldwide on January 6, 2022.  On information and belief, the Worldwide Hard Drive was at the time in the Vanderbilt office.  Moreover, both Porembski and Kampel still have access, use and conduct business through their respective Worldwide e-mail accounts, a system to which Gary has no access, without any legitimate or lawful business need or good reason, except to further damage Worldwide or otherwise unfairly compete and unjustly enrich Workforce.

130.    It was only after Glass initiated a books and records shareholder litigation against Workforce, and two days before a September 29, 2023 initial court hearing in that action, that the Defendants claimed to have suddenly "discovered" and returned two pieces of Worldwide equipment.

131.    Glass discovered that before returning the Worldwide Desktop Dell computer used by Goldstein, one or more of the Defendants removed the hard drive and replaced it with a newly-encrypted one.

132.    In a review of the Dell OptiPlex 3020 Desktop Computer ("Desktop"), it was discovered when the computer was first booted up after its return by Defendants that it was protected by BitLocker encryption, which had never been previously needed or installed.  A computer forensics expert Glass hired has been unable to access the computer, and Defendants have refused to provide the decryption key or any login information for the Dell desktop computer.

133.    Further, a review of the HP ProLiant MicroServer ("Server") has established that

Workforce's claim that "at the time these devices were discovered, the equipment had not been operated on for nearly two years, since January of 2022" is false.

134.    To the contrary, there is substantial evidence that Goldstein and/or other of the Defendants repeatedly accessed the Server and the computers linked to the server after January of 2022. That evidence includes, but is not limited to, the following information discovered by Plaintiff's examination of the computer equipment returned to Plaintiff.

135.    When accessing the Server, Plaintiff encountered a blue screen with a message requesting a recovery key. The drive label was identified as "ERIC-PCTH C:**5/23/2022**".  This indicates that Defendants recently accessed the server, as such a recovery key prompt typically arises due to changes or interactions with the system's security settings or configurations.  Glass did not know the newly recovery key the defendant had set up, but has been able to circumvent it with the help of a forensics computer expert.

136.    Plaintiff also discovered new shortcuts created on the server's Backoffice Folder on August 5, 2022, including two Workforce shortcuts and a third shortcut named "Eric Interfaces."  This creation date is more than seven months after Defendants and Workforce's counsel falsely claimed that Workforce ceased using the server after January 2022 and placed it in a storage closet outside Workforce's office.

137.    In the Share Folder on the server, Plaintiff found sixteen distinct folders containing numerous documents dated post-January 2022. These folders include, but are not limited to:

- Background Checks

- All Candidate Onboarding Paperwork

- CHC Proof of Vaccinations

- Confidentiality Forms

- Direct Deposit

- Disclosure & Release Forms

- Emergency Contact Forms

- Everify

- Fund Vaccinations

- I-9

- Identification

- Miscellaneous Documents

- References

- Resumes

- W-4

- Wage Rate Forms

138.    Each of the above referenced folders contained dozens if not hundreds of Adobe
Acrobat PDF files which were saved in the respective folder with a date after January of 2022,
when both the Defendants and their counsel falsely claimed the server was not used after that
date.

139.    As just one of hundreds of examples of the Defendants' brazen theft of
Worldwide's computer equipment and unauthorized access, Glass found on the server a
Confidentiality Agreement between *Worldwide* and a Temporary Employee ("Temporary
Employee 1"). Temporary Employee 1 executed the agreement in pen on March 23, 2022. This
is nearly two months after Defendants claimed they were not accessing the server, and had
already resigned from Worldwide.

140.    Moreover, after all of the Defendants left Worldwide to join Workforce in January 2022, they accessed Worldwide's Avionté account without authorization.

141.    After Defendants' departure, Glass obtained a new login for the software for his tax practice associate and Worldwide employee Avraham Zago ("Zago").  On October 7, 2022, Zago printed an Accounts Receivable Aging Report for Worldwide.  Despite Goldstein and West falsely stating that they no longer accessed any Worldwide software or equipment after January of 2022, the accounts receivable aging report shows entries for payments against existing invoices in February and March 2022.  Zago also noted that the Worldwide Admin Payroll Branch for its office staff had been deleted from Avionté.

142.    While Worldwide kept all of its Client contracts in digital form on its server, Worldwide no longer has access to them because Defendants misappropriated them and have refused to return them. Defendants also stole the final executed hard copies kept in Worldwide's office.

143.    Plaintiff has also discovered evidence that all of Worldwide's contracts with its Clients (as well as other critical files) have been deleted from the Server returned by Workforce.

144.    A screenshot that Plaintiff received in an email from West on June 1, 2018, showed a subfolder in the server's folder entitled "share" named "Client Contracts" in the server's share folder:



145.    But upon examination of the returned computers, in or around May 2024,
Plaintiff discovered that the Client Contracts subfolder, along with other files, is no longer
present. Yet as shown in the following screenshot, the subfolder "Client Cards," which appeared
in the same June 1, 2018 screenshot immediately preceding the Client Contracts folder that had
originally been there, is still on the Server:



146.    The Defendants deleted all of Worldwide contracts with its Clients before returning the computer equipment, after, upon information and belief, improperly and without authorization copying those contracts to convert to their own use.

147.    As Worldwide continued to demand that Workforce return its stolen property, Defendants suddenly "discovered" new items.

148.    On March 15, 2024, Workforce's counsel wrote to Worldwide regarding even more stolen computer equipment.

149.    Workforce now for the first time claimed that "Workforce has also determined that, despite its clear instructions to the contrary, one of its employees, West, never returned her Worldwide-issued laptop.  However, West never used that laptop following her resignation from Worldwide in January of 2022, as West was given a new Workforce-owned laptop to use for her Workforce assignments when she left Worldwide."

