**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

TALENTHUB WORLDWIDE, INC.,

      Plaintiff,

      - against -

TALENTHUB WORKFORCE,
INC.; ERIC GOLDSTEIN;
STANDARD CONSULTING,
INC.; DIANE POREMBSKI;
PATRICIA KAMPEL; TANYA
WILSON (WELLARD);
JEANNINE TRIOLO; VALERIE
WEST; JOSEPH LIPINSKI; and J
COMPUTER PRO, INC.

      Defendants.

Case No.24-civ-6264 (LGS)

**AMENDED COMPLAINT**

Plaintiff Talenthub Worldwide, Inc., by its attorneys Lewis Baach Kaufmann Middlemiss PLLC, as and for its Complaint against defendants Talenthub Workforce, Inc.; Eric Goldstein; Standard Consulting, Inc.; Diane Porembski; Patricia Kampel; Tanya Wilson (Wellard); Jeannine Triolo; Valerie West; Joseph Lipinski; and J Computer Pro, Inc. alleges as follows.

## **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................. 4

PARTIES ............................................................................................................................... 6

JURISDICTION AND VENUE ............................................................................................ 7

FACTUAL ALLEGATIONS ................................................................................................. 8

   I.   Gary Glass and His Son Oren Glass Form Worldwide, Which Grows Into a
       Multimillion-Dollar Business after Gary Glass is Introduced to Eric Goldstein ................. 8

      A.   The Founding of Worldwide ................................................................................... 8

      B.   Worldwide's Operations ....................................................................................... 11

   II.   Defendants' Roles at Worldwide ..................................................................................... 12

   III.   Worldwide's Trade Secrets ............................................................................................ 16

   IV.   Worldwide Safeguarded and Protected Its Confidential and Proprietary Information ....... 20

      A.   Information that Worldwide Obtained From Its Clients Was Confidential
           Information that Worldwide Was Required to Protect From
           Unauthorized Disclosure ..................................................................................... 22

      B.   The Temporary Employees Whom Worldwide Recruited and Provided to
           Its Clients Were Also Required to Protect the Confidential Client Information
           They Obtained From Worldwide or Its Clients .................................................... 23

      C.   During Their Employment at Worldwide, Defendants Downloaded
           Worldwide's Trade Secrets from Avionté Onto their Local Computers,
           Which Were Secured at Worldwide's Offices ..................................................... 24

   V.   Talenthub Workforce Inc. Is Created ............................................................................. 26

   VI.   The Defendants Steal Worldwide's Entire Business Operations And Use
       Workforce to Compete Against Worldwide ..................................................................... 27

      A.   Goldstein Begins Embezzling Worldwide Funds For Rent ................................... 28

      B.   The Defendants Use Worldwide's Funds to Set Up Workforce as a Competitor ......... 29

      C.   The Defendants Delayed Collection of Worldwide's Accounts Receivables
           So They Could Illegally Collect Them After Workforce Was Operating
           Out of a Separate Location, as a Competitor ....................................................... 29

   VII.  Defendants Move to a New Location and Set Up Workforce as a Direct
       Competitor to Worldwide ............................................................................................... 31

      A.   Defendants Misappropriated Worldwide Confidential Information and
           Trade Secrets from Worldwide Computer Equipment .......................................... 32

   B.    Workforce Misrepresents and Impersonates Worldwide to Steal
         Worldwide's Accounts Receivables.................................................... 41

   C.    Workforce Steals Worldwide's Clients and Accounts Receivable,
         and Admits Doing So ......................................................................... 43

   D.    Additional Evidence Establishes Defendants' Misappropriation ................. 49

CLAIMS FOR RELIEF ........................................................................................ 53

COUNT I – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO THE DEFEND
TRADE SECRETS ACT (18 U.S.C. § 1836) (Against All Defendants)...................................... 53

COUNT II – INJUNCTIVE RELIEF UNDER THE DTSA
         (18 U.S.C. § 1836, ET SEQ.) (Against All Defendants) ...................................... 57

COUNT III – VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT,
         (18 U.S.C. § 1030) (Against All Defendants)........................................................ 59

COUNT IV – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
         (Against All Defendants) ........................................................................ 60

COUNT V – UNFAIR COMPETITION (Against All Defendants) ........................................... 62

COUNT VI – BREACH OF FIDUCIARY DUTY (Against All Defendants)............................ 62

COUNT VII – BREACH OF FIDUCIARY DUTY (Violation of Faithless Servant
         Doctrine – Against All Defendants) ...................................................... 63

COUNT VIII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
         (Against all Defendants Except Kampel, Porembski and West)........................ 64

COUNT IX – UNJUST ENRICHMENT (Against All Defendants)............................................ 65

COUNT X – MONEY HAD AND RECEIVED (Against All Defendants) ................................ 68

COUNT XI – CONVERSION (Against All Defendants) ............................................................ 68

COUNT XII – TORTIOUS INTENTIONAL INTERFERENCE WITH
         CONTRACTUAL   BUSINESS RELATIONS (Against All Defendants) .......... 69

PRAYER FOR RELIEF............................................................................................ 70

JURY DEMAND ................................................................................................... 71

## **NATURE OF THE ACTION**

1.      This case arises from the wholesale theft of an entire business operation of a temporary staffing business named Talenthub Worldwide, Inc. ("Worldwide").  Among the property taken were its computers, a computer server, and access to its cloud-based software platform (and the massive store of data retained therein) from which the business was operated.  By stealing Worldwide's computers, data, and access to its cloud-based software platform, the defendants misappropriated valuable confidential information, trade secrets and rendered Plaintiff unable to operate.

2.      The majority owner of Plaintiff Worldwide, Gary Glass, an accountant by trade, was introduced to Defendant Eric Goldstein by mutual acquaintances in approximately late 2012, when Goldstein was seeking the assistance of a forensic accountant while under criminal investigation (ultimately pleading guilty shortly thereafter) as organizer of a massive Workman's Compensation fraud scheme in New York State (involving an approximate $25 million loss).  Back then, Gary was led to believe that Mr. Goldstein was a victim of circumstance.  With no apparent business or employment options, Goldstein proposed creating a new staffing agency, and Gary and his son, Oren, also an accountant, after various discussions, agreed to help him by setting up Worldwide and hired Goldstein as a consultant in exchange for a monthly consulting fee.  Plaintiff Worldwide was eventually, during the relevant time period, 100% owned by Gary and Oren Glass.[1]

3.      In 2021, Goldstein and the rest of the Defendants conspired amongst themselves

---

[1] That Gary Glass had rescued Goldstein from financial ruin when he was convicted of a multi-million dollar fraud scheme was acknowledged by Goldstein even as late as November 9, 2020 in an email to Gary in which Goldstein stated: "When I was going through my hell[.]  Nobody took care of me like you did – not Shargel, not Taber and certainly not Spizz – **No One…and you did it while you were going through your own hell**." (emphasis in original).

to carry out a covert plan to steal Worldwide's clients, and, in fact, the entire business operations of Worldwide from Plaintiff so they could operate Worldwide's business through a separate business entity, Defendant Talenthub Workforce, Inc. ("Workforce"), which was an affiliated business created at the request of Goldstein, Porembski and Kampel's in early 2021 solely for the purpose of working with one of Worldwide's largest clients.

4.      In or about January 2022, and at a time when Gary Glass was disabled by a mental health crisis, Goldstein and other defendants moved computers, server, and their entire business operations from Worldwide's business office in Manhattan to another location in Manhattan and began serving Worldwide's clients through Workforce.  In the following months, Plaintiff's owners began to learn at least some of what the Defendants had done to them.

5.      As detailed herein, Talenthub Workforce Inc. has admitted in filings in a separate litigation in New York State Court that the Defendants took Talenthub Worldwide Inc's trade secrets, computer equipment, and access to the cloud-based software on which those trade secrets were stored.  Furthermore, they have used that pilfered information to illegally divert to themselves more than a million dollars in accounts receivable owed to Worldwide by clients for services that Worldwide (not Workforce) provided to those clients.

6.      Plaintiff brings this action for damages and injunctive relief related to Defendants' intentional illegal diversion of Plaintiff's clients and employees through improper conduct and the misappropriation of Plaintiff's confidential information and trade secrets, alleging claims that include Defendants' violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"), and the Computer Fraud & Abuse Act, 18 U.S.C. § 1030 ("CFAA"); the misappropriation of trade secrets under New York common law; unfair competition under New York common law; breach of fiduciary duty, violation of the faithless servant doctrine;

unjust enrichment; conversion; and intentional interference of contractual relationships.

## PARTIES

7.    Plaintiff Talenthub Worldwide Inc. ("Worldwide") is a staffing company organized in 2013 and existing as a Subchapter S Corporation ("S Corporation") under the laws of the State of New York with its offices located in New York, New York.

8.    Defendant Talenthub Workforce Inc. ("Workforce") is a corporation formed in 2021 under the laws of the State of New York with its principal place of business in New York, New York.

9.    Defendant Eric Goldstein ("Goldstein") is an individual who at all relevant times has been domiciled in New York City, is a former consultant who performed services to Worldwide and, upon information and belief, is a current officer and employee of Workforce.

10.    Upon information and belief, Defendant Standard Consulting Inc. is a corporation formed by Defendant Goldstein under the laws of the State of Delaware with its principal place of business in New York, New York.  Beginning in or around July 2018, Standard Consulting Inc. began performing services for Worldwide through its owner and agent Goldstein.

11.    Defendant Diane Porembski ("Porembski") is an individual who at all relevant times has been domiciled in New York City, is a former officer and employee of Worldwide and, upon information and belief, is a current officer and employee of Workforce.

12.    Defendant Patricia Kampel ("Kampel") is an individual who at all relevant times has been domiciled in New York City, is a former officer and employee of Worldwide and, upon information and belief, is a current officer and employee of Workforce.

13.    Defendant Tanya Wilson (Wellard) ("Wilson") is an individual who at all

relevant times has been domiciled in New York City, is a former employee of Worldwide and, upon information and belief, a current employee of Workforce.

14.    Defendant Jeannine Triolo ("Triolo") is an individual who at all relevant times has been domiciled in New York City, is a former employee of Worldwide and, upon information and belief, is a current employee of Workforce.

15.    Defendant Valerie West ("West") is an individual who at all relevant times has been domiciled in New York City, is a former employee of Worldwide and, upon information and belief, is a current employee of Workforce.

16.    Defendant Joseph Lipinski ("Lipinski") is an individual who at all relevant times has been domiciled in New York City, and is a former IT consultant to Worldwide who, upon information and belief, is a current IT consultant to Workforce.

17.    Upon information and belief, Defendant J Computer Pro Inc. ("J Computer Pro") is a corporation formed by Defendant Lipinski under the laws of the State of New York with its principal place of business in New York, NY.  J Computer Pro performed services to Worldwide through its owner and agent Lipinski.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 18 U.S.C. 1836 (c) because it arises under United States federal laws, namely, the Defend Trade Secrets Act and the Computer Fraud and Abuse Act. This Court has supplemental jurisdiction over the related New York state law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

19.    This Court has personal jurisdiction over Workforce pursuant to N.Y. CPLR 301, because, upon information and belief, Workforce transacts business within New York and/or

contracts to supply services within the State of New York, including but not limited to employing people (including Goldstein) who work for Workforce in locations within the State.

20.     This Court has personal jurisdiction over Standard Consulting Inc. pursuant to CPLR 301, because upon information and belief, Standard Consulting Inc. transacts business within New York, and/or contracts to supply services within the State of New York, including but not limited to, employing people (including Goldstein) who work for Standard Consulting Inc. in locations within the State.

21.     This Court has personal jurisdiction over J Computer Pro, Inc. pursuant to N.Y. CPLR 301, because upon information and belief, J Computer Pro, Inc. transacts business within New York, and/or contracts to supply services within the State of New York, including but not limited to employing people (including Lipinski) who work for J Computer Pro in locations within the State.

22.     Personal jurisdiction exists over each of the individual Defendants under N.Y. CPLR 301 because, upon information and belief, Goldstein, Porembski, Kampel, Wilson, Triolo, West and Lipinski are each domiciled in New York; each has a physical presence in New York; and each transacts business in New York.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the clam occurred in this District.