150.    A review of West's stolen returned laptop ("West Laptop") made clear that Defendants' repeated claim not to have used this device after January of 2022 was, again, false.

151.    The West Laptop shows that on August 2, 2023 and August 4, 2023, there were

numerous downloads of a software application named SplashtopSOS.  SplashtopSOS is a software application that facilitates remote computer connections.  It allows one computer or mobile device to remotely access another computer or mobile device.   Furthermore, after Glass's computer forensics expert ran software to retrieve deleted files from the laptop, it returned a handful of results of deleted or overwritten files with a date post January 2022.

152.    The above-detailed evidence collectively demonstrates that Defendants continued to access and manipulate Plaintiff's server and desktop computers well beyond January 2022, contradicting their previous claims. This unauthorized access included creating shortcuts, altering folders, and deleting critical files such as client contracts, thereby substantiating Defendants' misconduct including violations of the Computer Fraud and Abuse Act.

153.    Moreover, this evidence demonstrates that Workforce obtained Worldwide's proprietary information from the Desktop and Server, the West Laptop, and other computer equipment, and that Workforce continues to illegally retain additional misappropriated computer equipment and data belonging to Worldwide.

154.    Thus, the extent of Defendants' theft of Worldwide's computer equipment, unauthorized access thereto, and deletion of Worldwide's Trade Secrets and other proprietary information remains unknown and is under investigation, because Defendants continue to refuse to return other Worldwide stolen property that, upon information and belief, they continue to possess, or to provide the BitLocker password for Goldstein's Desktop.

155.    The Defendants have also repeatedly and without authorization used their Worldwide email addresses throughout 2022 (and possibly beyond) – after departing Worldwide for Workforce -- to communicate with Worldwide Clients concerning billing and other matters.

For instance, on October 21, 2022 (nearly nine months after the Defendants resigned from Worldwide), the accounting department at one of Worldwide's Clients (referred to as "Client 4" *infra*), emailed West at her *Worldwide* email address asking her what invoices were outstanding. The customer emailed West because he had been contacted by C2C Resources Inc., the collections agency hired by Glass to collect outstanding receivables on behalf of Worldwide, about outstanding invoices for Worldwide.

156. Upon information and belief, Lipinski and his company J Computer Pro enabled and assisted Workforce to commit its theft of Worldwide Trade Secrets, by conduct including but not limited to setting up the stolen Worldwide Server containing Worldwide Trade Secrets at Workforce's offices and transferring  other Worldwide Trade Secrets and proprietary data contained on other Worldwide computer equipment, all of which Lipinski and his company J Computer Pro had initially set up for Worldwide.

157. Additionally, upon information and belief, Lipinski possesses the login information necessary to access Worldwide's Microsoft Office email server and accounts.  Since leaving Worldwide, Lipinski has improperly denied Worldwide's officers and employees access to the Worldwide email server and accounts since March 2022, ignoring Plaintiff's repeated demands for such access, while continuing to provide Defendants with unauthorized access to Worldwide Trade Secrets.

158. Moreover, upon information and belief, Lipinski and his company J Computer Pro further enabled and assisted Workforce to steal Worldwide's Clients by setting up a website for Workforce that was nearly identical to the one Lipinski setup for Worldwide.   Upon information and belief, Lipinski and/or his company J Computer Pro -- which set up the Worldwide website -- bought a website domain for Workforce on October 5, 2021, and first set

up Workforce's website on December 25, 2021.  Lipinski  stopped maintaining Worldwide's

website the next day, December 26, 2021.

159.    Lipinski and his company are performing at Workforce the same role they played

at Worldwide, purchasing and setting up all computer equipment.  Workforce's counsel March

15, 2024 letter attached as an exhibit pages of Lipinski's computer purchases for Workforce

showing Lipinski himself as the purchaser of each of the items.

### B.  Workforce Steals Worldwide's Clients and Accounts Receivable, and Admits Doing So

160.    Upon information and belief, in or around late November or December 2021,

Workforce began misappropriating clients from Worldwide, including by instructing

Worldwide's customers to send payment for Worldwide's outstanding invoices (Worldwide's

"Accounts Receivable, or Receivables") to Workforce (including payment on invoices for work

performed by Worldwide before Workforce even existed).  However, as set forth in further detail

below, to conceal its theft of Worldwide's receivables, Workforce instructed these Clients of

Worldwide not to pay Worldwide's invoices until after an extended period of time had elapsed,

at which point Defendants instructed the Clients to pay Workforce rather than Worldwide.

161.    Since departing Worldwide, the Defendants have illegally diverted to themselves

fees owed to Worldwide as accounts receivable, including for the following Clients.

### 1.  Client 1

162.    On October 13, 2023, an employee of Worldwide Client 1 emailed Corey

McGowan of C2C Resources (the collections agency hired by Glass to collect outstanding

receivables on behalf of Worldwide), confirming that all payments were made to the bank

account "USBankAP150097136561."

163.    On October 16, 2023, Corey McGowan replied to the Client 1 employee,

confirming that the account information provided did not belong to Worldwide. Upon information and belief, the US Bank account in question belonged to the defendant, Talenthub Workforce Inc.

164.    On October 17, 2023, the same Client 1 employee sent an email to Corey McGowan, which included a screenshot of a payment of $14,551.13 made on September 28, 2023, covering three invoices. Two of these invoices, totaling $12,768.75, corresponded to invoices from Talenthub Worldwide as shown on its accounts receivable aging report, with the same invoice numbers and amounts. The screenshot emailed by the Client 1 employee displayed the account "USBankAP150097136561" under the name Talenthub Worldwide, which is actually a bank account belonging to Workforce.