## FACTUAL ALLEGATIONS

**I.     Gary Glass and His Son Oren Glass Form Worldwide, Which Grows Into a Multimillion-Dollar Business after Gary Glass is Introduced to Eric Goldstein**

### A.  The Founding of Worldwide

24.     Gary Glass was introduced to Eric Goldstein through mutual acquaintances shortly before Eric Goldstein pleaded guilty as the head of what was described as the largest

Workman's Compensation fraud case in New York State History.[2]

25.     At the time, Goldstein characterized himself as a victim of circumstances. Gary Glass was persuaded by him and others that Goldstein was an individual who could be trusted and was someone who desperately needed help.

26.     Not long after meeting Goldstein, Goldstein proposed the idea of Gary Glass opening a new temporary staffing company.  Goldstein, now a convicted felon and barred from dealing with NYSIF (the New York State Insurance Fund that underwrites many workman's compensation policies in the state), did not appear to have any other employment or business opportunities, given his circumstances.  Eventually, Gary agreed to work with him. From that discussion, Worldwide was created and funded largely by Gary Glass and his son Oren.

27.     Worldwide is an employment staffing agency.  It was formed in 2013 by Gary Glass and his son Oren Glass, each of whom has been an officer of Worldwide since its formation.  Gary and Oren formed Worldwide on December 2, 2013, by filing Articles of Incorporation with the New York Department of State.

28.     At all relevant times, Gary and Oren have been the sole owners of Worldwide, with Gary owning 80% of the company and Oren owning 20%, except for one temporary investor whom Gary and Oren bought out after a six-month holding period ending in 2014.

29.     From Worldwide's founding in 2013 until mid-to-late 2021 and into 2022, when the Defendants began stealing its trade secrets and clients, Gary and Oren Glass grew Worldwide from a startup into a successful multimillion-dollar business in the competitive temporary staffing industry, by diligently working to obtain and retain a large base of staffing

---

[2] Laura Italiano, *Prosecutors go after temp-agency owner for bilking state out of $25M*, NEW YORK POST (May 17, 2010, 11:13 p.m.), https://nypost.com/2010/05/17/prosectors-go-after-temp-agency-owner-for-bilking-state-out-of-25m/.

clients and investing massive amounts of their own time and money into Worldwide's success. Since Gary and Oren are both Certified Public Accountants, they assumed responsibility for all of the company's tax and accounting issues, including but not limited to payroll taxes, unemployment insurance, and income taxes.

30.    As of the end of 2014, Gary and Oren Glass had invested a combined total of $420,000 of their own funds to finance Worldwide's operations.  Later, in 2016 and thereafter, Gary and Oren Glass provided additional personal funds for Worldwide's operations, loaning Worldwide $500,000.

31.    Thus, between investments and loans, Gary and Oren Glass contributed a combined total of $920,000 to fund the operations of Worldwide, all of which they put at risk of loss if the company did not succeed.  Except for an individual who briefly invested in the company but was bought out by Gary and Oren in 2014, and some temporary bank financing the Company obtained from 2014 to 2016, no one else has ever contributed to or invested funds in Worldwide.  Furthermore, none of the Defendants have ever contributed any funds to Worldwide at any time.

32.    As the Company grew, it was able to pay back its loans including all interest.

33.    By late 2021, Gary and Oren Glass had grown Worldwide into a multimillion-dollar business providing hundreds of Temporary Employees to more than seventy-five (75) Clients, which included multimillion-dollar national companies as well as smaller businesses, including businesses affecting interstate commerce.

34.    From 2014 to 2021, upon information and belief, Worldwide's average annual gross revenue was approximately $6.4 million.  As detailed further below, however, the exact amount of Worldwide's revenues is unknown to Plaintiff because Defendants stole Worldwide's

computer equipment containing all of Worldwide's QuickBooks accounting records and have refused Plaintiff's demands to return the Worldwide QuickBooks Software electronic data file.

### B. Worldwide's Operations

35.    Companies in various industries including healthcare facilities, media agencies, retailers, banks, law firms, and others (hereinafter referred to as Worldwide's "Clients" or "Customers") retained Worldwide to provide these Clients with temporary staffing by recruiting, hiring, and providing administrative support for Temporary Employees to work for the Clients ("Temporary Employees").

36.    To engage Worldwide's services, each Client entered into a contract with Worldwide allowing Worldwide to provide temporary staffing services on an ongoing basis.

37.    Specifically, Worldwide's services to its Clients included recruiting Temporary Employees for Clients to fill the specific staffing needs they requested.  Worldwide did so by placing advertisements on job placement platforms including Craigslist, Career Builder, Monster, LinkedIn, and Dice.com among others, at an average cost to Worldwide of approximately $11,600 per month.  Worldwide handled all payroll, payroll tax payments, unemployment insurance, worker's compensation insurance, health insurance, and all other administrative matters for the Temporary Employees, so that the Clients did not need to handle any of these matters.

38.    Worldwide paid the Temporary Employees' salaries (as the employer of record) and provided them health insurance, subsequently collecting funds from Clients to cover these expenses that Worldwide "advanced" (expenses incurred to service those customers).

39.    In exchange for these services, Clients paid Worldwide a markup for each Temporary Employee that ranged from 30% to 50% of the Temporary Employee's wages paid by Worldwide.  Thus, as a hypothetical example (leaving aside health insurance), if a Client

retained Worldwide to hire one Temporary Employee, Worldwide would (1) hire that Temporary Employee directly and put the Temporary Employee on Worldwide's own payroll as a W-2 employee of Worldwide; (2) pay the Temporary Employee's $1,000 per week salary; (3) bill the Client, on account, approximately $1,300 to $1,500 for this staffing service that Worldwide provided; and (4) the Client would then pay Worldwide's bill, usually on invoice terms of 30, 60, or 90 days.

40.    The delay between Worldwide's paying the wages of Temporary Employees and later collecting the associated costs and markup from its Clients required Worldwide to have significant working capital of hundreds of thousands of dollars in liquidity at all times. Until Worldwide was able to achieve this liquidity from its own operations, Gary and Oren Glass made significant capital contributions and loans to the Company to meet its need for immediate liquid working capital.

## II.    Defendants' Roles at Worldwide

### *Eric Goldstein*

41.    Eric Goldstein served as a consultant to Worldwide from its formation in 2013 until early January 2022. In this role, Goldstein presided over client accounts and had direct, regular and continuous access to all of Worldwide's trade secrets ("Trade Secrets"), including but not limited to all Client information, Client invoicing and collections, deposits of client checks, addresses and contacts, invoicing Client preferences, accounts receivable aging reports, and access to Worldwide's account with its cloud-based staffing software platform, which also included payroll for employees Worldwide placed at its Clients.

42.    Worldwide's cloud-based staffing software platform was provided to it by a Minnesota-based company, Avionté. Avionté provides a cloud-based software platform that is specifically designed for the recruiting and staffing industry. Upon information and belief,

Avionté provides this same platform to more than 500 staffing companies throughout the United States.  Each company has its own individual account and Worldwide's account was password-protected with only specific Worldwide employees having access to it.

43.    Goldstein also presided over the staff of Worldwide on a daily basis, recruited and hired new employees and Clients, and presided over Worldwide's advertising and all other budgets and financial information, all of which gave him direct access to Worldwide's critical business trade secrets.

44.    Goldstein in particular was very experienced in the staffing industry and understood that it was necessary to protect Worldwide's Trade Secrets.

45.    During his employment as a consultant with Worldwide, Goldstein worked with over 100 Worldwide Clients, placing large numbers of Temporary Employees at these Clients, ranging from one to 25 Temporary Employees at a time.  In that role, he had access to all information related to Temporary Employees and Clients, and other Worldwide Trade Secrets, through his access to Avionté.

### *Goldstein's Criminal History*

46.    That Goldstein is the organizer of a massive theft of Worldwide's clients, trade secrets and confidential information is consistent with the facts of his prior felony, in which he was the organizer of a massive fraud upon this State's workman's compensation insurer, where he used multiple entities in the temporary staffing industry, and has led to him owing millions of dollars in restitution.   Upon information and belief, Goldstein continues to owe millions of dollars towards his criminal restitution obligation and does not appear to have paid down the amount owed using any of the approximately $1 million he was paid by Worldwide in consulting income.

47.    A New York State Unified Court System Criminal History Record Search (CHRS) (Exhibit A at 2) shows that Goldstein was arrested on May 17, 2010 and charged in a May 17, 2010 Indictment in New York County Supreme Criminal Court with five crimes: Insurance Fraud in the First Degree (in violation of Penal Law § 176.30); Forgery in the Second Degree (in violation of Penal Law § 170.10(1)); two counts of Offering a False Instrument for Filing in the First Degree (in violation of Penal Law § 175.35), and Penalties for Fraudulent Practices (in violation of Workers Compensation Law § 96).

48.    Upon information and belief, on November 14, 2012, Goldstein was permitted to plead guilty to felony Attempted Insurance Fraud in the First Degree (*i.e.*, insurance fraud involving over $1 million), and was sentenced to five years of probation and ordered to pay $5 million in restitution.  (Exhibit A at 2).

49.    On May 17, 2010, the *New York Post* reported on Goldstein's arrest in an article with the headline, "Prosecutors go after temp-agency owner for bilking state out of $25M."  *See* fn. 1, supra.

50.    The article stated that according to prosecutors, Goldstein "tricked the state out of a whopping $25 million, money he should have paid into the workers' comp system over the past decade."  It further stated that prosecutors said that "Goldstein began outrunning the New York State Insurance Fund, which administers worker's comp, after the fund kicked him out ten years ago for getting in the arrears on premiums.  Barred by the fund from participating -- and apparently reluctant to pay for the mandatory coverage himself -- over the past decade he simply created some 50 subsidiary companies under his umbrella temp agency, GT Systems. He'd have his subsidiaries' employees fill out paperwork falsely denying any connection to him or GT Systems.  He'd lie about the size of the subsidiaries' payrolls.  When the state tried to audit his

payrolls or raise his initially low premiums, he'd shuffle the workers into new subsidiaries under new names."

51.     Notably, upon information and belief, Goldstein committed this felonious conduct by abusing and manipulating the corporate records of his prior company – his "umbrella temp agency, GT Systems" – another staffing agency, just like Worldwide.

**Patricia Kampel**

52.     Kampel was President of Worldwide from 2013 to early January 2022. In that role, she worked closely with Porembski to place employees at Clients and also had access to Worldwide Trade Secrets, including but not limited to Temporary Employee information, Client lists, Client information, invoices, and accounts receivable aging reports.

**Diane Porembski**

53.     Porembski was Executive Vice President and Chief of Staff of Worldwide from 2013 to early January 2022. In that role, she worked closely with Kampel to place Temporary Employees at Clients and had access to Worldwide Trade Secrets, including but not limited to Temporary Employee information, Client lists, Client information, invoices, and accounts receivable aging reports.

**Jeannine Triolo**

54.     Triolo was, from at least April 2014 through early January 2022, a high-level employee who also placed Temporary Employees with Clients and worked closely with Wilson. In that role, she had access to Worldwide Trade Secrets including but not limited to Temporary Employee records.

**Tanya Wilson (Wellard)**

55.     Wilson was, from at least April 2014 through early January 2022, a high-level

15

employee who also placed Temporary Employees with Clients and worked closely with Triolo. In that role, she had access to Worldwide Trade Secrets including but not limited to Temporary Employee records.

### Valerie West

56.    West was, from 2015 through early January 2022 a Payroll Manager. In that role, she had access to Worldwide Trade Secrets including but not limited to Temporary Employee and Client information because she, like Goldstein, had complete access to Avionté.

### Joseph Lipinski

57.    Lipinski was, from 2013 through early January 2022, an IT consultant who maintained Worldwide's entire IT operation, including but not limited to its computers, server, email domains, company website, and program software packages.  During that time, Lipinski also had access to Worldwide Trade Secrets.

58.    Lipinski was also responsible for purchasing and maintaining all of Worldwide's computer equipment.  On December 2, 2013, Lipinski emailed Goldstein regarding the initial equipment he had purchased on behalf of Worldwide to date, which consisted of four computers. Lipinski subsequently purchased and installed numerous other computers and software programs on behalf of Worldwide.