165.    The two original invoices in question, issued by Worldwide in October 2021, clearly indicated they were payable to Worldwide, as they were on Worldwide letterhead and explicitly stated payment was due to Talenthub Worldwide Inc. Additionally, Client 1 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

166.    These October 2021 invoices specified at the bottom that they were "due within 30 days of receipt". Despite this, to facilitate its theft of money owed to Worldwide, Workforce delayed Client 1's payment of these invoices due to Worldwide. Workforce did so by waiting until nearly 11 months after the first invoices were issued – *i.e.*, until September 28, 2023 -- to request payment from Worldwide's Client 1 – to itself, rather than to Worldwide.  As set forth below, Workforce used this same modus operandi to divert Worldwide's account receivables to itself, instructing Worldwide's customers to delay payment to Worldwide, only to redirect it later to Workforce.

167.    On November 7, 2023, the Client 1 employee emailed Oren Glass of Worldwide,

seeking confirmation of the bank account information listed in a supplier profile form and noting that payment had been deposited into the listed account.

168.    The supplier profile form attached to the November 7 email was signed by Eric Goldstein as "CEO" of Talenthub Worldwide on December 2, 2021.  But Goldstein never held the position of CEO at Worldwide. The form Goldstein filled out and submitted on behalf of Worldwide to Client 1 correctly listed the Sterling Bank account of Talenthub Worldwide for payment of invoices. However, the payment was ultimately deposited into *Workforce*'s US Bank account instead.

169.    Contrary to the information in the November 7 email, Client 1 made the payment to the US Bank account ending in 6561, belonging to Workforce, rather than to Worldwide's Sterling Bank account. The Client 1 employee had previously confirmed this payment destination in the emails dated October 13 and October 17, 2023. This demonstrates Workforce's tactic of instructing Worldwide's customers to pay Workforce for work performed and invoiced by Worldwide.

### 2.  Client 2

170.    On January 19, 2022, Talenthub Workforce's Chase bank account ending in #2152 received a deposit of $2,891 from Client 2.

171.    This receivable belonged to Worldwide, as shown on Worldwide's Accounts Receivable aging report, corresponding to invoice #1033447 for $2,891.

172.    The original invoice clearly showed it was payable to Worldwide, as it is on Worldwide letterhead, and at the bottom, it indicated payment was due to Talenthub Worldwide Inc.  Additionally, Client 2 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

### 3. Client 3

173.    On May 5, 2022, West, the payroll manager of Workforce and former payroll manager of Worldwide, emailed an employee at another Client of Worldwide, Client 2, instructing that payments should be made payable to Talenthub Workforce, Inc. via ACH to Chase Bank. West stated that attached to her email were invoice statements from 2021 to 2022. The email chain includes communications between the Client 2 employee and various Workforce personnel, all of whom were formerly employed by Worldwide. In a May 6, 2022, email to Goldstein, Wilson, and Triolo (all employed by Workforce and formerly employed by Worldwide), West used Wilson's and Triolo's Worldwide email addresses, despite their resignations from Worldwide four months prior.

174.    On June 1, 2022, Triolo from Workforce emailed another Client 2 employee requesting payment due for more than five months of outstanding billing. Again, as with the other Worldwide receivables stolen by Workforce, there was a significant time gap between the issuance of the invoice and Workforce's subsequent illegal collection of the payment.

175.    As a result of communication between C2C Resources (which was engaged to collect Worldwide's receivables) and Client 2, on November 2, 2022, Client 2's Finance Department emailed Lorri Clark of C2C Resources a comprehensive payment history. The schedule detailed payments, including invoice numbers, dates, amounts, payment dates, notes, bank account numbers, and bank names.

176.    The schedule showed numerous payments made to the correct Sterling bank account ending in 3558, belonging to Talenthub Worldwide. However, it also revealed 14 payments made to a JP Morgan Chase bank account ending in 2152 belonging to *Workforce*. These 14 invoices were for work performed by *Worldwide*, as shown on Worldwide's accounts

receivable aging report and printed invoices.

177.    Notably, two payments for Worldwide invoices dated April 9, 2021 were made to Workforce's Chase account.  But Workforce was not formed until May 25, 2021. In other words, Workforce was collecting Worldwide's receivables for work performed before Workforce even existed as a company.

178.    The original invoices show they were payable to Worldwide, as they are on Worldwide letterhead and at the bottom indicate payment is due to Talenthub Worldwide Inc. Additionally, Client 2 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

179.    The original invoices from Worldwide also indicate at the bottom that they are due "within 30 days of receipt". But as it did with respect to other Worldwide Clients, to facilitate its theft of money owed to Worldwide, Workforce delayed Client 2's payment of these invoices due to Worldwide. Workforce did so by waiting until nearly 15 months after the first invoices were issued to request payment from Worldwide's Client 2 – to itself, rather than to Worldwide.

180.    On November 9, 2022, another employee at Client 2 emailed Lorri Clark (at collection agency C2C Resources), stating that Client 2 had been "informed by the newly formed Talenthub team of a change in bank account details."  This Client 2 employee also stated "I also mentioned this right from the outset and shared these emails with you from the Talenthub team informing us of the change in details."  The "newly formed Talenthub team" to which the Client 2 employee referred was Talenthub Workforce, and the Client 2 employee was referring to the above-referenced May 5, 2022 email in which Defendant West instructed the other Client 2 employee to make all payments for outstanding invoices to Workforce's Chase Bank Account.

181.    This documentary evidence establishes that Workforce was purposely instructing yet another a Worldwide Client to redirect payment for Worldwide's invoices to Workforce.