## III.    Worldwide's Trade Secrets

59.    In its operations, Worldwide created and maintained confidential and proprietary information, including but not limited to:

a.    Worldwide's business model and Client lists.  This information was stored on both Worldwide's own computer server and on its cloud-based software program, Avionté.  The Client list, collectively, had significant economic value to Worldwide because, among other things, knowledge of the complete Client

16

list would allow a competitor to understand the identity and type of companies to whom Worldwide targets for its clients and upon whom it depends for its revenue.

b.      Lists of the Temporary Employees that Worldwide recruited and provided to Clients.  The list of Temporary Employees included the Employees' personal confidential information such as social security numbers and addresses, and revealed contact information that could be used by competitors in recruiting them. This information was stored in the Avionté system and on Worldwide's computer server.  Worldwide's list of Temporary employees was economically valuable because staffing agencies like Worldwide spend significant time and make significant expenditures identifying, marketing to, and recruiting candidates to become a Temporary Employee.

c.      Worldwide's weekly sales reports.  These sales reports delineated by Client name reported the volume of sales and the hours worked by Temporary Employees placed at each Client (with those hours broken out between regular hours, overtime hours, other hours, and which Worldwide employee was responsible for the placement at the Client), revealing Worldwide's pricing strategy and each Client's demand for Temporary Employees.  This information was generated from the Avionté system and was also stored on the Worldwide server.  This information was economically valuable to Worldwide and held in secret because could be used by competitors to target its Clients and provide competitors with the ability to undercut the services that Worldwide provided to its Clients.

d.      Worldwide's accounts receivable aging reports.  The accounts receivable reports,

which delineated by Client name each of the invoices still outstanding, providing for each invoice the invoice number, invoice date, due date, invoice amount, any payments on account applied against the invoice to date, and days past due, also revealing Worldwide's pricing strategy and each Client's demand for Temporary Employees. This information was produced by the Avionté system, and such reports were also stored on Worldwide's server. Such reports had economic value, because it could be used by competitors to target Worldwide's clients and undercut Worldwide.

e.    Worldwide's weekly, quarterly, and annual payroll reports. These reports delineated each Temporary Employee's name, social security number, and wage information (including federal and state payroll and tax withholdings). These reports were generated from the Avionté system and were also stored on Worldwide's server. Such reports were economically valuable because it revealed Worldwide's pricing strategy and the way it compensated its employees, which could be used by competitors to recruit the Temporary Employees.

60.    Worldwide maintained additional proprietary information that it gathered for each of the Temporary Employees it placed at its Clients, including "onboarding information" (which included salary withholding elections and direct deposit information), background check information, resumes, skillsets, references, emergency contacts, and COVID vaccination cards, among many other items. Worldwide kept all of this information confidential, granting access only to employees who needed it for their duties, and to Clients.

61.    Worldwide also maintained other proprietary information regarding each of its

Clients, including proposal letters, invoices, contact information, contracts, progress reports, notes from Client update calls and discussions with Temporary Employee candidates, marketing materials, references, and other Worldwide internal documents.

62.    The information described above in paragraphs 59 to 61, and other confidential and proprietary financial and other information, constituted trade secrets of Worldwide (collectively, the "Worldwide Trade Secrets").

63.    The Worldwide Trade Secrets were developed through significant monetary investments and over thousands of hours over the many years it was actively operational (from 2013 through 2021), and such information was not made available to the public and actively protected from disclosure.

64.    As detailed below, Worldwide's Trade Secrets were produced and stored in a software program called Avionté ("Avionté"), in a secure web-based portal with restricted access, and/or saved on Worldwide's secure computer server located in its leased office space (the "Worldwide Server").

65.    The service contract for Avionté was signed October 16, 2017 and is between Worldwide and Avionté -- Goldstein signed as "manager" on behalf of Worldwide.  (Exhibit B).  The rights under this contract were never assigned to Workforce and the data on the platform belonged to Worldwide. (See Exhibit B, at 10 (Article IV pertaining to Intellectual Property).

66.    All of the information contained on Worldwide's computer, IT, e-mail and other document management systems or contained in Worldwide's online accounts, including but not limited to Avionté, belonged to Worldwide, exclusively, and not to any individual employee or consultant of Worldwide.   Any and all proprietary information contained on Worldwide computers that was used by the Defendants in their capacity as Worldwide employees or

consultants was only authorized by Worldwide to be saved on the secure Worldwide Server located in its leased office space.

### IV.    Worldwide Safeguarded and Protected Its Confidential and Proprietary Information

67.    As stated above, in its operations, Worldwide created, maintained, and used in its business substantial amounts of confidential and proprietary, *i.e.*, the Worldwide Trade Secrets**.**

68.    As also stated above, all of the Worldwide Trade Secrets were produced and stored in a software program called Avionté, and/or saved on the Worldwide Server.

69.    Worldwide used Avionté for its billing and payroll.  That software gave Worldwide's management secure access and the ability to input data and retrieve company sales reports, Client lists, invoices, accounts receivable aging reports, employee lists, and payroll reports, among a myriad of other items.

70.    While Avionté generated invoices to be sent to its Worldwide's Clients, some Clients had specific formatting preferences for invoices which Worldwide made in Adobe Acrobat.

71.    Worldwide had login credentials for each authorized user of Avionté, and never shared login credentials with anyone outside of Worldwide.

72.    Only Worldwide employees had login information for Avionté and were never authorized to -- and to the knowledge of Plaintiff never did -- share the login information with anyone else during their employment at Worldwide.

73.    Goldstein' ability to log into Avionté enabled him to access all of Worldwide's Trade Secrets for the sole and exclusive purpose of performing his duties as a consultant to of Worldwide while he was performing that role for Worldwide.  Goldstein's Avionté access

provided him access to Worldwide's customer lists, customer information, sales reports showing the level of volume of sales with each customer, employee data, payroll, accounts receivable reports, invoices, onboarding information for all Temporary Employees placed at Clients of Worldwide, among many other Worldwide Trade Secrets.

74.    West had a special level of access to Avionté called "Super Admin Login," which enabled her the same access rights as Goldstein, as well as access to payroll for the office staff and the ability to modify Worldwide's login information for Avionté and to modify or remove user rights and credentials for Goldstein's access.  The office staff information in Avionté was stored in a section called the Admin Branch Payroll, which was separate from the information for Temporary Employees placed at Clients.

75.    The Worldwide Avionté account was first set up by West when she was employed by Worldwide as its payroll manager.  Upon information and belief, West is currently the payroll manager of Defendant Workforce.

76.    Worldwide last executed a contract with Avionté on October 16, 2017.

77.    As part of the software implementation process for Worldwide, Avionté emailed West a special hyperlink to a "Secure Remote Application Gateway" not available to anyone without the secure link.

78.    That link provided access to an "Avionté Application Portal" on which a user created a unique username and password, which after initial setup then allowed the user to connect to the Avionté software via remote connection through the Secure Remote Application Gateway.

79.    Going forward, to access the Worldwide Avionté account online, a user was required to log into his or her Avionté account on the Avionté website, and then choose to

connect via the Secure Remote Application Gateway.  A separate dialog box would open on the user's computer screen asking the user to allow permission for remote access.  The user then had to click connect on that screen to enter into the Avionté software application.

### A. Information that Worldwide Obtained From Its Clients Was Confidential Information that Worldwide Was Required to Protect From Unauthorized Disclosure

80.    To obtain Worldwide's services, each Client was required to execute a Temporary Staffing Agreement ("Temporary Staffing Contract") with terms that included Worldwide's duties, its status as the employer of record for the Temporary Employees, the fees paid by the Client to Worldwide, Worldwide's status as an independent contractor to the Clients, a fee schedule for conversion from a Temporary Employee of Worldwide to a permanent employee of the Client, and the terms under which the Clients could terminate Worldwide's services.

81.    All Temporary Staffing Contracts were signed on behalf of Worldwide by one of the Defendants in their capacities as Worldwide officers, managers, consultants and/or employees.  All Temporary Staffing Contracts included a confidentiality provision (Section 6), which stated that "all data, documents, and information which agency [*i.e.*, Worldwide] has access to, in connection with this Agreement, including the subject matter of this Agreement, shall be conclusively deemed to be confidential information.  Agency agrees and acknowledges that the confidential information be provided to it by Client Company, pursuant to this Agreement, in whatever form, is confidential and proprietary to client company and shall remain client company's sole property."

82.    Section 6 of the Temporary Staffing Contracts further stated that "Agency shall safeguard the Confidential Information to prevent unauthorized disclosure of it to third parties, including those of Agency's Employee's without a need to know."

83.     Thus, Worldwide's Temporary Staffing Contracts with its Clients prohibited Worldwide and its officers, managers, employees, and consultants from unauthorized disclosure of the confidential Client information that Worldwide obtained to anyone else – including, of course, Workforce, a separate company that was not party to Worldwide's Temporary Staffing Contracts with its Clients.

84.     Upon information and belief, Defendants Goldstein and those Defendants who were employees of Worldwide were each aware of the content of these contracts and the obligations to abide by the confidentiality requirements.

**B.  The Temporary Employees Whom Worldwide Recruited and Provided to Its Clients Were Also Required to Protect the Confidential Client Information They Obtained From Worldwide or Its Clients**

85.     As a further measure to protect its proprietary Client information, Worldwide required each Temporary Employee, before starting work at a Worldwide Client, to sign a Confidentiality Form ("Temporary Employee Confidentiality Agreement") stating that the Temporary Employee would not disclose any information whatsoever about the particular Worldwide Client at which the Temporary Employee was placed, or the nature of the job they were performing there.

86.     Specifically, the Temporary Employee Confidentiality Agreement stated that each Temporary Employee "hereby recognize[s] and accept[s] my responsibilities and duties as an employee of Talenthub Worldwide, with regard to information and knowledge obtained about any temporary client company I am assigned to."  Temporary Employees further agreed that they "completely understand that my duties and responsibilities at the client company, as a Temporary Employee bar me from publishing or disclosing any information and knowledge to others in any form (including but not limited to oral, written, and electronic media), as well as making any other use of such information or knowledge obtained from the client company."

87.     The Temporary Employee Confidentiality Agreement further required each Temporary Employee to "agree not to use, disclose, or discuss any client company confidential information, and not authorize anyone else to use, disclose or discuss such information."

88.     Thus, Temporary Employee Confidentiality Agreement prohibited the Temporary Employees that Worldwide recruited and hired from unauthorized disclosure of the confidential Client information that Worldwide obtained to anyone else – which, again, included Workforce.

89.     Upon information and belief, Defendants Goldstein and those Defendants who were employees of Worldwide were each aware of the content of these contracts and the obligations expected of Temporary Employees to abide by the confidentiality requirements for the economic benefit of Worldwide.

### C. During Their Employment at Worldwide, Defendants Downloaded Worldwide's Trade Secrets from Avionté Onto their Local Computers, Which Were Secured at Worldwide's Offices

90.     During their employment at Worldwide, Goldstein and West accessed Avionté to generate reports containing Worldwide's Trade Secrets.  They saved or shared this information onto Worldwide's desktop computers, laptops, and other peripherals, including the computers assigned to Goldstein, Porembski, Kampel, Wilson, Triolo, and West (collectively the "Worldwide Computer Equipment"), all of which was networked to, and stored all of this information on, the Worldwide Server.

91.     For example, Defendants West and Goldstein downloaded sales reports and payroll reports which were saved on their computers and thereby on the secure Worldwide Server.

92.     From the time Worldwide was formed in 2013 throughout the entire time Goldstein and the other defendants who were employed at Worldwide (until the theft of

Worldwide's computer equipment, described below), all of the Worldwide Computer Equipment was always kept securely at Worldwide's office premises.

93.    Plaintiff never authorized the removal of any of the Worldwide Computer Equipment from its offices.

94.    As far as Plaintiff is aware, prior to 2021, none of the Worldwide Computer Equipment ever left Worldwide's offices, even temporarily.

95.    From 2013 until 2019, all of the Worldwide Computer Equipment was located at Worldwide's leased office space at 220 East 42nd Street, Suite 407, New York, New York 10017.

96.    Beginning in 2019, all of the Worldwide Computer Equipment was securely relocated to and kept securely at Worldwide's leased office space on 52 Vanderbilt Avenue, Suite 1410, New York, New York, 10017.

97.    Each of Worldwide's leased office spaces (220 East 42nd Street and 52 Vanderbilt Avenue) had 24-hour building security, restricting access to Worldwide's offices to Worldwide employees with building ID badges or visitors who received Worldwide's specific approval at the lobby security front desk.