### 4.  Client 4

182.    On October 20, 2022, Ken Gaddy at C2C Collections Resources sent to another Worldwide Client, Client 4, a collections notice for outstanding receivables owed to Worldwide.

183.    On October 26, 2022, the Client 4 accounting team responded to Gaddy, stating, "that is impossible that we owe because I had an exchange back with Valerie in July [2022] back dating to October or November of last year [i.e., 2021]."

184.    Workforce did not perform any work for Client 4 during the referenced period (October or November of 2021) – only Worldwide did.  Thus, Workforce had no basis to attempt to collect receivables owed to Worldwide from that time frame. The Client 4 accounting team copied Defendant Wilson on the email, using her Worldwide email address despite her having resigned from Worldwide over nine months earlier.

185.    On October 26, 2022, Goldstein emailed an employee at Client 4 stating "Talenthub Workforce Inc is a separate and distinct corporation from Talenthub Worldwide Inc with different ownership. Workforce commenced business with [Client 4] in January 2022." Goldstein's express admission establishes that Workforce was collecting receivables on invoices predating the start of Workforce's business relationship with Client 4 in January 2022.

186.    On October 26, 2022, the Client 4 employee emailed Wilson and Triolo about the matter, addressing Triolo at her Worldwide email address.

187.    As shown in the accounts receivable aging report for Worldwide Inc., there were three Client 4 invoices for 2021, totaling $5,747.

188.    The original invoices show they were payable to Worldwide, as they are on

Worldwide letterhead and at the bottom expressly indicate payment is due to Talenthub Worldwide Inc. Additionally, Client 4 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

189.    All three invoices also state at the bottom that they are "due within 30 days of receipt."  But again, as it did with respect to other Worldwide Clients, to facilitate its theft of money owed to Worldwide, Workforce delayed Client 4's payment of these invoices due to Worldwide. Workforce did so by waiting until more than seven months after the invoices were issued to request payment from Worldwide's Client – again, to itself rather than to Worldwide.

**Other Unknown Worldwide Clients**

190.    In addition to the foregoing Worldwide Clients whose accounts receivables Defendants misappropriated by diverting them to Workforce, upon information and belief there are multiple other Worldwide Clients whose accounts receivables Defendants have also misappropriated by diverting them to Workforce.  But Workforce has prevented Worldwide from being able to investigate and pursue collection efforts for these amounts owed to Worldwide by these other Worldwide Clients because Workforce stole Worldwide's critical data including its Client contact information.

**Additional Evidence Establishes Defendants' Misappropriation**

191.    Beyond the foregoing extensive evidence of Defendants' misappropriation of Worldwide's clients, review of the returned Server has revealed numerous confidentiality forms signed by *Worldwide* Temporary Employees, which were executed during 2021 through at least January 2022 (with a few even after that date, extending into March 2022).   Not one confidentiality form was executed with *Workforce* until January 2022 (other than with the employees placed at Client A).  This, along with other evidence, demonstrates that Worldwide's

Clients continued throughout 2021 to understand themselves to have retained and to still be serviced by Worldwide.  All contracts executed with Clients in 2021 were with Worldwide, not Workforce.  As stated above, Defendants stole and deleted those contracts from Worldwide Computer Equipment.  Additionally, all invoices for these clients are on Worldwide, not Workforce, letterhead.

192.    Both the West Laptop and the Server that Defendants stole contained thousands of invoices, spanning many years.  Notably, of the invoices issued in 2021, only the ones addressed to Client A were on Workforce letterhead, while all invoices for customers other than Client A were on *Worldwide* letterhead.

193.    Additionally, all invoices addressed to Worldwide's Clients contained at the bottom written payment instructions stating: "**Please remit to Talenthub Worldwide,** 52 Vanderbilt Street, Suite 1410, New York, NY 10017."  (Many of these invoices also included a supporting timesheet of the Temporary Employees' hours worked at the Client, also on *Worldwide* letterhead.

194.    These payment instructions demonstrate that it is false, as Workforce has claimed (and detailed below), that Worldwide Clients "mistakenly" paid Worldwide invoices to Workforce due to an "inadvertent mix-up" of the company names.

195.    In an email to Glass on January 7, 2022, Defendant Porembski admitted that through that date, it was Worldwide – not Workforce -- that had funded the expenses to service Client A's temporary staffing, stating: "we will back to you by the end of the day today with a concrete payment plan **to repay Worldwide all the moneys previously *advanced* to Workforce**" (emphasis added).

196.    What Porembski meant by "moneys previously advanced to Workforce" was

money that Worldwide had advanced *on behalf of* Workforce.  This is confirmed by Porembski's later email to Glass the same day (January 7, 2022), in which she stated "We calculate the amount **of payroll advanced and owed to Talenthub Worldwide** on the payments received by Workforce as $1,149,430.52."  The "advanced" payments to which Porembski referred was the revenue collected on invoices to Client A (although Porembski provided no backup to this amount, which was intentionally severely understated).

197.    In other words, in this January 7, 2022 email, Workforce admitted and acknowledged that Worldwide had, on behalf of Workforce, advanced payroll and other expenses to Client A, money which Workforce was obliged to pay back to Worldwide.  This obligation by Workforce to Worldwide had nothing to do with *Workforce's wholly separate theft of Worldwide's account receivables – i.e.*, money owed to Worldwide for invoices issued by Worldwide to Worldwide Clients other than Client A for which Worldwide had not yet been paid.

198.    But after Worldwide and Glass initiated shareholder litigation against Workforce in July 2023 and raised Workforce's wholly separate theft of Worldwide's account receivables, Workforce suddenly claimed – falsely -- that Workforce's repayment of Client A expenses was in fact Workforce repaying these separate stolen Worldwide account receivables.  But in making this claim, Workforce admitted it had stolen the Worldwide account receivables.