98.    Once admitted to the office floors of the building, visitors could only access Worldwide's office suite via a key which unlocked the front door (which remained locked at all times), or by being buzzed in by the front desk secretary during business hours.

99.    Worldwide's Trade Secrets and other data were further secured because each of the Defendants' desktop computers required a Microsoft Windows login to access the computer itself, in addition to separate logins for all software that contained trade secrets and other confidential business information (including Avionté as detailed above).

## V.    Talenthub Workforce Inc. Is Created

100.    In or around May 2021, Goldstein, Kampel and Porembski represented to Gary Glass that Worldwide's business relationship with one of the Clients ("Client-1") was threatened because Client-1 was requiring that Worldwide's temporary staffing services be provided through an affiliate company that was majority owned by minority or women owners.  At Goldstein's request, Gary Glass agreed to create a company that Worldwide would work with Client #1 with Worldwide providing all necessary resources for the new company to operate.

101.    In May 2021, Gary Glass, Kampel and Porembski formed Talenthub Workforce Inc. as a separate company.  As to Gary Glass's understanding, the only purpose for creating Workforce was to assist Worldwide serving the needs of its client, Client #1.  Gary Glass was unaware that Goldstein intended to use Workforce to complete the theft of Worldwide's entire business operations.

102.    Gary Glass was a minority 10% shareholder (holding 20 of Workforce's 200 total outstanding shares) and an officer (Secretary/Treasurer) of Workforce.

103.    Kampel and Porembski each owned 45% of Workforce (holding 90 shares each).  Kampel was President and Porembski was Executive Vice President of Workforce.

104.    Workforce was established as a minority/women's owned business that ultimately obtained Minority and Women Owned Business Enterprise (MWBE) certification.

105.    The only existing client that requested MWBE certification at the time Workforce was formed was Client #1, which was Worldwide's largest customer.[3]

106.    On May 27, 2021, Worldwide loaned $2,000 into Workforce's newly created Chase bank account.  These funds were paid out of Worldwide's Chase bank account ending in

---

[3] Because the identities of this and other Clients are Worldwide Trade Secrets, they are not identified by name herein, but referred to as Client-1 and, *infra*, as Client-2 to -5.

#0690.

107.    On August 13, 2021, Worldwide loaned Workforce a total of $50,000 into Workforce's Chase bank account (in two separate transactions of $40,000 and $10,000), which Workforce has never repaid to Worldwide. The funds for the loan of $40,000 were paid out of Worldwide's Sterling bank account ending in #3558. The funds for the loan of $10,000 were paid out of Worldwide's Chase bank account ending in #0690.

108.    Workforce did not have enough capital to front the costs of its temporary staffing for Client #1, because the Client was billed on account and therefore Workforce would not be paid for months.  Worldwide funded the salaries and related costs for the Temporary Employees to be placed at Client #1, and upon being paid by Client #1, Workforce was supposed to reimburse Worldwide for the costs of the funds it fronted in this arrangement.  These costs included all payroll related expenses and any associated overhead for the Temporary Employees placed at Client #1.

109.    Porembski and Kampel became employees of Workforce in May 2021, but did not resign from Worldwide because Workforce, at that time, was not competing against Worldwide.

## VI.    The Defendants Steal Worldwide's Entire Business Operations And Use Workforce to Compete Against Worldwide

110.    Around the time that Goldstein, Kampel and Porembski caused Workforce to be created (middle 2021), they and the rest of the defendants agreed and executed a plan to steal the entire business operations of Worldwide by moving to a separate location in Manhattan and physically taking Worldwide's computers and server and by denying Worldwide access to all of its confidential data and trade secrets stored on the Avionté system.  And then, once moved, they impersonated Worldwide and operated Workforce as a direct competitor to Worldwide.

111.    Furthermore, the individual defendants each took actions during 2021 to further their plot of operating Workforce as a competitor to Worldwide while being paid their salary and consulting fees by Worldwide and having fiduciary and good faith obligations to work to the economic advantage of Worldwide.    Each of the defendants, in fact, betrayed those obligations and spent months planning and taking actions to destroy the business, after Gary and Oren Glass had spent many hundreds of thousands of dollars and years of work investing into the economic success of Worldwide.

**A.  Goldstein Begins Embezzling Worldwide Funds For Rent**

112.    Beginning in the middle of 2021, Goldstein began taking steps to harm Worldwide for his own benefit, and in furtherance of his intention to separate from Worldwide. Goldstein embezzled and converted to his own use a total of almost $19,000, by writing checks from Worldwide's bank account – without the knowledge or consent of its sole owners Gary and Oren Glass – to pay Goldstein's personal rent.

113.    Goldstein made the following payments for his personal rent from Worldwide's bank account:

- June 2, 2021 - $2,700
- August 3, 2021 - $2,700
- September 9, 2021 - $2,700
- October 5, 2021 - $2,700
- November 3, 2021- $2,700
- November 30, 2021 - $2,700
- January 5, 2022- $2,700

114.    Specifically, on or around January 5, 2022 – Goldstein, without authorization from Worldwide, wrote a check from Worldwide's Sterling bank account for $2,700, payable to Contor Assoc. & 78th Street Associates, for the rent of his personal residence at 1125 Lexington Avenue, Apartment 5B, New York, NY 10075.

115.    Not surprisingly, beginning in or around May and June of 2021, Goldstein and Gary Glass began to have several business-related disagreements that continued and exacerbated until the Defendants moved to a new location in January 2022.  Looking back, it was apparent that Goldstein was laying the groundwork to attempt to justify his and the rest of the individual Defendants' illegal actions.

**B.  The Defendants Use Worldwide's Funds to Set Up Workforce as a Competitor**

116.    In addition to the embezzlement of rent money, the Defendants, in direct detriment to their employer Worldwide, embezzled other funds to advance the economic interests of Workforce as a direct competitor to Worldwide.

117.    Between June and December of 2021, Defendants purchased numerous computers and equipment with Worldwide funds, without permission or consent of its owners Gary and Oren Glass, that, upon information and belief, was installed in the offices of Workforce in or after January 2022 when Workforce was operated by Defendants as a direct competitor to Worldwide.

118.    Near the end of 2021, and in violation of their fiduciary and good faith obligations to Worldwide, Defendants failed to inform Worldwide or its owners of their intent to separate and compete against Worldwide, and continued to cause Worldwide to extend funding for the payroll of the Temporary Employees serving the Clients (at an additional cost of hundreds of thousands of dollars) while knowing they intended to steal the Clients from Worldwide.  Worldwide would never have extended such funding had the Defendants disclosed that they had been preparing to operate Workforce as a direct competitor to Worldwide.

**C.  The Defendants Delayed Collection of Worldwide's Accounts Receivables So They Could Illegally Collect Them After Workforce Was Operating Out of a Separate Location, as a Competitor**

119.    In late November and December 2021, due to irregularities in the Worldwide

bank statements that conflicted with Worldwide's accounts receivable aging reports, Gary Glass began to suspect that Defendants were intentionally delaying collections of Worldwide's accounts receivable that were then due by telling Worldwide customers not to pay Worldwide at the time. As it turned out, that is precisely what Workforce did, so that Defendants could later make misrepresentations to Worldwide's Clients by instructing them to pay to Workforce the money owed to Worldwide on Worldwide's outstanding invoices.

122.     This discovery led to an escalating series of confrontational discussions between Plaintiff and Goldstein with Plaintiff seeking information that the defendants were withholding.

123.     Despite repeated demands from Gary Glass and his then counsel during late 2021 and thereafter, Workforce refused to reimburse Worldwide for approximately $2,000,000 in costs it covered for Workforce. These costs included salaries for the Temporary Employees placed at Client #1, the associated payroll taxes, unemployment insurance, and all other related overhead expenses.

124.     Given Workforce's refusal to reimburse Gary Glass for the funds Worldwide had advanced for payroll for the Temporary Employees placed at Client #1, Gary informed Workforce that he would have to stop providing such advances on or around December 2021.

125.     Absurdly, Defendants demanded that Worldwide continue to cover all payroll costs for Client #1, as well as any related overhead costs, endlessly funding the costs for Workforce's operations, receiving nothing in return while Workforce misappropriated Worldwide's money and business operations.

126.     At the same time, Workforce refused to give Worldwide (Gary and Oren Glass) access to any of its books and records or to substantiate any claims regarding the amounts that Workforce admitted they owed Worldwide for the payroll expenses Worldwide had advanced

for the salaries for the Temporary Employees placed at Client #1.

## VII.    Defendants Move to a New Location and Set Up Workforce as a Direct Competitor to Worldwide

127.    In or about January 6, 2022, Defendants abruptly left Worldwide and joined Workforce on a full-time basis.

128.    In their resignation email dated January 6, 2022, Kampel and Porembski specifically stated that they were leaving Worldwide "in order to devote our full-time professional efforts to Talenthub Workforce, Inc."

129.    That same day, on January 6, 2022, Porembski stated in another email to Gary that "while we have resigned from Talenthub Worldwide today and expect that clients from Talenthub Worldwide *will follow* us to Talenthub Workforce, *we want to assure you in writing that your economic interest and Oren's economic interest in the fruits of any such business that does follow us to Workforce will be the same as if that business were conducted at Worldwide. Our move is not motivated at all by a desire to change the economics of the business.*" (Exhibit C).

130.    Porembski thereby admitted that she and the other Defendants were stealing Worldwide's Clients and taking them to Workforce.  Porembski also, however, promised that Gary and Oren would still retain 100% of the stolen Clients.  That promise was false.

131.    Notably, when Workforce moved to its new location and began operating as a direct competitor it retained its full name, Talenthub Workforce, so that Talenthub Worldwide's Clients would be confused and believe they were dealing with the same entity they had contracted with, instead of a new competitor to the marketplace.  Retaining "Talenthub" in its name instead of changing its name (or even using a d/b/a) was done for the purpose of client confusion and, as explained below, to allow it to cause clients to mistakenly pay Workforce for

services provided by Worldwide.  Even Workforce's own counsel implicitly acknowledged that such confusion could occur in a letter dated March 15, 2024, when noted that the two companies had "near-identical names".

132.    Further evidence that this move was a long-planned while defendants were working for Worldwide and that Defendants, in violation of their fiduciary and good faith obligation to Worldwide, is the fact that Workforce was able to transition in virtually days from a totally financially dependent affiliate of Worldwide to a fully functioning direct competitor without any interruption in business operations.

## A.  Defendants Misappropriated Worldwide Confidential Information and Trade Secrets from Worldwide Computer Equipment

133.    Both prior to and after their departure from Worldwide, each of the Defendants accessed information which constituted Worldwide's Trade Secrets. They used this information to steal Worldwide's Clients, have continued to service those Clients, and continue to illegally divert to themselves the fees earned by and owed as accounts receivable to Worldwide.  They achieved this by using both Worldwide's computer equipment -- including the Worldwide Server – that they stole from Worldwide's offices, as well as continuing to access Worldwide's Avionté account without authorization, in violation of the Computer Fraud and Abuse Act.

134.    Defendants' misappropriation of Worldwide's trade secrets is established by, among other evidence, a preliminary forensic review of the computer equipment and server that Defendants stole from Worldwide and later returned with information deleted; a review of the history of Defendants' access to the Avionté software; the Defendants' own statements in emails and sworn affidavits submitted in New York State Court; and the Defendants' counsel's own statements in emails and filings in New York State Court.

135.    Workforce obtained Worldwide's confidential trade secrets and proprietary

information, including but not limited to Worldwide's Client information, from multiple computers including a desktop computer that Goldstein used ("Goldstein's Desktop"), and a computer server ("Server") that Goldstein and the other Defendants illegally stole from Worldwide's offices at 52 Vanderbilt Street on or about January 6, 2022, and brought to Workforce's office at 295 Madison Avenue.  Defendants never advised Worldwide or its owners that they had moved or that they had taken computer equipment from Worldwide's offices, and such removal of equipment was not discovered until months later, as Gary and Oren Glass did not work at Worldwide's Vanderbilt address.  In addition, Gary Glass was suffering from a mental health crisis at this time requiring hospitalization, and due to the escalating conflicts with Goldstein, both Gary and Oren had avoided appearing at the Vanderbilt address.