199.    Thus, in a September 12, 2023 affidavit, Defendant Porembski stated "TW (Workforce) has already repaid to Worldwide ***funds received on Worldwide's behalf***" (emphasis added).  The funds Workforce had repaid Worldwide were not "funds received [by Workforce] on Worldwide's behalf" – they were funds Worldwide had advanced to a Client on behalf of Workforce.  But Porembski admitted that Workforce had "received" "funds" "on

Worldwide's behalf" – *i.e.*, Worldwide's account receivables.

200.    Then, in a January 12, 2024 court filing, Workforce confirmed its diversion to itself of Worldwide's account receivables, falsely claiming that "Workforce long ago acknowledged that it had inadvertently received monies from clients that were owed to Worldwide- owing to the parties' prior affiliation and near-identical names."

201.    As shown above, there was nothing "inadvertent" about how Workforce wound up receiving payment from Worldwide's Clients on Worldwide invoices which were on Worldwide letterhead and which explicitly directed payment to Worldwide – including payments from Worldwide Clients who routinely paid their invoices to Worldwide via wire transfer to Worldwide's Sterling bank account, with an account number the Clients knew for years.

202.    Worldwide's Clients did not "inadvertently" send payment to a completely different bank account belonging to Workforce – rather, they were explicitly told to do so by Workforce.

**Goldstein Steals Cash from Worldwide to Pay his Personal Rent**

203.    In addition to the misconduct described above, soon after disputes arose between Goldstein and Gary Glass in 2021, Goldstein began embezzling money – a total of almost $19,000 -- from Worldwide, by writing checks from Worldwide's bank account -- without the knowledge or consent of its sole owners Gary and Oren Glass – to pay Goldstein's personal rent.  Goldstein continued this misconduct for months even after he claims he thought was fired from Worldwide in November 2021.

204.    Specifically, on or around January 5, 2022 – more than two months after Goldstein claims he thought he was fired from Worldwide in November 2021 -- Goldstein,

without authorization from Worldwide, wrote a check from Worldwide's Sterling bank account for $2,700, payable to Contor Assoc. & 78th Street Associates, for the rent of his personal residence at 1125 Lexington Avenue, Apartment 5B, New York, NY 10075 (January 2022 Sterling bank statement, Check #3470).

205.    This was not the first instance of Goldstein's illegal use of Worldwide's bank account to pay his personal rent.  Goldstein also made the following payments for his personal rent from Worldwide's bank account:

- June 2, 2021 - $2,700 (June 2021 Sterling bank statement, Check #3283).
- August 3, 2021 - $2,700 (August 2021 Sterling bank statement, Check #3335).
- September 9, 2021 - $2,700 (September 2021 Sterling bank statement, Check #3351).
- October 5, 2021 - $2,700 (October 2021 Sterling bank statement, Check #3380).
- November 3, 2021, and November 30, 2021 - $5,400 (November 2021 Sterling bank statement, Checks #3401 & #3428).

## CLAIMS FOR RELIEF

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES
(Against All Defendants)

206.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

207.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate foreign commerce." 18 U.S.C. § 1836.

208.    Under the DTSA, "trade secret" means

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program

devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

209.    Under the DTSA, "misappropriation" means

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

210.    Under the DTSA, "improper means" … "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

211.    By engaging in the above conduct, Workforce and the Departed Defendants have misappropriated Worldwide's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce in violation of the DTSA.

212.    This information was used in connection with Worldwide's services, which are

offered in New York and throughout the country.

213.    By virtue of their employment by Worldwide, each of the Departed Defendants was given access to and possessed Worldwide's Confidential Information, which includes trade secrets of Worldwide such as, inter alia, Worldwide's business model, Client lists; lists of the Temporary Employees that Worldwide recruited and provided to Clients (which included the employees' personal confidential information such as social security numbers and addresses); sales reports; accounts receivable aging reports; weekly, quarterly, annual payroll reports, and other confidential and proprietary financial and other information (collectively the "Worldwide Trade Secrets").

214.    By virtue of his employment by Worldwide, Goldstein was given access to and possessed Worldwide's Trade Secrets.

215.    Worldwide's Trade Secrets were developed and maintained by Worldwide over a course of years at great time, effort and expense to Worldwide, and were at all relevant times maintained on password-protected networks accessible only by certain Worldwide employees and consultants with need to use such trade secrets on the company's behalf and for its benefit.

216.    In addition, as set forth in detail above, Worldwide has taken reasonable measures to maintain the secrecy of Worldwide's Trade Secrets.

217.    Defendants misappropriated Worldwide's Trade Secrets without Worldwide's consent.

218.    In particular, upon information and belief, each of the Departed Defendants accessed and either made digital copies of or emailed to themselves information which constituted Worldwide Trade Secrets, which they used to steal Worldwide's Clients and have retained and continued to use to service those Clients and to illegally divert to themselves the

fees earned by and owed as accounts receivable to Worldwide.

219.    The Departed Defendants had no right to retain or use any of Worldwide's Trade Secrets or other confidential and proprietary information after resigning from employment with Worldwide.

220.    Worldwide did not consent to Workforce's use of Worldwide's Trade Secrets. At no point did Worldwide give any of the Departed Defendants permission to download or take Worldwide's Trade Secrets or any confidential information, transfer them to external storage devices, or email the information to personal email addresses. The Departed Defendants knew or should have known that the information they retained upon their departure contained trade secrets belonging to Worldwide.