136.    Prior to this theft by Goldstein, Worldwide had been careful to protect its trade secrets and other proprietary information by not allowing its hard drives and servers out of its offices.

137.    In a September 27, 2023 email to Plaintiff's then counsel, Workforce's counsel stated:

> While clearing out its offices at 295 Madison Avenue due to the expiration if its lease, Talenthub Workforce Inc. ("Workforce") discovered two pieces of computer equipment belonging to Talenthub Worldwide Inc. in a storage closet located just outside Workforce's rented space. Specifically, a HP ProLiant MicroServer and a Dell OptiPlex 3020 Desktop Computer [Goldstein's Desktop]. The equipment has not been operated for nearly two years, since January 2022. We have sent the equipment to your office via overnight delivery. Please let us know if you have any questions.

138.    The claim that Defendants happened to "discover" the Worldwide Computer Equipment in a storage closet right outside of Workforce's office suite was patently false, because Workforce and Worldwide operated out of separate office spaces.  Worldwide's office space was located at 52 Vanderbilt Street, while Workforce's office space was located at 295

Madison Avenue, a full 0.3 miles away.  Worldwide's Computer Equipment could not have ended up at Workforce's office space unless it was taken there by Defendants.

139.    Worldwide repeatedly demanded that Workforce return all of the above-referenced computer equipment, and all other property that Workforce stole from Worldwide. These demands included a letter to Workforce on July 11, 2022 and emails on July 15, 2022, September 2, 2022, and October 3, 2022.

140.    The demand letter dated July 11, 2022 letter specifically advised Workforce that its ongoing conduct gave rise to claims against Workforce for its misappropriation of Worldwide's confidential information and trade secrets, stating:

> [I]mportantly, it has very recently been discovered that a valuable, external hard drive, owned by Worldwide and containing thousands of Worldwide e-mails, documents, financial and customer records -- much of it confidential information and certainly some of its trade secrets -- has been taken from, stolen or otherwise misappropriated from the former offices of Worldwide. … As is already transparently clear from the investigation, Porembski and Kampel, and Goldstein as well, undoubtedly, misappropriated Worldwide's business model, customer lists, trade secrets, and other confidential and proprietary information [which] gave Porembski and Kampel an advantage over other competitors who do not know, use, or have access to Worldwide's information.

141.    The July 11, 2022 letter also laid out Worldwide's claims against Workforce's for violation of the Computer Fraud & Abuse Act, stating:

> Porembski and Kampel resigned their employment from Worldwide on January 6, 2022.  On information and belief, the Worldwide Hard Drive was at the time in the Vanderbilt office.  Moreover, both Porembski and Kampel still have access, use and conduct business through their respective Worldwide e-mail accounts, a system to which Gary has no access, without any legitimate or lawful business need or good reason, except to further damage Worldwide or otherwise unfairly compete and unjustly enrich Workforce.

142.    It was only after Gary Glass initiated a books and records shareholder litigation against Workforce, and two days before a September 29, 2023 initial court hearing in that action, that the Defendants claimed to have suddenly "discovered" and returned Goldstein's Desktop

and the Server, only two pieces of Worldwide computer equipment that was stolen.

143.    After Defendants returned Goldstein's Desktop, a Dell OptiPlex 3020 Desktop Computer, it was only then discovered that all the data had been made inaccessible by Defendants.

144.    In a preliminary review of Goldstein's desktop, it was discovered when the computer was first booted up after its return by Defendants that it was protected by BitLocker encryption, which had never been previously utilized.  A computer forensics expert Gary Glass hired has been unable to access the computer, and Defendants have refused to provide the decryption key or any login information for the Dell desktop computer.

145.    And after being returned by Defendants, a review of the Server, a HP ProLiant MicroServer was conducted.  This review for the first time established that data on a Worldwide computer had been accessed and altered or destroyed without Worldwide's permission.  Further, this discovery put the lie to Workforce's claim that "at the time these devices were discovered, the equipment had not been operated on for nearly two years, since January of 2022."

146.    There is, instead, substantial evidence that Goldstein and/or other of the Defendants repeatedly accessed the Server and the computers linked to the server after January of 2022. That evidence includes, but is not limited to, the following information discovered by Plaintiff's examination of the computer equipment returned to Plaintiff.

147.    When accessing the Server, Plaintiff encountered a blue screen with a message requesting a recovery key. The drive label was identified as "ERIC-PCTH C:5/23/2022." Upon information and belief, the "5/23/2022" portion of the drive label indicates that Defendants accessed the server on or about that day and that such a recovery key prompt typically arises due to changes or interactions with the system's security settings or configurations.  The owners

of Worldwide did not know the recovery key the Defendants had set up, but have since been able to circumvent it with the help of a forensics computer expert. Without that assistance, the data on the Server would have been inaccessible. And a review of the data that was nearly inaccessible by Defendants reveals good reason why they likely did this – to prevent Plaintiff from learning that Defendants had illegally accessed the data on the Server and contradicted claims by Defendants that the computers were not accessed after being moved from Worldwide's offices in January 2022.

148.    Plaintiff discovered new shortcuts created on the Server's Backoffice Folder on August 5, 2022, including two Workforce shortcuts and a third shortcut named "Eric Interfaces." This creation date is more than seven months after Defendants and Workforce's counsel falsely claimed that Workforce ceased using the server after January 2022 and placed it in a storage closet outside Workforce's office.

149.    In the Share Folder on the server, Plaintiff found sixteen distinct folders containing numerous documents dated post-January 2022. These folders include, but are not limited to:

- Background Checks
- All Candidate Onboarding Paperwork
- CHC Proof of Vaccinations
- Confidentiality Forms
- Direct Deposit
- Disclosure & Release Forms
- Emergency Contact Forms
- Everify
- Fund Vaccinations
- I-9
- Identification
- Miscellaneous Documents
- References
- Resumes
- W-4

- Wage Rate Forms

150.   Each of the above-referenced folders contained dozens, if not hundreds, of Adobe Acrobat PDF files which were saved in the respective folder with a date after January of 2022, when both the Defendants and their counsel falsely claimed the server was not used after that date.

151.   As just one of hundreds of examples of the Defendants' brazen theft of Worldwide's computer equipment and unauthorized access, a Confidentiality Agreement between *Worldwide* and a Temporary Employee ("Temporary Employee 1") was discovered. Temporary Employee 1 executed the agreement in pen on March 23, 2022.  This is nearly two months after Defendants claimed they were not accessing the server and had already resigned from Worldwide.

152.   Moreover, after all of the Defendants left Worldwide to join Workforce in January 2022, they accessed Worldwide's Avionté account without authorization.

153.   After Defendants' departure, Gary Glass obtained a new login for the software for his tax practice associate and Worldwide consultant Avraham Zago ("Zago").  On October 7, 2022, Zago printed an Accounts Receivable Aging Report for Worldwide.  Despite Goldstein and West falsely stating that they no longer accessed any Worldwide software or equipment after January of 2022, the accounts receivable aging report shows entries for payments against existing invoices in February and March 2022.  Zago also noted that the Worldwide Admin Payroll Branch for its office staff had been deleted from Avionté.

154.   While Worldwide kept all of its Client contracts in digital form on its server, Worldwide no longer has access to them because Defendants misappropriated them and deleted them from the Server, refusing to return them. Defendants also stole the final executed hard copies kept in Worldwide's office.

155.    Plaintiff has also discovered evidence that all of Worldwide's contracts with its Clients (as well as other critical files) have been deleted from the Server returned by Workforce.

156.    A screenshot that Plaintiff received in an email from West on June 1, 2018 showed a subfolder in the server's folder entitled "share" named "Client Contracts" in the server's share folder:



157.    But upon examination of the returned computers, in or around May 2024, Plaintiff discovered that the Client Contracts subfolder, along with other files, is no longer present. Yet as shown in the following screenshot , the subfolder "Client Cards," which appeared in the same June 1, 2018 screenshot immediately preceding the Client Contracts folder that had originally been there, is still on the Server:



158.    Defendants deleted all of Worldwide contracts with its Clients before returning the computer equipment, after, upon information and belief, improperly and without authorization copying those contracts to convert to their own use.

159.    As Worldwide continued to demand that Workforce return its stolen property, Defendants suddenly "discovered" new items.

160.    On March 15, 2024, Workforce's counsel wrote to Worldwide regarding even more stolen computer equipment.

161.    Workforce now for the first time claimed that "Workforce has also determined that, despite its clear instructions to the contrary, one of its employees, West, never returned her Worldwide-issued laptop.  However, West never used that laptop following her resignation from Worldwide in January of 2022, as West was given a new Workforce-owned laptop to use for her Workforce assignments when she left Worldwide."

162.    A review of West's stolen returned laptop ("West Laptop") made clear that Defendants' repeated claim not to have used this device after January of 2022 was, again, false.

163.    The West Laptop shows that on August 2, 2023, and August 4, 2023, there were

numerous downloads of a software application named SplashtopSOS.  SplashtopSOS is a software application that facilitates remote computer connections.  It allows one computer or mobile device to remotely access another computer or mobile device.  Furthermore, after Gary's computer forensics expert ran software to retrieve deleted files from the laptop, it returned a handful of results of deleted or overwritten files with a date post January 2022.

164.   And Goldstein inadvertently disclosed that they have had access to the Worldwide QuickBooks data file that was last known to exist on the Goldstein Desktop that Defendant rendered inaccessible.  On September 13, 2023, Goldstein attached as an exhibit a general ledger detail printout for both Gary's and Oren's distribution accounts from *Worldwide*. (Exhibit D).  The layout of the exhibit shows it was clearly extracted directly from the Worldwide QuickBooks data file, and Goldstein did so on August 19, 2022, at 3:00PM. This is more than seven months since he had effectively resigned from Worldwide.  The QuickBooks data file was stored on Goldstein's Desktop.

165.   The above-detailed evidence collectively demonstrates that Defendants continued to access and manipulate Plaintiff's server and desktop computers well beyond January 2022, contradicting their previous claims. This unauthorized access included creating shortcuts, altering folders, and deleting critical files such as client contracts, thereby substantiating Defendants' misconduct including violations of the Computer Fraud and Abuse Act.

166.   Moreover, this evidence demonstrates that Workforce obtained Worldwide's proprietary information from the Desktop and Server, the West Laptop, and other computer equipment, and that Workforce continues to illegally retain additional misappropriated computer equipment and data belonging to Worldwide.

167.    Thus, the extent of Defendants' theft of Worldwide's computer equipment, unauthorized access thereto, and deletion of Worldwide's Trade Secrets and other proprietary information remains unknown and is under investigation, because Defendants continue to refuse to return other Worldwide stolen property that, upon information and belief, they continue to possess, or to provide the BitLocker password for Goldstein's Desktop.

### B. Workforce Misrepresents and Impersonates Worldwide to Steal Worldwide's Accounts Receivables

168.    The Defendants have also repeatedly and without authorization used their Worldwide email addresses throughout 2022 (and possibly beyond) – after departing Worldwide for Workforce -- to communicate with Worldwide Clients concerning billing and other matters. For instance, on October 21, 2022 (nearly nine months after the Defendants resigned from Worldwide), the accounting department at one of Worldwide's Clients (referred to as "Client #5" *infra*), emailed West at her *Worldwide* email address asking her what invoices were outstanding.    The customer emailed West because he had been contacted by C2C Resources Inc., the collections agency hired by Gary Glass to collect outstanding receivables on behalf of Worldwide, about outstanding invoices for Worldwide.

169.    Upon information and belief, Defendants Lipinski and his company, J Computer Pro, enabled and assisted Workforce to commit its theft of Worldwide Trade Secrets, by conduct including but not limited to setting up the stolen Worldwide Server containing Worldwide Trade Secrets at Workforce's offices and transferring other Worldwide Trade Secrets and proprietary data contained on other Worldwide computer equipment, all of which Lipinski and his company J Computer Pro had initially set up for Worldwide.

170.    Additionally, upon information and belief, Lipinski possesses the login information necessary to access Worldwide's Microsoft Office email server and accounts.  Since

leaving Worldwide, Lipinski has improperly denied Worldwide's officers and employees access to the Worldwide email server and accounts since March 2022, ignoring Plaintiff's repeated demands for such access, while continuing to provide Defendants with unauthorized access to Worldwide Trade Secrets.