221.    Workforce directed, participated in, and/or benefited from the misappropriation of Worldwide's Trade Secrets. Upon information and belief, Worldwide's confidential Trade Secrets is now in Workforce's possession and on Workforce's systems and Defendants are retaining the misappropriated information to compete with and otherwise harm Worldwide.

222.    Worldwide's Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

223.    Defendants can obtain economic value for the disclosure and use of Worldwide's Trade Secrets, for example, by avoiding the years, and millions of dollars in investment, that it took Worldwide to develop the trade secrets, and to convert Worldwide Clients and employees to Workforce for their own financial gain.

224.    Workforce knew or should have known that Worldwide's Trade Secrets, (1) are

confidential; (2) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (3) were developed or acquired by Worldwide at great time, effort and expense; (4) were maintained as confidential and are not generally available to the public and Worldwide's competitors; (5) would provide significant benefit to a competitor seeking to compete with Worldwide; and (6) are critical to Worldwide's ability to conduct its business successfully.

225.    Workforce will be or is unjustly enriched by its misappropriation of Worldwide's Trade Secrets, including its trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Worldwide's Trade Secrets.

226.    Workforce's misappropriation has been willful and malicious.

227.    Unless enjoined, Defendants will continue to use Worldwide's trade secret information to unfairly compete and Worldwide will continue to suffer irreparable harm.

228.    As a direct and proximate result of Workforce's misappropriation of Worldwide's Trade Secrets, Worldwide has been and will continue to be threatened with loss of business expectancies, clients, employees, its trade secrets and goodwill and otherwise continue to suffer irreparable harm, injury, and loss that cannot be remedied through monetary damages.

229.    Worldwide also is entitled to a seizure order providing for the seizure from Workforce of Worldwide's Trade Secrets, insofar as necessary to prevent Workforce's propagation or dissemination of them.

230.    In addition, as a result of Workforce's conduct, Worldwide has suffered direct and consequential damages, and is entitled to recover actual, incidental, compensatory and punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

**COUNT II - INJUNCTIVE RELIEF UNDER THE DTSA (18 U.S.C. § 1836, ET SEQ.)**
**(Against All Defendants)**

231.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

232.    Plaintiffs operate their business in interstate commerce, and the trade secrets misappropriated by Defendants are related to, and intended for use in, interstate commerce.

233.    As set forth above, Defendants improperly acquired the Worldwide's Trade Secrets, including information regarding Plaintiffs' business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except Worldwide employees and consultants who had a duty to keep this information confidential.

234.    The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

235.    The misappropriated documents concern Plaintiffs' operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

236.    Furthermore, Plaintiffs have taken reasonable measures to keep such information secret by, among other things, limiting those employees and consultants with access to the confidential information.

237.    The trade secrets misappropriated by Defendants include trade secrets which required substantial resources, time and investment by Plaintiffs to create and/or develop, and

derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as Plaintiffs' competitors.

238.    Defendants' misappropriation of Plaintiffs' trade secrets has caused Plaintiff Worldwide to suffer harm, including but not limited to the loss of clients, loss of reputation and client goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

239.    This harm cannot be adequately remedied at law and requires permanent injunctive relief.   Plaintiffs will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation of Plaintiffs' trade secrets and failure to return Plaintiffs' documents containing Trade Secrets, has caused and will continue to cause Plaintiffs loss of clients, clients, accounts and/or market share.

240.    This imminent injury is neither remote nor speculative, because Plaintiffs have already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

241.    Defendants will not suffer harm from the rightful return of Plaintiff's proprietary information and trade secrets, and will not be prevented from conducting their ordinary business by lawful means.

242.    Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiff's expense. The ongoing, continuing and future harm to Plaintiff cannot be adequately remedied at law and requires permanent injunctive relief.

243.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiffs' Trade Secrets.

244.    Accordingly, Plaintiffs are entitled to an injunction, pursuant to 18 U.S.C.

1836(b)(3)(A), enjoining Defendants from continuing to use Plaintiffs' trade secrets, in order to prevent continued actual and threatened misappropriation of Plaintiffs' trade secrets, and requiring Defendants to return and/or destroy the trade secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

### COUNT III – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
### (All Defendants)

245.    Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

246.    Defendants' actions, as set forth herein, constitutes misappropriation under New York law.

247.    Defendants currently possess information belonging to and used in the operation of Worldwide's business, which information constitutes confidential, proprietary and trade secret information under New York law.

248.    Workforce is and was a direct competitor of Worldwide.

249.    Goldstein and each of the Departed Defendants had access to Worldwide's Confidential Information (employee's social security numbers, Covid Vaccination Cards, employee direct deposit information, and payroll information) as a result of their employment at Worldwide.

250.    As set forth in detail above, Worldwide has taken reasonable measures to maintain the secrecy of Worldwide's Confidential Information, including its trade secrets.

251.    Goldstein and each of the Departed Defendants has provided Worldwide's Confidential Information to Workforce.

252.    Workforce has misappropriated Worldwide's Confidential Information and is using it to compete with Worldwide.

253. The improperly retained information constitute trade secrets and Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure Worldwide's business.

254. As a direct and proximate result of Workforce's misappropriation of Worldwide's Confidential Information, Worldwide has suffered: (a) the loss of business expectancies, clients, employees and goodwill; (b) Workforce's use of Worldwide's Client lists and information to profit off the back of Worldwide's years of hard work; and (c) will otherwise be substantially and irreparably harmed unless Workforce is enjoined and restrained by order of the Court.

255. Unless restrained by this Court, Workforce will cause further irreparable harm to Worldwide.

## COUNT IV – UNFAIR COMPETITION
### (All Defendants)

256. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

257. Through Defendants' misappropriation of Plaintiff's confidential trade secrets, Defendants have stolen Clients from Worldwide.