171.    Moreover, upon information and belief, Lipinski and his company J Computer Pro further enabled and assisted Workforce to steal Worldwide's Clients by setting up a website for Workforce that was nearly identical to the one Lipinski set up for Worldwide.    Upon information and belief, Lipinski and/or his company J Computer Pro– which set up the Worldwide website -- bought a website domain for Workforce on October 5, 2021, and first set up Workforce's website on December 25, 2021.  Lipinski stopped maintaining Worldwide's website the next day, December 26, 2021.

172.    Lipinski and his company are performing at Workforce the same role they played at Worldwide, purchasing and setting up all computer equipment.  Some of that work includes the purchase of computer equipment in 2021 and was disclosed by Workforce's counsel in a letter dated March 15, 2024, and attached receipts, (Exhibit E).  Lipinski himself as the purchaser of each of the items and notably, the purchases occurred in 2021, which as previously discussed, demonstrates that Defendants had been planning the wholesale theft of Worldwide's business operations while still being employed as workers or consultants to Worldwide. And such purchases were paid for from Worldwide bank accounts without the authorization of Worldwide or its owners.

173.    In addition, in March 2022, upon information and belief, Defendants changed the profile photo on Worldwide's Facebook page to an image containing a Talenthub Workforce logo.  This action, along with the taking down Worldwide's webpage while immediately

standing up a nearly identical website for Workforce actions were clearly undertaken to sow confusion among Worldwide's Clients so they could not appreciate that Workforce was a competing company, and not an affiliate of, Worldwide.

### C. Workforce Steals Worldwide's Clients and Accounts Receivable, and Admits Doing So

174.    Upon information and belief, in or around late November or December 2021, Workforce began misappropriating clients from Worldwide, including by instructing Worldwide's customers to send payment for Worldwide's outstanding invoices (Worldwide's "Accounts Receivable, or Receivables") to Workforce (including payment on invoices for work performed by Worldwide before Workforce even existed).  However, as set forth in further detail below, to conceal the theft of Worldwide's receivables, Workforce instructed these Clients of Worldwide not to pay Worldwide's invoices until after an extended period of time had elapsed, at which point Defendants instructed the Clients to pay Workforce rather than Worldwide.

175.    Since departing Worldwide, the Defendants have illegally diverted to themselves fees owed to Worldwide as accounts receivable.  The following provides information related to the theft from four of such clients:

#### 1.    Client #2

176.    On October 13, 2023, an employee of Worldwide Client #2 emailed Corey McGowan of C2C Resources (the collections agency hired by Gary Glass to collect outstanding receivables on behalf of Worldwide), confirming that all payments were made to the bank account "USBankAP150097136561."

177.    On October 16, 2023, Corey McGowan replied to the Client #2 employee, confirming that the account information provided did not belong to Worldwide. Upon information and belief, the US Bank account in question belonged to the defendant, Talenthub

43

Workforce Inc.

178.    On October 17, 2023, the same Client #2 employee sent an email to Corey McGowan, which included a screenshot of a payment of $14,551.13 made on September 28, 2023, covering three invoices. Two of these invoices, totaling $12,768.75, corresponded to invoices from Talenthub Worldwide as shown on its accounts receivable aging report, with the same invoice numbers and amounts.   The screenshot emailed by the Client #2 employee displayed the account "USBankAP150097136561" under the name Talenthub Worldwide, which is actually a bank account belonging to Workforce.

179.    The two original invoices in question, issued by Worldwide in October 2021, clearly indicated they were payable to Worldwide, as they were on Worldwide letterhead and explicitly stated payment was due to Talenthub Worldwide Inc.   Additionally, Client #2 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

180.    These October 2021 invoices specified at the bottom that they were "due within 30 days of receipt." Despite this, to facilitate its theft of money owed to Worldwide, Workforce delayed Client #2's payment of these invoices due to Worldwide. Workforce did so by waiting until nearly 11 months after the first invoices were issued – *i.e.*, until September 28, 2023 -- to request payment from Worldwide's Client #2 – to itself, rather than to Worldwide.  As set forth below, Workforce used this same modus operandi to divert Worldwide's account receivables to itself, instructing Worldwide's customers to delay payment to Worldwide, only to redirect it later to Workforce.

181.    On November 7, 2023, the Client #2 employee emailed Oren Glass, seeking confirmation of the bank account information listed in a supplier profile form and noting that payment had been deposited into the listed account.

182.    The supplier profile form attached to the November 7 email was signed by Eric Goldstein as "CEO" of Talenthub Worldwide on December 2, 2021. But Goldstein never held the position of CEO at Worldwide. The form Goldstein filled out and submitted on behalf of Worldwide to Client #2 correctly listed the Sterling Bank account of Talenthub Worldwide for payment of invoices.  However, the payment was ultimately deposited into *Workforce*'s US Bank account instead.

183.    Contrary to the information in the November 7 email, Client #2 made the payment to the US Bank account ending in 6561, belonging to Workforce, rather than to Worldwide's Sterling Bank account as instructed in the completed Worldwide supplier profile form filled out by Goldstein. The Client #2 employee had previously confirmed this payment destination in the emails dated October 13 and October 17, 2023. This demonstrates Workforce's tactic of instructing Worldwide's customers to pay Workforce for work performed and invoiced by Worldwide and how Workforce leveraged the confusion it created with Clients so that they would not understand that Workforce was now a direct competitor to Worldwide.

### 2.  Client #3

184.    On January 19, 2022, Talenthub Workforce's Chase bank account ending in #2152 received a deposit of $2,891 from Client #3.

185.    This receivable belonged to Worldwide, as shown on Worldwide's Accounts Receivable aging report, corresponding to invoice #1033447 for $2,891.

186.    The original invoice clearly showed it was payable to Worldwide, as it is on Worldwide letterhead, and at the bottom, it indicated payment was due to Talenthub Worldwide Inc. Additionally, Client #3 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.  In doing so, Workforce was clearly attempting to confuse the client into believing that Workforce and Worldwide were related entities instead of direct competitors

at this point.

### 3. Client #4

187.    On May 5, 2022, West, the payroll manager of Workforce and former payroll manager of Worldwide, emailed an employee at another Client of Worldwide, Client #4, instructing that payments should be made payable to Talenthub Workforce, Inc. via ACH to Chase Bank. West stated that attached to her email were invoice statements from 2021 to 2022. The email chain includes communications between the Client #4 employee and various Workforce personnel, all of whom were formerly employed by Worldwide. In a May 6, 2022, email to Goldstein, Wilson, and Triolo (all employed by Workforce and formerly employed by Worldwide), West used Wilson's and Triolo's Worldwide email addresses, despite their resignations from Worldwide four months prior.

188.    On June 1, 2022, Triolo from Workforce emailed another Client #4 employee requesting payment due for more than five months of outstanding billing. Again, as with the other Worldwide receivables stolen by Workforce, there was a significant time gap between the issuance of the invoice and Workforce's subsequent illegal collection of the payment.

189.    As a result of communication between C2C Resources (which was engaged to collect Worldwide's receivables) and Client #4, on November 2, 2022, Client #4's Finance Department emailed Lorri Clark of C2C Resources a comprehensive payment history. The schedule detailed payments, including invoice numbers, dates, amounts, payment dates, notes, bank account numbers, and bank names.

190.    The schedule showed numerous payments made to the correct Sterling bank account ending in 3558, belonging to Talenthub Worldwide. However, it also revealed 14 payments made to a JP Morgan Chase bank account ending in 2152 belonging to *Workforce*. These 14 invoices were for work performed by *Worldwide*, as shown on Worldwide's accounts

receivable aging report and printed invoices.

191.    Notably, two payments for Worldwide invoices dated April 9, 2021 were made to Workforce's Chase account.  But Workforce was not formed until May 25, 2021.  In other words, Workforce was collecting Worldwide's receivables for work performed before Workforce even existed as a company.

192.    The original invoices show they were payable to Worldwide, as they are on Worldwide letterhead and at the bottom indicate payment is due to Talenthub Worldwide Inc. Additionally, Client #4 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

193.    The original invoices from Worldwide also indicate at the bottom that they are due "within 30 days of receipt." But as it did with respect to other Worldwide Clients, to facilitate its theft of money owed to Worldwide, Workforce delayed Client #4's payment of these invoices. Workforce did so by waiting until nearly 15 months after the first invoices were issued to Client #4.

194.    On November 9, 2022, another employee at Client #4 emailed Lorri Clark (at collection agency C2C Resources), stating that Client #4 had been "informed by the newly formed Talenthub team of a change in bank account details."  This Client #4 employee also stated, "I also mentioned this right from the outset and shared these emails with you from the Talenthub team informing us of the change in details."  The "the newly formed Talenthub team" to which the Client #4 employee referred was Talenthub Workforce, and the Client #4 employee was referring to the above-referenced May 5, 2022 email in which Defendant West instructed the other Client #4 employee to make all payments for outstanding invoices to Workforce's Chase Bank Account.

195.    This documentary evidence establishes that Workforce was purposely instructing yet another Worldwide Client to redirect payment for Worldwide's invoices to Workforce.  And the language is explicitly meant to confuse the client into believing that Workforce and Worldwide are a "team" instead of direct competitors.

### 4.  Client #5

196.    On October 20, 2022, Ken Gaddy at C2C Collections Resources sent to another Worldwide Client, Client #5, collections notice for outstanding receivables owed to Worldwide.

197.    On October 26, 2022, the Client #5 accounting team responded to Gaddy, stating, "that is impossible that we owe because I had an exchange back with Valerie in July [2022] back dating to October or November of last year [i.e., 2021]."

198.    Workforce did not perform any work for Client #5 during the referenced period (October or November of 2021) – only Worldwide did.  Thus, Workforce had no basis to attempt to collect receivables owed to Worldwide from that time frame. The Client #5 accounting team copied Defendant Wilson on the email, using her Worldwide email address despite her having resigned from Worldwide over nine months earlier.

199.    On October 26, 2022, Goldstein emailed an employee at Client #5 stating "Talenthub Workforce Inc is a separate and distinct corporation from Talenthub Worldwide Inc with different ownership. Workforce commenced business with [Client #5] in January 2022." Goldstein's express admission establishes that Workforce was collecting receivables on invoices predating the start of Workforce's business relationship with Client #5 in January 2022.

200.    On October 26, 2022, the Client #5 employee emailed Wilson and Triolo about the matter, addressing Triolo at her Worldwide email address.  The client's use of Worldwide email addresses 10 months after Workforce had been operating as a direct competitor shows that Workforce and the rest of the Defendants were actively working to hide and confuse Clients

about the fact that Workforce was acting as a direct competitor to Worldwide.

201.    As shown in the accounts receivable aging report for Worldwide Inc. there were three Client #5 invoices for 2021, totaling $5,747.

202.    The original invoices show they were payable to Worldwide, as they are on Worldwide letterhead and at the bottom expressly indicate payment is due to Talenthub Worldwide Inc.  Additionally, Client #5 had previously always paid all of its Worldwide invoices to Worldwide via bank wire.

203.    All three invoices also state at the bottom that they are "due within 30 days of receipt."  But again, as it did with respect to other Worldwide Clients, to facilitate its theft of money owed to Worldwide, Workforce delayed Client #5's payment of these invoices due to Worldwide. Workforce did so by waiting until more than seven months after the invoices were issued to request payment from Worldwide's Client – again, to itself rather than to Worldwide.

### 5.  Other Unknown Worldwide Clients

204.    In addition to the foregoing examples of Defendants misappropriating Worldwide's accounts receivable by diverting them to Workforce, upon information and belief, there are multiple other Worldwide clients whose accounts receivables defendants have also misappropriated them by diverting them to Workforce.  But Workforce has prevented Worldwide from being able to investigate and pursue collections efforts for these amounts owed to Worldwide by these other Worldwide Clients because Workforce stole Worldwide's critical data including the contact information for all of its Clients.

### D.  Additional Evidence Establishes Defendants' Misappropriation

205.    Beyond the foregoing extensive evidence of Defendants' misappropriation of Worldwide's clients, review of the returned Server has revealed numerous confidentiality forms signed by *Worldwide* Temporary Employees, which were executed during 2021 through at least

January 2022 (with a few even after that date, extending into March 2022). Not one confidentiality form was executed with *Workforce* until January 2022 (other than with the employees placed at Client #1). This, along with other evidence, demonstrates that Worldwide's Clients continued throughout 2021 to understand themselves to have retained and to still be serviced by Worldwide. All contracts that were executed and in effect with Clients at the time the defendants abandoned Worldwide in January 2022 were with Worldwide, not Workforce. As stated above, Defendants stole and deleted those contracts from Worldwide Computer Equipment. Additionally, all invoices for these clients are on Worldwide, not Workforce, letterhead.