258. As a result of Defendants' use of the trade secrets they obtained a competitive advantage against Plaintiff, and as such, Defendants have caused economic damages to Worldwide along with diminishing its goodwill.

## COUNT V - BREACH OF FIDUCIARY DUTY
### (All Departed Defendants)

259. Plaintiff incorporates by reference each of the foregoing allegations as though

fully set forth herein.

260.    Each of the Departed Defendants was either an officer, high-level employee, or consultant of Worldwide who occupied a position of trust and confidence in which he or she was entrusted with access to Worldwide Trade Secrets.

261.    As such, each of the Departed Defendants owed Worldwide a fiduciary duty of loyalty and honesty.

262.    By virtue of these duties, each of the Departed Defendants was prohibited from acting in a disloyal manner, or in any way inconsistent with that fiduciary relationship.

263.    Each of the Departed Defendants' aforementioned conduct of stealing Plaintiffs' Clients and accounts receivable utilizing the confidential information they learned of through employment with Worldwide, while they worked for Plaintiff using Plaintiff's confidential information, constitutes a breach of their fiduciary duties owed to Plaintiff.

264.    As a consequence of each of the Departed Defendants' foregoing intentional breach of their fiduciary duties to Plaintiff, Plaintiff has been injured, for which it is entitled to recover damages including – but not limited to – financial loss, loss of good will and reputation, compensatory and special damages, interest, and punitive damages in an amount as the proof at a trial may warrant.

### COUNT VI -BREACH OF FIDUCIARY DUTY
### (Violation of Faithless Servant Doctrine – All Departed Defendants)

265.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

266.    Each of the Departed Defendants was either an officer, high-level employee, or consultant of Worldwide who occupied a position of trust and confidence in which he or she was entrusted with access to Worldwide Trade Secrets.

267.    As such, each of the Departed Defendants owed Worldwide a fiduciary duty of loyalty, honesty, and fidelity.

268.    By virtue of these duties, the Departed Defendants were prohibited from acting in a disloyal manner or in any way inconsistent with that trust relationship.

269.    Pursuant to the faithless servant doctrine, the Departed Defendants were obligated to be loyal to Plaintiff and were prohibited from acting in a manner inconsistent with their agency or trust and was bound to exercise the utmost good faith and loyalty in the performance of their duties.

270.    The Departed Defendants' aforementioned conduct of misappropriating Plaintiff's Clients and fees earned by Worldwide and owed to Worldwide as accounts receivable utilizing the confidential information they learned of through employment with Worldwide, while they worked for Plaintiff using Plaintiff's confidential information constitutes a breach of the fiduciary duty owed to Plaintiff.

271.    The Departed Defendants' activity was related to the performance of each of their duties.

272.    The Departed Defendants' disloyalty permeated their services in its most material and substantial part.

273.    As a consequence of the Departed Defendants' conduct, which constitutes a cause of action pursuant to the faithless servant doctrine, Plaintiff has been injured, for which it is entitled to recover damages including but not limited to the return of wages, bonuses and other compensation paid to the Departed Defendants such that they are disgorged, financial loss, loss of good will and reputation, compensatory and special damages, interest, and punitive damages in an amount as the proof at a trial may warrant.

**COUNT VII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against all Defendants Except Kampel, Porembski and West)**

274.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

275.    Kampel, Porembski and West were each officers of Worldwide ("Worldwide Officers").

276.    Kampel, Porembski and West each owed Worldwide a fiduciary duty both during and after their employment not to use Worldwide's confidential information and trade secrets other than for purposes of Worldwide's business.

277.    Workforce and each of the Departed Defendants knew that Kampel, Porembski and West had been employed by and were officers of Worldwide and therefore owed Worldwide a fiduciary duty, and further knew that in disclosing Worldwide's confidential information and trade secrets to Workforce, Kampel, Porembski and West were breaching that duty.

278.    Workforce and each of the Departed Defendants substantially assisted the breaches by Kampel, Porembski and West of their fiduciary duties to Worldwide, among other things, inducing, encouraging, requesting, incentivizing and causing them to provide Workforce with confidential information and trade secrets of Worldwide for Workforce to use in its business and to compete with Worldwide.

279.    As a direct and proximate result of the Worldwide Officers' and Workforce's breach and each of the Departed Defendants' aiding and abetting thereof, Worldwide has been damaged in an amount to be determined at trial.

**COUNT VIII - UNJUST ENRICHMENT**
**(All Defendants)**

280.    Plaintiff incorporates by reference each of the foregoing allegations as though

fully set forth herein.

281.    Plaintiff Worldwide has invested substantial time, money, and effort into developing and maintaining its confidential information and Worldwide Trade Secrets over the course of a decade building a successful staffing business, including its Client and Temporary Employee lists and information databases, pricing and cost data, as well as Worldwide's Clients' preferences.

282.    Defendants have used and continue to use Plaintiff's confidential information to compete with Plaintiff and funnel Plaintiff's business opportunities away from Plaintiff to Defendants.

283.    As a result of Defendants' use of Plaintiff's confidential information and trade secrets, Defendants have all been enriched at Plaintiff's expense by, among other things, receiving substantial revenues from sales of services that compete with Plaintiff's services without bearing the expense and risk of identifying the services and developing the clients, Temporary Employees, marketing plans, and materials necessary to achieve the sales.

284.    As a consequence of Defendants' acts to steal Clients of Worldwide, Plaintiff has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

285.    Moreover, as Workforce admitted and acknowledged in a January 7, 2022 email, Worldwide had, on behalf of Workforce, advanced payroll and other expenses to Client A, money which Workforce was obliged to pay back to Worldwide.