206.    Both the West Laptop and the Server that Defendants stole contained thousands of invoices, spanning many years. Notably, of the invoices issued in 2021, only the ones addressed to Client #1 were on Workforce letterhead, while all invoices for customers other than Client #1 were on *Worldwide* letterhead.

207.    Additionally, all invoices addressed to Worldwide's Clients contained at the bottom written payment instructions stating: "**Please remit to Talenthub Worldwide,** 52 Vanderbilt Street, Suite 1410, New York, NY 10017." (Many of these invoices also included a supporting timesheet of the Temporary Employees' hours worked at the Client, also on *Worldwide* letterhead).

208.    These payment instructions demonstrate that it is false, as Workforce has claimed (and detailed below), that Worldwide Clients "mistakenly" paid Worldwide invoices to Workforce due to an "inadvertent mix-up" of the company names.

209.    In an email to Gary Glass on January 7, 2022, Defendant Porembski admitted that through that date, it was Worldwide – not Workforce -- that had funded the expenses to

service Client #1's temporary staffing, stating: "we will back to you by the end of the day today with a concrete payment plan **to repay Worldwide all the moneys previously *advanced* to Workforce**." (emphasis added).

210.   What Porembski meant by "moneys previously advanced to Workforce" was money that Worldwide had advanced *on behalf of* Workforce.  This is confirmed by Porembski's later email to Gary Glass the same day (January 7, 2022), in which she stated, "We calculate the amount **of payroll advanced and owed to Talenthub Worldwide** on the payments received by Workforce as $1,149,430.52."  The "advanced" payments to which Porembski referred was the revenue collected on invoices to Client #1 (although Porembski provided no backup to this amount, which was intentionally severely understated).

211.   In other words, in this January 7, 2022 email, Workforce admitted and acknowledged that Worldwide had, on behalf of Workforce, advanced payroll and other expenses to service Client #1, money which Workforce was obliged to pay back to Worldwide. This obligation by Workforce to Worldwide had nothing to do with *Workforce's wholly separate theft of Worldwide's account receivables – i.e.*, money owed to Worldwide for invoices issued by Worldwide to Worldwide Clients other than Client #1 for which Worldwide had not yet been paid.

212.   But after Worldwide and Gary Glass initiated shareholder litigation against Workforce in July 2023 and raised Workforce's wholly separate theft of Worldwide's account receivables, Workforce suddenly claimed – falsely -- that Workforce's repayment of Client #1 expenses was in fact Workforce repaying these separate stolen Worldwide account receivables. But in making this claim, Workforce in essence admitted it had misappropriated Worldwide account receivables.

213.    Thus, in a September 12, 2023 affidavit, Defendant Porembski stated "TW (Workforce) has already repaid to Worldwide ***funds received on Worldwide's behalf***" (emphasis added).  The funds Workforce had repaid Worldwide were not "funds received [by Workforce] on Worldwide's behalf" – they were funds Worldwide had advanced for paying payroll expenses for employees placed at Client #1 on behalf of Workforce.  But Porembski admitted that Workforce had "received" "funds" "on Worldwide's behalf" – *i.e.*, Worldwide's account receivables.

214.    Then, in a January 12, 2024 court filing, Workforce confirmed its diversion to itself of Worldwide's account receivables, falsely claiming that "Workforce long ago acknowledged that it had inadvertently received monies from clients that were owed to Worldwide- owing to the parties' prior affiliation and near-identical names."

215.    As shown above, there was nothing "inadvertent" about how Workforce wound up receiving payment from Worldwide's Clients on Worldwide invoices which were on Worldwide letterhead and which explicitly directed payment to Worldwide – including payments from Worldwide Clients who routinely paid their invoices to Worldwide via wire transfer to Worldwide's Sterling bank account, with an account number the Clients knew for years.

216.    Worldwide's Clients did not "inadvertently" send payment to a completely different bank account belonging to Workforce – rather, they were explicitly told to do so by Workforce.

## CLAIMS FOR RELIEF

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)

### (Against All Defendants)

217.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

218.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate foreign commerce." 18 U.S.C. § 1836.

219.    Under the DTSA, "trade secret" means

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

220.    Under the DTSA, "misappropriation" means

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had

reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

221.    Under the DTSA, "improper means" … "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

222.    By engaging in the above conduct, Workforce and the Defendants have misappropriated Worldwide's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce in violation of the DTSA.

223.    This information was used in connection with Worldwide's services, which are offered in New York and throughout the country.

224.    By virtue of their employment by Worldwide, each of the Defendants was given access to and possessed Worldwide's Confidential Information, which includes trade secrets of Worldwide such as, inter alia, Worldwide's business model, Client lists; lists of the Temporary Employees that Worldwide recruited and provided to Clients (which included the employees' personal confidential information such as social security numbers and addresses); sales reports; accounts receivable aging reports; weekly, quarterly, annual payroll reports, and other confidential and proprietary financial and other information (collectively the "Worldwide Trade Secrets").

225.    By virtue of his employment by Worldwide, Goldstein was given access to and possessed Worldwide's Trade Secrets.

226.    Worldwide's Trade Secrets were developed and maintained by Worldwide over a course of years at great time, effort and expense to Worldwide, and were at all relevant times

maintained on password-protected networks accessible only by certain Worldwide employees and consultants with need to use such trade secrets on the company's behalf and for its benefit.

227.    In addition, as set forth in detail above, Worldwide has taken reasonable measures to maintain the secrecy of Worldwide's Trade Secrets.

228.    Defendants misappropriated Worldwide's Trade Secrets without Worldwide's consent.

229.    In particular, upon information and belief, each of the Defendants accessed and either made digital copies of or emailed to themselves information which constituted Worldwide Trade Secrets, which they used to steal Worldwide's Clients and have retained and continued to use to service those Clients and to illegally divert to themselves the fees earned by and owed as accounts receivable to Worldwide.

230.    The Defendants had no right to retain or use any of Worldwide's Trade Secrets or other confidential and proprietary information after resigning from employment with Worldwide.

231.    Worldwide did not consent to Workforce's use of Worldwide's Trade Secrets. At no point did Worldwide give any of the Defendants permission to download or take Worldwide's Trade Secrets or any confidential information, transfer it to external storage devices, or email the information to personal email addresses. The Defendants knew or should have known that the information they retained upon their departure contained trade secrets belonging to Worldwide.

232.    Workforce directed, participated in, and/or benefited from the misappropriation of Worldwide's Trade Secrets. Upon information and belief, Worldwide's confidential Trade Secrets is now in Workforce's possession and on Workforce's systems and Defendants are retaining the misappropriated information to compete with and otherwise harm Worldwide.

233.    Worldwide's Trade Secrets derive independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

234.    Defendants can obtain economic value for the disclosure and use of Worldwide's Trade Secrets, for example, by avoiding the years, and millions of dollars in investment, that it took Worldwide to develop the trade secrets, and to convert Worldwide Clients and employees to Workforce for their own financial gain.

235.    Workforce knew or should have known that Worldwide's Trade Secrets, (1) are confidential; (2) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (3) were developed or acquired by Worldwide at great time, effort and expense; (4) were maintained as confidential and are not generally available to the public and Worldwide's competitors; (5) would provide significant benefit to a competitor seeking to compete with Worldwide; and (6) are critical to Worldwide's ability to conduct its business successfully.

236.    Workforce will be or is unjustly enriched by its misappropriation of Worldwide's Trade Secrets, including its trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Worldwide's Trade Secrets.

237.    Workforce's misappropriation has been willful and malicious.

238.    As a direct and proximate result of Workforce's misappropriation of Worldwide's Trade Secrets, Worldwide has been and will continue to be threatened with loss of business expectancies, clients, employees, its trade secrets and goodwill and otherwise continue to suffer irreparable harm, injury, and loss that cannot be remedied through monetary damages.

239. Worldwide also is entitled to a seizure order providing for the seizure from Workforce of Worldwide's Trade Secrets, insofar as necessary to prevent Workforce's propagation or dissemination of them.

240. In addition, as a result of Workforce's conduct, Worldwide has suffered direct and consequential damages, and is entitled to recover actual, incidental, compensatory and punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

## COUNT II – INJUNCTIVE RELIEF UNDER THE DTSA (18 U.S.C. § 1836, ET SEQ.)

### (Against All Defendants)

241. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein and those paragraphs as to Count I.

242. Plaintiff operates their business in interstate commerce, and the trade secrets misappropriated by Defendants are related to, and intended for use in, interstate commerce.

243. As set forth above, Defendants improperly acquired the Worldwide's Trade Secrets, including information regarding Plaintiff's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except Worldwide employees and consultants who had a duty to keep this information confidential.

244. The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

245. The misappropriated documents concern Plaintiff's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods,

techniques, procedures, formulas and processes.

246.    Furthermore, Plaintiff has taken reasonable measures to keep such information secret by, among other things, limiting those employees and consultants with access to the confidential information.

247.    The trade secrets misappropriated by Defendants include trade secrets which required substantial resources, time and investment by Plaintiff to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as Plaintiff's competitors.

248.    Defendants' misappropriation of Plaintiff's trade secrets has caused Plaintiff Worldwide to suffer harm, including but not limited to the loss of clients, loss of reputation and client goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

249.    This harm cannot be adequately remedied at law and requires permanent injunctive relief.  Plaintiff will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation of Plaintiff's trade secrets and failure to return Plaintiff's documents containing Trade Secrets, has caused and will continue to cause Plaintiff loss of clients, clients, accounts and/or market share.

250.    This imminent injury is neither remote nor speculative, because Plaintiff has already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

251.    Defendants will not suffer harm from the rightful return of Plaintiff's proprietary information and trade secrets and will not be prevented from conducting their ordinary business by lawful means.

252.    Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiff's expense. The ongoing, continuing and future harm to Plaintiff cannot be adequately remedied at law and requires permanent injunctive relief.

253.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiff's Trade Secrets.

254.    Accordingly, Plaintiff is entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Defendants from continuing to use Plaintiff's trade secrets, in order to prevent continued actual and threatened misappropriation of Plaintiff's trade secrets, and requiring Defendants to return and/or destroy the trade secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

## COUNT III – VIOLATION OF
## THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)

### (Against All Defendants)

255.     Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

256.    Plaintiff's computer systems were at all relevant times used in interstate commerce and communication and are thus "protected computers" under 18 U.S.C. § 1030(e)(2).

257.    Upon information and belief, in violation of 18 U.S.C. § 1030(a)(4), Defendants have deliberately and without authorization accessed Plaintiff's computers for the purpose of misappropriating its trade secrets.

258.    Defendants' access of Plaintiff's computers was unauthorized.  Indeed, upon information and belief, after being separated from employment with Plaintiff, Defendants have accessed Plaintiff's accounts and/or computers without authority and have otherwise exceeded

the scope of authorized use of such computer and software in violation of 18 U.S.C. § 1030(a)(4).

259.    Upon information and belief, Defendants knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, recklessly and intentionally caused damage without authorization, and/or intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. §§ 1030(a)(5)(A)-(C).

260.    By reason of the foregoing, Plaintiff was damaged in an amount to be proved at trial, but well in excess of the statutorily required minimum in any one (1) year period.  More particularly, said damages are well over $1 million, which includes the costs of paying for computer forensic experts to examine the computers recovered from Defendants and the lost revenue caused by Defendants misappropriating all of the data from the computers, server and cloud account held by Worldwide and denying  Worldwide access thereto as described above.

## COUNT IV – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
### (Against All Defendants)

261.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

262.    Defendants' actions, as set forth herein, constitutes misappropriation under New York law.

263.    Defendants currently possess information belonging to and used in the operation of Worldwide's business, which information constitutes confidential, proprietary and trade secret information under New York law.

264.    Workforce is and was a direct competitor of Worldwide.

265.    Goldstein and each of the Defendants had access to Worldwide's Confidential Information (employee's social security numbers, Covid Vaccination Cards, employee direct deposit information, and payroll information) as a result of their employment at Worldwide.