286.    As stated above, Workforce did not have enough capital to front the costs of its

temporary staffing for its Client Client A, because the Client was billed on account and therefore Workforce would not be paid for months. Therefore, the parties agreed that *Worldwide* would provide and fund the salaries and related costs for the Temporary Employees to be placed at Client A, and upon being paid by Client A, Workforce would then reimburse Worldwide for the costs of the funds it fronted in this arrangement. These costs included all payroll related expenses and any associated overhead for the Temporary Employees placed at Client A.

287.    Workforce has failed to repay Worldwide all of the money that Worldwide advanced to Client A, and refused Worldwide's demands to do so.

288.    As a consequence of Defendants' failure to repay Worldwide all of the money that Worldwide advanced to Client A, Plaintiff has been further injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

289.    Furthermore, Workforce has refused Worldwide's demand for repayment of amounts that Worldwide loaned to and which are owed to Worldwide by Workforce.

290.    As stated above, when Workforce was formed, Defendants agreed that Worldwide would loan Workforce initial funding needed to begin the business, on the condition that Workforce would repay the loaned amounts. In accordance with this agreement, on May 27, 2021 Worldwide loaned $2,000 into Workforce's newly created Chase bank account. On June 24, 2021 and June 25 2021, Worldwide loaned $1,000 each to Porembski and Kampel respectively. Porembski and Kampel then each contributed these funds into Workforce's Chase bank account on their own behalf. As a result, Porembski and Kampel owed Worldwide $1,000 each, which they have never repaid to Worldwide.

291.    On August 13, 2021 Worldwide loaned Workforce a total of $50,000 into Workforce's Chase bank account (in two 2 separate transactions of $40,000 and $10,000), which Workforce has never repaid to Worldwide.

292.    Workforce has refused Worldwide's demand for repayment of the loaned amounts.

293.    By reason of all of the foregoing conduct, Defendants have unfairly and improperly obtained, and continue to unfairly and improperly obtain, substantial benefits at Plaintiff's expense.

294.    It would be against equity and good conscience to permit Defendants to retain the money that they owed to Plaintiff and the other benefits they have obtained at Plaintiff's expense.

295.    Accordingly, Plaintiff is entitled to a money judgment against Defendant in an amount to be determined at trial.

## COUNT IX – MONEY HAD AND RECEIVED
### (All Defendants)

296.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

297.    By reason of the conduct set forth in Count VIII above, Defendants have received and continue to retain money and other valuable benefits, including but not limited to trade secrets from which Defendants have unlawfully profited, moneys advanced to Client A, and money loaned to Workforce, which is money belonging to the Plaintiff.

298.    Defendants have benefitted from receipt and retention of the money.

299.    Under principles of equity and good conscience, Defendants should not be permitted to keep the money.

## COUNT X – VIOLATION OF
## THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
### (All Defendants)

1.      Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

2.      Plaintiffs' computer systems were at all relevant times used in interstate commerce and communication and are thus "protected computers" under 18 U.S.C. § 1030(e)(2).

3.      Upon information and belief, in violation of 18 U.S.C. § 1030(a)(4), Defendants have deliberately and without authorization accessed Plaintiff's computers for the purpose of misappropriating its trade secrets.

4.      Defendants' access of Plaintiffs' computers was unauthorized.  Indeed, upon information and belief, after being separated from employment with Plaintiff, Defendants have accessed Plaintiffs' accounts and/or computers without authority and have otherwise exceeded the scope of authorized use of such computer and software in violation of 18 U.S.C. § 1030(a)(4).

5.      Upon information and belief, Defendants knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, recklessly and intentionally caused damage without authorization, and/or intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. §§ 1030(a)(5)(A)-(C).

6.      By reason of the foregoing, Plaintiff was damaged in an amount to be proved at trial, but well in excess of the statutorily required minimum in any one (1) year period.

## COUNT X1 - CONVERSION
### (All Defendants)

7.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

8.    Plaintiff has a possessory right and legal ownership to the confidential information and trade secrets referenced herein.

9.    Defendants exercised unauthorized dominion over Plaintiff's confidential information and trade secrets.

10.    Defendants willfully exercised unauthorized dominion over Plaintiff's confidential information and trade secrets to the detriment of Plaintiff.

11.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets was and is to the exclusion of Plaintiff's rights.

12.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets constitutes conversion.

13.    Defendants have thus committed the tort of conversion under New York common law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment against Defendants jointly and severally as follows:

    (a)    A preliminary and permanent injunction barring Workforce as well as its officers, employees and agents from possessing or using Worldwide's confidential information and trade secrets;

    (b)    A seizure order providing for the seizure from Workforce of Worldwide's trade secrets insofar as necessary to prevent Workforce's propagation or dissemination of Worldwide's trade secrets;

    (c)    An award of damages in an amount to be determined at trial, including without limitation direct, consequential, actual, incidental, compensatory as well as the reasonable attorneys' fees and expenses Worldwide has been forced to incur to identify, investigate, address and remediate Workforce's wrongdoing;

    (d)    An award of punitive damages;

    (e)    An award of reasonable attorneys' fees and expenses pursuant to the Defend Trade Secrets Act and the Computer Fraud and Abuse Act; and

    (f)    Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury for all issues so triable.

Dated: New York, New York
       August 19, 2024

                         KAGEN, CASPERSEN & BOGART PLLC

                         s/ Stuart Kagen
                         Stuart Kagen (skagen@kcbfirm.com)
                         Joshua Gillette (jgillette@kcbfirm.com)
                         551 Madison Avenue, 12th Floor
                         New York, NY 10022
                         (212) 880-2045

                         *Attorneys for Plaintiffs*