266.    As set forth in detail above, Worldwide has taken reasonable measures to maintain the secrecy of Worldwide's Confidential Information, including its trade secrets.

267.    Goldstein and each of the Defendants has provided Worldwide's Confidential Information to Workforce.

268.    Workforce has misappropriated Worldwide's Confidential Information and is using it to compete with Worldwide.

269.    The improperly retained information constitute trade secrets and Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure Worldwide's business.

270.    As a direct and proximate result of Workforce's misappropriation of Worldwide's Confidential Information, Worldwide has suffered: (a) the loss of business expectancies, clients, employees and goodwill; (b) Workforce's use of Worldwide's Client lists and information to profit off the back of Worldwide's years of hard work; and (c) will otherwise be substantially and irreparably harmed unless Workforce is enjoined and restrained by order of the Court.

271.    Unless restrained by this Court, Workforce will cause further irreparable harm to Worldwide.

## COUNT V – UNFAIR COMPETITION

### (Against All Defendants)

272.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

273.    Through Defendants' misappropriation of Plaintiff's confidential trade secrets, Defendants have stolen Clients from Worldwide.

274.    As a result of Defendants' use of the trade secrets they obtained a competitive advantage against Plaintiff, and as such, Defendants have caused economic damages to Worldwide along with diminishing its goodwill.

## COUNT VI – BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

275.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

276.    Each of the Defendants was either an officer, high-level employee, or consultant of Worldwide who occupied a position of trust and confidence in which he or she was entrusted with access to Worldwide Trade Secrets.

277.    As such, each of the Defendants owed Worldwide a fiduciary duty of loyalty and honesty.

278.    By virtue of these duties, each of the Defendants was prohibited from acting in a disloyal manner, or in any way inconsistent with that fiduciary relationship.

279.    Each of the Defendants' aforementioned conduct of stealing Plaintiff's Clients and accounts receivable utilizing the confidential information they learned of through employment with Worldwide, while they worked for Plaintiff using Plaintiff's confidential

information, constitutes a breach of their fiduciary duties owed to Plaintiff.

280.    As a consequence of each of the Defendants' foregoing intentional breach of their fiduciary duties to Plaintiff, Plaintiff has been injured, for which it is entitled to recover damages including – but not limited to – financial loss, loss of good will and reputation, compensatory and special damages, interest, and punitive damages in an amount as the proof at a trial may warrant.

## COUNT VII – BREACH OF FIDUCIARY DUTY

### (Violation of Faithless Servant Doctrine – Against All Defendants)

281.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

282.    Each of the Defendants was either an officer, high-level employee, or consultant of Worldwide who occupied a position of trust and confidence in which he or she was entrusted with access to Worldwide Trade Secrets.

283.    As such, each of the Defendants owed Worldwide a fiduciary duty of loyalty, honesty, and fidelity.

284.    By virtue of these duties, the Defendants were prohibited from acting in a disloyal manner or in any way inconsistent with that trust relationship.

285.    Pursuant to the faithless servant doctrine, the Defendants were obligated to be loyal to Plaintiff and were prohibited from acting in a manner inconsistent with their agency or trust and was bound to exercise the utmost good faith and loyalty in the performance of their duties.

286.    The Defendants' aforementioned conduct of misappropriating Plaintiff's Clients and fees earned by Worldwide and owed to Worldwide as accounts receivable utilizing the

confidential information they learned of through employment with Worldwide, while they worked for Plaintiff using Plaintiff's confidential information constitutes a breach of the fiduciary duty owed to Plaintiff.

287.    The Defendants' activity was related to the performance of each of their duties.

288.    The Defendants' disloyalty permeated their services in its most material and substantial part.

289.    As a consequence of the Defendants' conduct, which constitutes a cause of action pursuant to the faithless servant doctrine, Plaintiff has been injured, for which it is entitled to recover damages including but not limited to the return of wages, bonuses and other compensation paid to the Defendants such that they are disgorged, financial loss, loss of good will and reputation, compensatory and special damages, interest, and punitive damages in an amount as the proof at a trial may warrant.

## **COUNT VIII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
### **(Against all Defendants Except Kampel and Porembski)**

290.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

291.    Kampel and Porembski were each an officer of Worldwide ("Worldwide Officers").

292.    Kampel and Porembski each owed Worldwide a fiduciary duty both during and after their employment not to use Worldwide's confidential information and trade secrets other than for purposes of Worldwide's business.

293.    Workforce and each of the Defendants knew that Kampel and Porembski had been employed by and were officers of Worldwide and therefore owed Worldwide a fiduciary

duty, and further knew that in disclosing Worldwide's confidential information and trade secrets to Workforce, Kampel and Porembski were breaching that duty.

294.    Workforce and each of the Defendants substantially assisted the breaches by Kampel and Porembski of their fiduciary duties to Worldwide, among other things, inducing, encouraging, requesting, incentivizing and causing them to provide Workforce with confidential information and trade secrets of Worldwide for Workforce to use in its business and to compete with Worldwide.

295.    As a direct and proximate result of the Worldwide Officers' and Workforce's breach and each of the Defendants' aiding and abetting thereof, Worldwide has been damaged in an amount to be determined at trial.

## COUNT IX – UNJUST ENRICHMENT

### (Against All Defendants)

296.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

297.    Plaintiff Worldwide has invested substantial time, money, and effort into developing and maintaining its confidential information and Worldwide Trade Secrets over the course of a decade building a successful staffing business, including its Client and Temporary Employee lists and information databases, pricing and cost data, as well as Worldwide's Clients' preferences.

298.    Defendants have used and continue to use Plaintiff's confidential information to compete with Plaintiff and funnel Plaintiff's business opportunities away from Plaintiff to Defendants.

299.    As a result of Defendants' use of Plaintiff's confidential information and trade

secrets, Defendants have all been enriched at Plaintiff's expense by, among other things, receiving substantial revenues from sales of services that compete with Plaintiff's services without bearing the expense and risk of identifying the services and developing the clients, Temporary Employees, marketing plans, and materials necessary to achieve the sales.

300.    As a consequence of Defendants' acts to steal Clients of Worldwide, Plaintiff has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

301.    Moreover, as Workforce admitted and acknowledged in a January 7, 2022 email, Worldwide had, on behalf of Workforce, advanced payroll and other expenses to service Client #1, money which Workforce was obliged to pay back to Worldwide.

302.    As stated above, Workforce did not have enough capital to front the costs of its temporary staffing for its Client #1, because the client was billed on account and therefore Workforce would not be paid for months.  Therefore, the parties agreed that *Worldwide* would provide and fund the salaries and related costs for the Temporary Employees to be placed at Client #1, and upon being paid by Client #1, Workforce would then reimburse Worldwide for the costs of the funds it fronted in this arrangement.  These costs included all payroll related expenses and any associated overhead for the Temporary Employees placed at Client #1.

303.    Workforce has failed to repay Worldwide all of the money that Worldwide had incurred as payroll expenses for temporary employees placed at Client #1, and refused Worldwide's demands to do so.

304.    As a consequence of Defendants' failure to repay Worldwide all of the money

that Worldwide had incurred as payroll expenses for temporary employees placed at Client #1, Plaintiff has been further injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

305.    Furthermore, Workforce has refused Worldwide's demand for payment of amounts that Worldwide loaned to and which are owed to Worldwide by Workforce.

306.    As stated above, when Workforce was formed, Defendants agreed that Worldwide would loan Workforce initial funding needed to begin the business, on the condition that Workforce would repay the loaned amounts.  In accordance with this agreement, on May 27, 2021, Worldwide loaned $2,000 into Workforce's newly created Chase bank account.  On June 24, 2021, and June 25, 2021, Worldwide loaned $1,000 each to Porembski and Kampel respectively.  Porembski and Kampel then each contributed these funds into Workforce's Chase account on their own behalf.  As a result, Porembski and Kampel owed Worldwide $1,000 each, which they have never repaid to Worldwide.

307.    On August 13, 2021, Worldwide loaned Workforce a total of $50,000 into Workforce's Chase bank account (in two separate transactions of $40,000 and $10,000), which Workforce has never repaid to Worldwide.

308.    Workforce has refused Worldwide's demand for repayment of the loaned amounts.

309.    By reason of all of the foregoing conduct, Defendants have unfairly and improperly obtained, and continued to unfairly and improperly obtain, substantial benefit at Plaintiff's expense.

310.    It would be against equity and good conscience to permit Defendants to retain the money that they owed to Plaintiff and the other benefits they have obtained at Plaintiff's expense.

311.    Accordingly, Plaintiff is entitled to a money judgement against Defendant in an amount to be determined at trial.

## COUNT X – MONEY HAD AND RECEIVED

### (Against All Defendants)

312.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

313.    By reason of the conduct set forth in Count IX above, Defendants have received and continue to retain money and other valuable benefits, including but not limited to trade secrets which Defendants have unlawfully profited, moneys for payroll expenses incurred for temporary employees placed at Client #1 (but for which Workforce collected the revenue), and money loaned to Workforce, which is money belonging to the plaintiff.

314.    Defendants have benefited from receipt and retention of the money.

315.    Under principles of equity and good conscience, Defendants should not be permitted to keep the money.

## COUNT XI – CONVERSION

### (Against All Defendants)

316.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

317.    Plaintiff has a possessory right and legal ownership to the confidential information and trade secrets referenced herein.

318.    Defendants exercised unauthorized dominion over Plaintiff's confidential information and trade secrets.

319.    Defendants willfully exercised unauthorized dominion over Plaintiff's confidential information and trade secrets to the detriment of Plaintiff.

320.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets was and is to the exclusion of Plaintiff's rights.

321.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets constitutes conversion.

322.    Defendants have thus committed the tort of conversion under New York common law.

## COUNT XII – TORTIOUS INTENTIONAL INTERFERENCE WITH CONTRACTUAL BUSINESS RELATIONS

### (Against All Defendants)

323.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

324.    Defendants, at all times relevant herein, have known of Plaintiff's ongoing and continuous contractual relationships as alleged herein between Plaintiff and its Clients.

325.    With knowledge of the existing contractual relations with Pure Power's clients, Defendants intentionally and maliciously and without justification or excuse interfered with the aforementioned contractual relationship.

326.    The aforementioned unlawful and unfair conduct by Defendants has disrupted the Plaintiff's economic relationship with those clients and has resulted in, and will continue to result in, preclusion of Plaintiff's successful continued relationship with these clients.

327.    As a result of Defendants' intentional, malicious interference and without justification or excuse, Plaintiff's Clients were stolen by Defendants.

328.    The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiff's relationships and expectations.

329.    As a result of the foregoing wrongful conduct, Plaintiff has been damaged in an amount as yet unknown, but greater than $1 million and to be proven at trial.  Plaintiff has no adequate remedy at law for the continuing violations of Plaintiff's rights as set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendants jointly and severally as follows:

(a)    A preliminary and permanent injunction barring Workforce as well as its officers, employees and agents from possessing or using Worldwide's confidential information and trade secrets;

(b)    A seizure order providing for the seizure from Workforce of Worldwide's trade secrets insofar as necessary to prevent Workforce's propagation or dissemination of Worldwide's trade secrets;

(c)    An award of damages in an amount to be determined at trial, including without limitation direct, consequential, actual, incidental, compensatory as well as the reasonable attorneys' fees and expenses Worldwide has been forced to incur to identify, investigate, address and remediate Workforce's wrongdoing;

(d)    An award of punitive damages;

(e)    An award of reasonable attorneys' fees and expenses pursuant to the Defend Trade Secrets Act and the Computer Fraud and Abuse Act; and

(f)    Such other and further relief as the Court deems just and proper.

(g)    Repayment of wages to the extent permitted by law under Count VII.

## JURY DEMAND

Plaintiff demands trial by jury for all issues so triable.


Dated: New York, New York
      November 8, 2024

                                            */s/* Anthony M. Capozzolo
                                            Anthony M. Capozzolo
                                            SDNY Bar No. AC-8633
                                            LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
                                            10 Grand Central
                                            155 East 44th Street, 25th Floor
                                            New York, New York 10017
                                            Tel: (212) 897-1970; Fax: (212) 826-7146
                                            anthony.capozzolo@lbkmlaw.com

                                            *Counsel for Plaintiff Talenthub Worldwide, Inc.*