**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TALENTHUB WORLDWIDE, INC.

               Plaintiff,

       -against-

TALENTHUB WORKFORCE, INC.; ERIC
GOLDSTEIN; STANDARD CONSULTING,
INC.; DIANE POREMBSKI; PATRICIA
KAMPEL; TANYA WILSON (WELLARD);
JEANNINE TRIOLO; VALERIE WEST;
JOSEPH LIPINSKI; and J COMPUTER PRO,
INC.

             Defendants.

Case No. 24 Civ. 6264 (LGS)

Hon. Lorna G. Schofield

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 4

    A.    Worldwide's Business Model and Operations ......................................... 4

    B.    Workforce is Created as an MWBE and Jointly Services Certain
        Worldwide Clients ................................................................................. 6

    C.    Glass Exhibits Erratic and Extreme Behavior, Triggering the Mass
        Departure of Worldwide Employees ..................................................... 6

    D.    Glass Terminates the Business Service Relationship between Worldwide
        and Workforce, but Permits Workforce to Keep Using the Purported
        Worldwide Trade Secrets ....................................................................... 9

    E.    Worldwide Threatens to Bring CFAA Claims ...................................... 10

    F.    Glass Commences a Books and Records Action in New York State Court;
        Goldstein Sues Worldwide in New York State Court to Obtain His Unpaid
        50% Profit Share in Worldwide .......................................................... 11

LEGAL STANDARD .......................................................................................... 12

ARGUMENT ..................................................................................................... 13

I.    PLAINTIFF'S CFAA CLAIM (COUNT III) SHOULD BE DISMISSED AS
    TIME-BARRED ........................................................................................ 13

    A.    Plaintiff Admits It Alleged Purported Unlawful Access to Worldwide
        Computer Equipment and Accounts More than Two Years Before this
        Case was Commenced ........................................................................... 14

    B.    Plaintiff Fails to Sufficiently Allege that the Two-Year CFAA Limitations
        Period Should be Extended or Equitably Tolled.................................... 15

II.    PLAINTIFF'S DTSA CLAIMS (COUNTS I-II) SHOULD BE DISMISSED FOR
    FAILURE TO STATE A CLAIM .................................................................. 18

    A.    Plaintiff Fails to Sufficiently Allege a Trade Secret ............................ 19

    B.    Even if Plaintiff Had Sufficiently Alleged a Trade Secret, Any Such
        Protection Was Extinguished When Plaintiff Voluntarily Disclosed Its
        Trade Secrets to Workforce without Confidentiality Protections........................ 21

III.    COUNTS I-III SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT
    LEAVE TO AMEND BECAUSE AMENDMENT WOULD BE FUTILE .................. 23

IV.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION TO HEAR THIS
    CASE ..................................................................................................... 24

CONCLUSION.................................................................................................. 25

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

<u>Cases</u>

*24 Seven, LLC v. Martinez*,
    No. 19-CV-7320 (VSB), 2021 WL 276654 (S.D.N.Y. Jan. 26, 2021) ....................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................12, 13, 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................13, 17

*Carnegie–Mellon Univ. v. Cohill*,
    484 U.S. 343 (1988).........................................................................................................24

*Cohen v. Am. Airlines, Inc.*,
    13 F.4th 240 (2d Cir. 2021) .............................................................................................23

*Democratic Nat'l Comm. v. Russian Fed'n*,
    392 F. Supp. 3d 410 (S.D.N.Y. 2019)......................................................................... 18-19

*El Omari v. Dechert LLP*,
    No. 23-CV-4607 (LAK) (OTW), 2024 WL 1509683, (S.D.N.Y. Feb. 22) ...........................14

*F5 Cap. v. Pappas*,
    856 F.3d 61 (2d Cir. 2017).............................................................................................23

*Flaherty v. Dixon*,
    No. 22 CIV. 2642 (LGS), 2023 WL 2051861 (S.D.N.Y. Feb. 16, 2023)..............................23

*Glass v. Talenthub Workforce, Inc.*,
    Index No. 157302/2023 (Sup. Ct. N.Y. Cnty.). .............................................................10, 11

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)............................................................................................13

*Goldstein v. Glass*,
    Index No. 654474/2023 (Sup. Ct. N.Y. Cnty.) .........................................................7, 12, 20

*Inv. Sci., LLC v. Oath Holdings Inc.*,
    No. 20 Civ. 8159, 2021 WL 3541152 (S.D.N.Y. Aug. 11, 2021) ...............................20, 21, 22

*Jordan v. Verizon Corp.*,
No. 17 Civ. 9197 (LGS), 2019 WL 340715 (S.D.N.Y. Jan. 28, 2019)...................................23

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021)..........................................................................................12

*KT Grp. Ltd. v. NCR Corp.*,
No. 15 Civ. 7482 (PGG), 2018 WL 11213091 (S.D.N.Y. Sept. 29, 2018) .....................19, 21

*Lehman v. Dow Jones & Co.*,
783 F.2d 285 (2d Cir. 1986)..........................................................................................19

*Manning v. City of New York*,
No. 23 Civ. 2352 (LGS), 2024 WL 3480437 (S.D.N.Y. July 19, 2024) ...............................7

*Medike Int'l Corp. v. Giller*,
No. 23-CV-8939 (JPO), 2024 WL 139575 (S.D.N.Y. Jan. 12, 2024)..................................22

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998)............................................................................................24

*Mintz v. Mktg. Cohorts, LLC*,
No. 18-CV-4159 (ERK) (SIL), 2019 WL 3337896 (E.D.N.Y. July 25, 2019) .....................20

*Monterroso v. City of New York*,
No. 22 Civ. 7142 (LGS), 2024 WL 360816 (S.D.N.Y. Jan. 31, 2024)................................13

*MThree Corp. Consulting Ltd. v. Wascak*,
No. 22 Civ. 7158 (AKH), 2022 WL 15524842 (S.D.N.Y. Oct. 27, 2022) ...........................19

*Nova Chems., Inc. v. Sekisui Plastics Co.*,
579 F.3d 319 (3d Cir. 2009)...........................................................................................21

*O'Callaghan v. City of New York*,
No. 16 Civ. 1139 (ER), 2016 WL 7177509 (S.D.N.Y. Dec. 8, 2016)...................................7

*Red Rock Sourcing LLC v. JGX LLC*,
No. 21 Civ. 1054 (JPC), 2024 WL 1243325 (S.D.N.Y. Mar. 22, 2024) ...............................8

*Rodriguez v. City of New York*,
No. 18 Civ. 4805 (NRB), 2021 WL 5360120 (S.D.N.Y. Nov. 16, 2021) .............................13

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017).........................................................................................13

*Sewell v. Bernardin*,
795 F.3d 337 (2d Cir. 2015)......................................................................................14, 16

*Smartix Int'l Corp. v. MasterCard Int'l LLC*,
 No. 06 CV 5174(GBD), 2008 WL 4444554 (S.D.N.Y. Sept. 30, 2008) ...................16, 17, 18

*TechnoMarine SA v. Giftports, Inc.*,
 758 F.3d 493 (2d Cir. 2014)..................................................................................................23

*Thea v. Kleinhandler*,
 807 F.3d 492 (2d Cir. 2015)..............................................................................................13, 17

*TomGal LLC v. Castano*,
 No. 22-CV-9516 (JGK), 2022 WL 17822717 (S.D.N.Y. Dec. 19, 2022) ..............................22

*Turret Labs USA, Inc. v. CargoSprint, LLC*,
 No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022)............................................................21

*UrthTech LLC v. GOJO Indus., Inc.*,
 No. 22-cv-6727 (PKC), 2023 WL 4640995 (S.D.N.Y. July 20, 2023) ...................................20

*Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*,
 No. 14 Civ. 7343(ER), 2015 WL 5671724 (S.D.N.Y. Sept. 22, 2015) ....................................8

*S.E.C. v. Wyly*,
 788 F. Supp. 2d 92 (S.D.N.Y. 2011).................................................................................16, 17

*Wynn v. Union Loc. 237, I.B.T.*,
 No. 17 Civ. 3167 (LGS), 2019 WL 1171563 (S.D.N.Y. Mar. 13, 2019) .................................7

*Zabit v. Brandometry, LLC*,
 540 F. Supp. 3d 412 (S.D.N.Y. 2021)................................................................21, 22, 24, 25

*Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*,
 610 F. Supp. 3d 535 (S.D.N.Y. 2022)....................................................................................13

## Statutes and Codes

United States Code
 Title 18, Section 1030(a)(2)(C)..............................................................................................14
 Title 18, Section 1030(a)(5)(C)..............................................................................................14
 Title 18, Section 1030(e)(8)....................................................................................................14
 Title 18, Section 1030 *et seq.*..................................................................................................3
 Title 18, Section 1030(g)........................................................................................................14
 Title 18, Section 1836(b)(1)....................................................................................................19
 Title 18, Section 1836(b)(2)(ii)(II) .........................................................................................22
 Title 18, Section 1836 *et seq.*..................................................................................................3
 Title 18, Section 1839(3)(A)....................................................................................................19
 Title 18, Section 1839(3)(B)....................................................................................................19
 Title 28, Section 1331..............................................................................................................24
 Title 28, Section 1447(c)..........................................................................................................24

## Rules and Regulations

Federal Rules of Civil Procedure
    Rule 9(b) .................................................................................................................3, 14, 17
    Rule 12(b)(2)......................................................................................................1, 4, 24, 25
    Rule 12(b)(6)..................................................................................................................3, 13

Federal Rules of Evidence
    Rule 408 ...............................................................................................................................11

Defendants Talenthub Workforce, Inc. ("Workforce"), Eric Goldstein ("Goldstein"), Standard Consulting, Inc. ("Standard"), Diane Porembski ("Porembski"), Patricia Kampel ("Kampel"), Tanya Wilson (Wellard) ("Wilson"), Jeannine Triolo ("Triolo"), Valerie West ("West"), Joseph Lipinski ("Lipinski"), and J Computer Pro, Inc. (collectively, "Defendants"), by and through their undersigned counsel Pillsbury Winthrop Shaw Pittman LLP, respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the First Amended Complaint, Dkt. 41 ("FAC"), filed by Plaintiff Talenthub Worldwide, Inc. ("Plaintiff" or "Worldwide"), pursuant to Rules 12(b)(2) and (6) of the Federal Rules of Civil Procedure.[1]

## **PRELIMINARY STATEMENT**

Plaintiff attempts to paint a narrative in which Defendants ransacked Worldwide, "stealing" its trade secrets, confidential information and clients, all while Worldwide's owner, Gary Glass ("Glass"), was involuntarily "disabled by a mental health crisis." FAC ¶¶ 1, 4, 29. But nothing could be further from the truth – and the Court need not look beyond documents already in the public record, together with documents cited in the FAC itself, to so conclude.

The FAC conveniently omits any mention of the fact that the Individual Defendants were forced to leave Worldwide by Glass's aberrant behavior. In other Court filings, though, Glass admits to making death threats against one of them, to attempting to destroy the Worldwide and Workforce businesses, and to repeatedly launching vile racist, sexist and antisemitic slurs at the Individual Defendants – including "nigger," "cunt" and "self-hating jew." Understandably fearing for their livelihoods, and even their personal safety, the Individual Defendants departed Worldwide to devote their full-time professional efforts to Workforce – a company only 10% owned by Glass.

---

[1] Defendants Goldstein, Porembski, Kampel, Wilson, Triolo, West and Lipinski are collectively referenced herein as the "Individual Defendants." Capitalized terms otherwise not defined herein have their meaning as in the FAC. All emphasis herein is added unless indicated otherwise. The Federal Rules of Civil Procedure are referenced herein as the "Rules," and each individually, a "Rule."

When they departed, Defendants made no secret of what they were doing, writing Glass that they were "resigning from Talenthub Worldwide Inc., effective today, January 6, 2022, in order to devote our full-time professional efforts to Talenthub Workforce, Inc. While we have high regard for your capabilities, we regret that our resignations must follow in response to the instability and hostile environment created by or reflected in your numerous communications including telephone calls, texts, emails, and voicemails, that you have sent to us and others." *See* Declaration of Kenneth W. Taber, dated January 10, 2025 ("Taber Decl.") Ex. F, ¶ 59.

Worldwide's clients unsurprisingly followed – a fact that was immediately obvious to all. Indeed, Defendants sent a second email to Glass on January 6th advising him that they fully "expect[ed] that clients from . . . Worldwide will follow us to . . . Workforce . . . . Our move is . . . motivated . . . by the urgent need to address the management actions and statements that seriously threaten the business. If left unaddressed, that could very well destroy a business on which so many people depend for their livelihoods — including us." FAC, Ex. C; Taber Decl. Ex. B.

At the time of their departures, Workforce already had full and unrestricted access to the purported "Worldwide Trade Secrets" (as defined in the FAC). But instead of demanding that Workforce immediately cease accessing and using the "Worldwide Trade Secrets" after that break-up, Plaintiff did the opposite. Worldwide's counsel told Workforce counsel, in a letter dated April 26, 2022, that Workforce could keep accessing and using that data, stored on a platform called Avionté: "If you want to have two passwords or separate accounts [for the Avionté data] for Worldwide and Workforce that works." Taber Decl. Ex. C at 2; *id*. Ex. E, ¶ 26.

The FAC omits all of this, however, just as it omits any mention of the two related cases, already pending in New York State Supreme Court, where Justice Moyne credited, and relied upon, the foregoing facts to render decisions adverse to Plaintiff and to Glass. Unhappy with that

track record, Plaintiff brought suit here instead, hoping to find a friendlier forum where the Court, on a Rule 12(b)(6) motion, would simply accept as true Plaintiff's cherry-picked allegations.

While this Court must accept as true on this motion any well-pled allegations, it need **not** credit conclusory allegations, nor allegations contradicted by matters properly subject to judicial notice (such as public filings in the two related state court actions), or directly contradicted by documents referenced in the FAC itself. That includes the contemporaneous correspondence between Plaintiff and Defendants – correspondence only selectively-excerpted in the FAC.

What those public filings and contemporaneous communications demonstrate, in particular, is that Plaintiff's claims for violations of the Computer Fraud & Abuse Act, 18 U.S.C. 1030 *et seq*. ("CFAA"), and the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA") (Counts I-III), cannot withstand judicial scrutiny. *First*, the CFAA claim (Count III) is time-barred as a matter of law. The FAC itself acknowledges that Plaintiff had knowledge of events underlying the CFAA claim, at the latest, by July 11, 2022 – when Plaintiff sent Defendants a letter unambiguously threatening to bring that very claim. *See* FAC ¶¶ 140-41. Having thereafter sat on its hands for over two years, Plaintiff is now time-barred from asserting a CFAA claim. And, any suggestion that the running of the statute of limitations should be equitably tolled here falls far short of meeting the controlling Rule 9(b) pleading standard.

*Second*, Plaintiff's DTSA claims (Counts I-II) fail because Plaintiff does not sufficiently allege any trade secret that Defendants misappropriated. Plaintiff fails to allege with sufficient specificity *any* information that derives independent economic value from not being generally known to another person, particularly when Plaintiff voluntarily disclosed the alleged "Worldwide Trade Secrets" (as defined in the FAC) to Defendants, including Workforce, without any limitations or restrictions on their use. The FAC admits that Defendants – none of whom were

subject to non-competition, non-solicitation or confidentiality covenants – were given complete access to the purported "Worldwide Trade Secrets" when the two companies coordinated their activities. Even when they stopped working together, Worldwide agreed to let Defendants continue accessing those claimed trade secrets long after the Individual Defendants had left Worldwide and joined Workforce full-time. Critically, the FAC does not plead any nonconclusory allegations that it ever took reasonable measures to keep the purported "Worldwide Trade Secrets" secret from Workforce. Even if it had, however, Plaintiff's more than two-year delay bringing this action, confirms that Plaintiff failed to protect its information. That, standing alone, dooms the DTSA claims.

The above-mentioned defects – all clear on the face of the FAC, the documents referenced therein, and the public record – cannot be cured through further amendment. Accordingly, Defendants respectfully request that the Court now dismiss the already once-amended DTSA and CFAA claims (Counts I-III) with prejudice, and without leave to amend yet again. After those claims are dismissed, this Court will lack subject-matter jurisdiction to hear this case and, pursuant to Rule 12(b)(2), should dismiss the remaining state law claims, without prejudice to their being refiled in New York State Supreme Court.

## FACTUAL BACKGROUND

### A. Worldwide's Business Model and Operations

Worldwide is a temporary staffing company created by Glass and Goldstein in 2013, and currently owned entirely by Glass and his son, Oren. FAC ¶¶ 26-28. Worldwide placed temporary employees with its clients and, in exchange, received a markup for each hour worked by those temporary employees. *Id.* ¶¶ 37-39.

Goldstein served as the principal manager of Worldwide from its formation in 2013 until January 2022. *Id.* ¶¶ 41-43. Kampel was President of Worldwide from 2013 until January 2022.

*Id.* ¶ 52. Porembski was Executive Vice President and Chief of Staff of Worldwide from 2013 until January 2022. *Id.* ¶ 53. Triolo, Wilson and West were also employed by Worldwide beginning on different dates, but all ending in January 2022. *Id.* ¶¶ 54-56. Lipinski was an outside IT consultant for Worldwide from 2013 until January 2022. *Id.* ¶ 57. Through his company, J Computer Pro Inc., Lipinski "maintained Worldwide's entire IT operation." *Id.*

To handle its operations, including billing and payroll, Worldwide used a cloud-based staffing software platform designed for the temporary staffing industry called Avionté. *Id.* ¶¶ 42, 69. Avionté provides this same platform to more than 500 staffing companies throughout the United States. *Id.* ¶ 42.

According to the FAC, **all** the claimed "Worldwide Trade Secrets" were "produced and stored in . . . Avionté." *Id.* ¶ 68. This included: Worldwide's "business model and Client lists" (*id.* ¶ 59(a)); "[l]ists of the Temporary Employees" (*id.* ¶ 59(b)); "weekly sales reports" (*id.* ¶ 59(c)); "accounts receivable aging reports" (*id.* ¶ 59(d)); "weekly, quarterly, and annual payroll reports (*id.* ¶ 59(e)); "additional proprietary information that [Worldwide] gathered for each of the Temporary Employees it placed at its Clients, including 'onboarding information' (which included salary withholding elections and direct deposit information), background check information, resumes, skillsets, references, emergency contacts, and COVID vaccination cards, among many other items" (*id.* ¶ 60); and "other proprietary information regarding each of its Clients, including proposal letters, invoices, contact information, contracts, progress reports, notes from Client update calls and discussions with Temporary Employee candidates, marketing materials, references, and other Worldwide internal documents" (*id.* ¶ 61).[2]

---

[2] Worldwide also stored all its purported "Worldwide[] Trade Secrets" on its own computer server (the "Worldwide Server"). *Id.* ¶ 64. "[A]ll of the Worldwide Computer Equipment was . . . kept securely at Worldwide's leased office space on 52 Vanderbilt Avenue." *Id.* ¶ 96.

Access to Worldwide's Avionté account required that a user enter a login password on the Avionté website, and then click a dialogue box for remote access into the Avionté platform. *Id.* ¶¶ 64, 71, 78-79. The FAC alleges that each of Defendants Kampel, Porembski, Triolo, Wilson, West and Lipinski had such access to the purported Worldwide Trade Secrets in the course of their ordinary business activities. *Id.* ¶¶ 52-58. The FAC alleges that Defendants Goldstein and West also had full access to Worldwide's Avionté using different online login accounts. *Id.* ¶¶ 46, 56.

**B.      Workforce is Created as an MWBE and Jointly Services Certain Worldwide Clients**

In May 2021, Glass, Kampel and Porembski formed Workforce, so as to have a Minority and Women Owned Business Enterprise ("MWBE") entity able to service those clients who preferred to deal with an MWBE. Glass owned 10% of Workforce, and Kampel and Porembski each owned 45%. *Id.* ¶¶ 101-03. Porembski and Kampel became employees of Workforce in May 2021, but also remained Worldwide employees until January 2022. *Id.* ¶ 109. Workforce serviced, in particular, Worldwide's largest client, identified as "Client #1" in the FAC. Client #1 had specifically required that the temporary staffing agencies it retained have an MWBE certification. *Id.* ¶¶ 101-05.

While the FAC tries to strategically plead around the fact that Worldwide knowingly gave Workforce unrestricted access to Worldwide's Avionté account, and all the information contained therein, the FAC alleges that Kampel and Porembski had full access to the purported Worldwide Trade Secrets until "early January 2022" – including after "Porembski and Kampel became employees of Workforce in May 2021." FAC ¶¶ 52-53, 61-62, 109.

**C.      Glass Exhibits Erratic and Extreme Behavior, Triggering the Mass Departure of Worldwide Employees**

Beginning in mid-2021, Glass started exhibiting erratic and offensive behavior for extended periods of time, during which he abused Individual Defendants through emails, text

messages and phone calls. On May 19, for example, Glass left Goldstein two alarming voicemails. In one, he called long-time Worldwide employee West a "fucking ugly fucking nigger," and called Goldstein's adult daughter a "fucking cunt." *See* Taber Decl. Ex. F, ¶ 46. Glass admits making these statements. *See id.* Ex. J, ¶ 46.[3] In a second voicemail that same day, Glass called Goldstein a "piece of shit" and said that he "will not fucking listen to [Goldstein]." *See id.* Ex. F, ¶ 46. Glass admits making those statements as well. *See id.* Ex. J, ¶ 46.[4]

As still further examples, in a November 3rd email, Glass called West an "ugly piece of shit," *id.* Ex. F, ¶ 46, and the next day, attacked Goldstein in an email sent to multiple Worldwide personnel, stating: "What does Eric do 1) Lies 2) Abuses Oren 3) Arrogant 4) terrible bookkeeper 4) answer phones 5) Creates more work not less work 6) Knows nothing about payroll tax reporting and refuses to learn." *Id.*, ¶ 47.

On November 4, 2021, Glass was involuntarily committed to the Weill Cornell Psychiatry New York-Presbyterian Westchester Behavioral Health Center ("Weill Cornell"), after he made threats of violence to a treating psychiatrist. *Id.* ¶ 49. But even while undergoing treatment at Weill Cornell, Glass left Goldstein a threatening voicemail on November 6, 2021, stating that Goldstein was about to be "throw[n] out of [Worldwide]" and would be "nothing." *Id.* ¶ 50.[5]

---

[3] The Court may take judicial notice of filings in the related New York state actions (Taber Decl. Exs. A-B, E-J) as a matter of law. *See, e.g., O'Callaghan v. City of New York*, No. 16 Civ. 1139 (ER), 2016 WL 7177509, at *4 (S.D.N.Y. Dec. 8, 2016) (taking judicial notice of filings in connection with related state court proceedings); *Manning v. City of New York*, No. 23 Civ. 2352 (LGS), 2024 WL 3480437, at *1 (S.D.N.Y. July 19, 2024) (Schofield, J) (same); *Wynn v. Union Loc. 237, I.B.T.*, No. 17 Civ. 3167 (LGS), 2019 WL 1171563, at *2 (S.D.N.Y. Mar. 13, 2019) (Schofield, J) (taking judicial notice of complaint and proceedings in related action) *aff'd*, 797 F. App'x 13 (2d Cir. 2019). The exhibits to the Complaint in *Goldstein v. Glass*, Index No. 654474/2023 (Sup. Ct. N.Y. Cnty.) ("*Goldstein v. Glass*") are omitted pursuant to the limitation on exhibits in Your Honor's Individual Rule III(B)(3).
[4] In *Goldstein v. Glass*, Worldwide and Glass "[a]dmitted that Glass, while suffering from psychiatric illness, used racial, religious and sexual slurs against Kampel, Porembski and/or West" and "[a]dmitted that Glass, while suffering from psychiatric illness, from May 2021 forward exhibited erratic behavior and sent or made the emails, text messages and phone calls alleged in the Complaint." Taber Decl. Ex. J, ¶¶ 7, 45.
[5] In *Goldstein v. Glass*, Worldwide and Glass "[a]dmitted that in May 2021, Glass was involuntarily committed to a Westchester County psychiatric facility for nineteen days in November 2021, and that while committed, Glass threatened to throw Goldstein out of the Company." Taber Decl. Ex. J, ¶ 6; *see also id.* ¶¶ 47-50.

Glass's involuntary commitment lasted 19 days, from November 4 to November 23, 2021, during which time his son Oren, using a power of attorney he held from Glass, removed Glass as a signatory to Worldwide's bank account and removed Glass as Secretary-Treasurer of Workforce. *Id*. ¶¶ 52-54. But even following his release from that 19-day involuntary commitment, Glass again made threats of violence, this time including death threats against Goldstein. *Id*. ¶ 50. He also sent emails to Goldstein calling him a "thief" with "self-hating Jewish in-laws," and claiming Goldstein's two sons were "mentally deficient." *See, e.g.*, *id.* ¶ 55.

With matters plainly not improving, the Individual Defendants jointly decided in December 2021 to leave Worldwide and join Workforce on a full-time basis. FAC ¶¶ 117-18. In their January 6, 2022, Worldwide resignation email, Kampel and Porembski specifically stated they were leaving Worldwide due to Glass's threats to destroy Worldwide and his abusive behavior:

> This letter is to inform you that Pat [Kampel] and Diane Porembski are resigning from Talenthub Worldwide Inc, effective today, January 6, 2022, in order to devote our full-time professional efforts to Talenthub Workforce, Inc. While we have high regard for your capabilities, **we regret that our resignations must follow in response to the instability and hostile environment created by or reflected in your numerous communications including telephone calls, texts, emails, and voicemails, that you have sent to us and others. Your recent illness and your repeated threats to destroy the business, over the last few months, have only made matters worse. We simply cannot tie our professional livelihoods to a business plagued by such instability.** Our wish is for you to be well and for us, to continue to build the business so everyone will profit, you included. We are happy to assist in this transition; you may contact us by email.

*See* FAC ¶¶ 127-28; Taber Decl. Ex. A at 1-3.[6]

---

[6] The FAC selectively quotes from this January 6, 2022 email, omitting the critical part that Kampel and Porembski were leaving Worldwide due to Glass's behavior. *See* FAC ¶ 128. The entire January 6, 2022 email is attached hereto as Taber Decl. Exhibit A. The Court may consider this document on Defendants' motion to dismiss because the FAC makes "a clear, definite, and substantial reference to the document," and, thus, it is incorporated into the FAC by reference. *See, e.g.*, *Red Rock Sourcing LLC v. JGX LLC*, No. 21 Civ. 1054 (JPC), 2024 WL 1243325, at *12 (S.D.N.Y. Mar. 22, 2024) (incorporating by reference into complaint two emails referenced in complaint); *accord Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343(ER), 2015 WL 5671724, at *8 (S.D.N.Y. Sept. 22, 2015) (deeming eight documents, including four e-mails, incorporated by reference in the complaint, because the "documents [were] clearly referenced by the Complaint" and "highly relevant").

In a second email sent later that same day, Kampel and Porembski made clear their intention to compete directly with Worldwide for the clients they'd previously serviced through Worldwide: "[W]e have resigned from TalentHub Worldwide today, and expect that clients from . . . Worldwide will follow us to . . . Workforce . . . . Our move is . . . motivated . . . by the urgent need to address the management actions and statements that seriously threaten the business. If left unaddressed, that could very well destroy a business on which so many people depend for their livelihoods — including us." FAC, Ex. C; Taber Decl. Ex. B.

**D.**   **Glass Terminates the Business Service Relationship between Worldwide and Workforce, but Permits Workforce to Keep Using the Purported Worldwide Trade Secrets**

Worldwide's and Workforce's prior business service relationship did not survive for long after the Individual Defendants left Worldwide. Within two weeks, Glass (i) shut down Workforce's ability to process payroll through Worldwide for Workforce's staff and Temporary Employees; (ii) shut down Workforce's ability to process payments to vendors through Worldwide; (iii) threatened to destroy Workforce by contacting the New York State Small Business Administration in an effort to undermine its MWBE accreditation; (iv) made further harassing statements to the Individual Defendants;[7] and (v) enlisted an online blogger to publish a negative article about Goldstein. *See* Taber Decl. Ex. H, ¶ 1. Workforce thereafter had no choice but to operate independently of Worldwide to make sure, in particular, that the hundreds of Temporary Employees at issue continued to be paid.

On April 26, 2022, Plaintiff's then legal counsel (the *first* of what would ultimately turn out to be *four* successive sets of lawyers hired by Glass), sent Defendants a letter with various demands. Of greatest significance for present purposes, after specifically noting that Defendants

---

[7] This included threatening to file a "criminal complaint" against Defendants unless they paid Glass $600,000. *See* Taber Decl. Ex. G at 7.

had continuing access to Worldwide's QuickBooks and Avionté accounts, Plaintiff's counsel voluntarily offered to give Defendants their own Avionté logins:

> [Glass] needs to log into his Quick Books for Worldwide and the password has been changed or he does not know it. . . . I want those books and records. Also, there is the Avient [sic] program which stores payroll and AR information for his company. He needs access to that too! This can be remote and he will not have to enter the premises, but he needs the password. **If you want to have two passwords or separate accounts for Worldwide and Workforce that works.**

*See* Taber Decl. Ex. C at 2;[8] *see also id.* Ex. E, ¶ 26 (quoting the April 26, 2022 letter).

### E.     Worldwide Threatens to Bring CFAA Claims

By July of 2022, Plaintiff had a new (*second*) legal counsel, who sent Defendants a more aggressive letter, dated July 2022, in which he "specifically advised Workforce that its ongoing conduct gave rise to claims against Workforce . . . for violation of the Computer Fraud & Abuse Act." FAC ¶¶ 140-41; Taber Decl. Ex. D. Under the specific heading **"Claim For Violation of the Computer Fraud and Abuse Act"**, the July 11, 2022 letter stated:

> [I]t has very recently been discovered that a valuable, external hard drive, owned by Worldwide and containing thousands of Worldwide e-mails, documents, financial and customer records-much of it confidential information and certainly some of it trade secrets . . . has been taken from, stolen or otherwise misappropriated from the former offices of Worldwide . . . at 52 Vanderbilt Avenue . . . No doubt, each of the Workforce Management Personnel had exclusive regular access to the office, to and including through at least mid-June 2022. The Worldwide Hard Drive was missing upon Worldwide's inspection of the Vanderbilt Office on or about June 14, 2022.
>
> . . .
>
> [B]oth Porembski and Kampel still have access, use and conduct business through their respective Worldwide e-mail accounts, a system to which [Glass] has no access, without any legitimate or lawful business need or good reason, except to further damage Worldwide or otherwise unfairly compete and unjustly enrich

---

[8] The FAC conveniently fails to make any reference to this April 26, 2022 demand letter. Nonetheless, the Court may consider this document when deciding Defendants' motion to dismiss, as a "document[] possessed by or known to the plaintiff and upon which it relied in bringing the suit." *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). The Court may also take judicial notice of this April 26, 2022 letter, as it was cited extensively in the Verified Petition in *Glass v. Talenthub Workforce, Inc.*, Index No. 157302/2023 (Sup. Ct. N.Y. Cnty.) ("*Glass v. Workforce*"). *See* Taber Decl. Ex. E, ¶¶ 24-26.

> Workforce. It is clear, especially given the prolonged nature of dispute underlying this Matter, that Porembski, Kampel and likely Goldstein, and perhaps others of the Workforce Personnel, including and especially Lapinski[sic], have intentionally continued to access Worldwide's computer and e-mail systems, without authorization, with the value of the information accessed, used, misdirected and/or destroyed in excess of $5,000.

*Id.*; Taber Decl. Ex. D at 3.[9]

On September 27, 2023, Workforce thereafter notified Worldwide that two pieces of computer equipment had been discovered in a storage closet just outside Workforce's rented space. FAC ¶ 137. Workforce promptly returned that computer equipment to Worldwide. *Id.* ¶ 143. Then, on March 15, 2024, Workforce notified Worldwide that Workforce had learned that West had never returned her Worldwide-issued laptop. *Id.* ¶¶ 160-61. Workforce promptly returned that laptop to Worldwide as well. *Id.* ¶ 162.

### F. Glass Commences a Books and Records Action in New York State Court; Goldstein Sues Worldwide in New York State Court to Obtain His Unpaid 50% Profit Share in Worldwide

On July 20, 2023, Glass, through his then *third* legal counsel, commenced *Glass v. Workforce* in New York State Supreme Court, an Article 78 proceeding demanding to inspect Workforce's books and records, as a purported Workforce officer and 10% shareholder. Taber Decl. Ex. F. On February 2, 2024, Justice Moyne denied that demand for unfettered access to Worldwide's books and records, adopting instead Workforce's proposal that there be "[r]easonable restrictions on [Glass's] inspection . . . to ensure that this information is not used in a way that will be harmful to [Workforce's] business." Taber Decl. Ex. H, ¶ 13. That ruling followed Justice Moyne's detailed findings, *inter alia*, that:

---

[9] The July 11, 2022 demand letter, the relevant excerpts of which are attached hereto as Taber Decl. Exhibit D, is extensively quoted and relied upon in the FAC (*see* FAC ¶¶ 139-41), and, thus, is incorporated into the FAC by reference. *See supra* n.2. Defendants are not disclosing the balance of this letter because it was marked by Plaintiff's counsel as protected by Federal Rule of Evidence 408.

> [Workforce] has credibly alleged that [Glass] has engaged in conduct detrimental to [Workforce] . . . including, but not limited to, (i) shutting down Workforce's ability to process payroll for Workforce's staff and temporary employees; (ii) shutting down Workforce's ability to process payments to vendors; (iii) threatening to destroy Workforce by interfering with its business relationships and contacting the New York State Small Business Administration in an effort to undermine Respondent's Minority- or Women-Owned Business Enterprise ('MWBE') accreditation; (iv) making harassing statements to Workforce employees; and (v) pressing an online blogger to publish a negative article about Respondent's lead manager.
>
> . . . .
>
> [Workforce] has [also] credibly alleged that [Glass] also harbors improper purposes which are inimical to the corporation, including attempts to discover business secrets, to aid a competitor of the corporation, to locate information to pursue one's own social or political goals, and/or to secure prospects for personal business.

*See* Taber Decl. Ex. H, ¶¶ 1, 11.

On September 13, 2023, Goldstein separately commenced the *Goldstein v. Glass* action in New York State Supreme Court, seeking damages for the refusal by Worldwide and Glass to honor their contractual obligation to pay Goldstein 50% of Worldwide's profits, in exchange for Goldstein having provided full-time managerial services to Worldwide for over eight years. *See id.* Ex. F. This case was also assigned to Justice Moyne as a related action to the Article 78 case. On July 3, 2024, Justice Moyne denied Glass's and Worldwide's motion to dismiss Goldstein's Complaint, (*see id.* Ex. I), and discovery in that action is now ongoing.

Approximately one month after Justice Moyne rendered his decision adverse to Worldwide in *Goldstein v. Glass*, Worldwide commenced this action on August 19, 2024, in Federal Court.

## **LEGAL STANDARD**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)) (internal quotation marks and citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). "It is not enough for a complaint to allege facts that are consistent with liability; it must 'nudge[ ]' claims 'across the line from conceivable to plausible.'" *Monterroso v. City of New York*, No. 22 Civ. 7142 (LGS), 2024 WL 360816, at *2 (S.D.N.Y. Jan. 31, 2024) (Schofield, J) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (alterations in original) (citation omitted).

In determining the adequacy of a claim under Rule 12(b)(6), in addition to facts stated on the face of the complaint, the Court may consider "documents appended to the complaint or incorporated in the complaint by reference," and "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted); *accord Rodriguez v. City of New York*, No. 18 Civ. 4805 (NRB), 2021 WL 5360120, at *2-6 & n.3 (S.D.N.Y. Nov. 16, 2021) (taking judicial notice of publicly filed documents and granting motion to dismiss where such documents barred plaintiff's claims). Moreover, even "[a]t the pleadings stage, 'a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.'" *Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*, 610 F. Supp. 3d 535, 543 (S.D.N.Y. 2022) (Schofield, J) (quoting *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017)).

## **ARGUMENT**

## I. **PLAINTIFF'S CFAA CLAIM (COUNT III) SHOULD BE DISMISSED AS TIME-BARRED**

It is well settled that "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (citations omitted). Here, it is clear on the face of the FAC that Plaintiff's CFAA

claim is time-barred as a matter of law, because the claim was first articulated by Plaintiff in correspondence dated July 11, 2022, more than two years before this case was commenced on August 19, 2024.

That other alleged facts supporting the claim may have come to light thereafter does not, under controlling authority, alter the conclusion that the claim is time-barred. As for any attempt now to circumvent the statute of limitations on a theory of equitable estoppel by fraudulent concealment, any such assertion here is not supported by the required specific facts, and falls far short of the Rule 9(b) heightened pleading standard.

A.     **Plaintiff Admits It Alleged Purported Unlawful Access to Worldwide Computer Equipment and Accounts More than Two Years Before this Case was Commenced**

The CFAA creates a private right of action for "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer," and "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss." *Sewell v. Bernardin*, 795 F.3d 337, 339-40 (2d Cir. 2015) (citing 18 U.S.C. § 1030(a)(2)(C) and § 1030(a)(5)(C)). Damage is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id*. at 340 (citing § 1030(e)(8)).

The statute expressly provides that a CFAA claim must be filed "within 2 years of the date of the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g); *accord Sewell*, 795 F.3d at 339-40 (holding that CFAA limitations period "ran from the date that [plaintiff] discovered that *someone* had impaired the integrity of each of her relevant Internet accounts"); *El Omari v. Dechert LLP*, No. 23-CV-4607 (LAK) (OTW), 2024 WL 1509683, at *6 (S.D.N.Y. Feb. 22), *report and recommendation adopted* No. 23-CV-4607 (LAK), 2024 WL 3517429 (S.D.N.Y. June 24, 2024).

Here, the August 19, 2024, FAC alleges that, "on or about January 6, 2022," Defendants "stole" computer equipment "from Worldwide's offices at 52 Vanderbilt Street . . . and brought [them] to Workforce's office at 295 Madison Avenue." FAC ¶ 135; *see also id.* ¶ 4 ("In . . . January 2022 . . . Goldstein and other defendants moved computers, server, and their entire business operations from Worldwide's business office in Manhattan to another location in Manhattan and began serving Worldwide's clients through Workforce."). Plaintiff admits it discovered the "removal" of such equipment at the latest on June 14, 2022, when Worldwide inspected its offices. *Id.* ¶ 135; *see also* Taber Decl. Ex. D at 2.

As stated in the FAC itself, Worldwide's demands in respect of that equipment "included a letter to Workforce on July 11, 2022 and emails on July 15, 2022 . . .." FAC ¶ 139. The July 11, 2022 letter, as noted above, "specifically advised Workforce that its ongoing conduct gave rise to claims against Workforce for . . . violation of the Computer Fraud & Abuse Act." *Id.* ¶¶ 140-41. Yet, the CFAA claim here was not formally pled until August 19, 2024, more than two years later.

Accordingly, Plaintiff's CFAA claim is time-barred as a matter of law.[10]

**B.     Plaintiff Fails to Sufficiently Allege that the Two-Year CFAA Limitations Period Should be Extended or Equitably Tolled**

Plaintiff contends that the running of the statute of limitations period should be extended, with the commencement of the limitations period deferred until September 27, 2023, the date when

---

[10] Insofar as the CFAA claim is also predicated on Defendants' continued access to Worldwide's Avionté data, that access was, as noted above, known at least as of April 26, 2022 (*see* Taber Decl. Ex. C), also well more than two years before the CFAA claim here was first pled on August 19, 2024. To the extent Plaintiff argues its CFAA claim is based on its allegations (i) that Defendants "repeatedly and without authorization used their Worldwide email addresses" (FAC ¶ 168) or (ii) that "Defendants changed the profile photo on Worldwide's Facebook page to an image containing a . . . Workforce logo" and "[took] down Worldwide's webpage" (*id.* ¶ 173), the CFAA claim would still be time-barred as a matter of law. Plaintiff admits it had knowledge of Defendants' purported use of Worldwide's email accounts in **March 2022**. *See id.* ¶ 170 (alleging that "Lipinski has improperly denied Worldwide's officers and employees access to the Worldwide email server and accounts since March 2022, ignoring Plaintiff's repeated demands for such access"). Similarly, Plaintiff admits the unauthorized access to Worldwide's website and Facebook page happened "in **March 2022**." *Id.* ¶ 173. A CFAA claim based on these purported acts needed to be asserted by March 2024 – nearly six months before this case was actually commenced.

Plaintiff now claims it learned the *extent* of Defendants' purported unlawful access and use. *Id.* ¶¶ 136-37. But that does not save the CFAA claim, because a CFAA claim begins to accrue when a plaintiff first discovers the intrusion – "[t]hat [a plaintiff] may not have known exactly what happened . . . is of no moment." *See Sewell*, 795 F.3d at 340-42; *accord Smartix Int'l Corp. v. MasterCard Int'l LLC*, No. 06 CV 5174(GBD), 2008 WL 4444554, at *3 (S.D.N.Y. Sept. 30, 2008), *aff'd,* 355 F. App'x 464 (2d Cir. 2009) (dismissing CFAA claims as time-barred, where plaintiff discovered the intrusion two years and three months prior to complaint, but did not learn the full extent of the injury until six months later).

In *Sewell*, the plaintiff alleged that a former romantic partner improperly accessed her computer and social media accounts in violation of CFAA. *Sewell*, 795 F.3d at 338. The plaintiff learned of the intrusion on August 1, 2011, when she first discovered her AOL password had been altered, and she was unable to access her email account. *Id.* at 338-39. Though she was unaware at the time that it was her former romantic partner that changed her password, the court found that the CFAA' statute of limitation still began to run on August 1, 2011, when she discovered the "damage" to her AOL account and learned she could not log into her email account. *Id.* at 340-41. This same standard dooms Plaintiff's CFAA claim here.

Plaintiff's alternate contention that the limitations period here must be equitably tolled because of misrepresentations supposedly made by Defendants is similarly entitled to short shrift. Plaintiff cites *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 104 (S.D.N.Y. 2011), for the proposition that the statue of limitations should be tolled because Defendants "fraudulently concealed the evidence of their unlawful intrusion into Worldwide's computer and server." Dkt. 44 at 3. However, *Wyly* is non-precedential, as it did not concern claims brought under the CFAA, much less tolling the

statute of limitations thereunder. *See Wyly*, 788 F. Supp. 2d at 104 (discussing doctrine of fraudulent concealment on statute of limitations in securities violations claims).

But even assuming the doctrine of fraudulent concealment could toll the statute of limitations here, Plaintiff falls far short of meeting the applicable Rule 9(b) pleading standard. As stated in *Thea*, "[w]hen a plaintiff relies on a theory of equitable estoppel to save a claim that otherwise appears untimely on its face, the plaintiff must **specifically plead** facts that make entitlement to estoppel plausible (not merely possible)," and must do so pursuant to the heightened pleading standards of Rule 9(b). *See Thea*, 807 F.3d at 501(citing *Iqbal,* 556 U.S. at 678-79; *Twombly,* 550 U.S. at 556-57).

Indeed, it is well established that "[e]quitable tolling is only warranted under rare and exceptional circumstances," and "should be sparingly invoked only where there has been a showing that plaintiff has been diligently pursuing its legal rights and that some extraordinary circumstance stood in the way of its timely filing the action." *Smartix*, 2008 WL 4444554, at *4 (citations omitted). In *Smartix*, plaintiff asserted a CFAA claim more than two years after it discovered the alleged unauthorized computer access giving rise to the claim. Plaintiff alleged that defendants "attempt[ed] to deliberately corrupt and erase evidence of the unauthorized access and theft from plaintiff's computer system," and the CFAA limitations period should therefore be tolled "until plaintiff was able to ascertain the extent of the damage to its computer system." *Id*. at *3.

But, the *Smartix* court rejected this argument, holding that, because plaintiff had knowledge of the claimed unlawful computer access, plaintiff had "ample time, opportunity and knowledge to timely file suit, [so] equitable tolling [was] unwarranted." *Id*. at *4 (dismissing CFAA claim as time-barred). Here, too, Plaintiff fails to assert *any* allegations that make its equitable tolling defense plausible, much less demonstrating this is the kind of "extraordinary" case that would

warrant such relief. All Plaintiff pointed to in opposing Defendants' pre-motion conference letter were Defendants' denials that they possessed the computers. *See* Dkt. 44 at 2 (citing FAC ¶ 137-39). But the paragraphs of the FAC cited don't support that statement; they allege only that:

(1) Defendants informed Plaintiff that computer equipment belonging to Plaintiff was discovered in a closet just outside Defendants' offices in September 2023, following the expiration of Defendants' lease (FAC ¶ 137);

(2) Plaintiff disputes Defendants' claim that the computer equipment was first discovered then (*id.* ¶ 138); and

(3) Plaintiff previously demanded all Plaintiff's property from Defendants in 2022 (*id.* ¶ 139).

None of that amounts to allegations establishing fraudulent concealment. Moreover, even assuming *arguendo* that Defendants had affirmatively denied possession of the equipment, *Smartix* establishes that such allegations would still not warrant tolling the statute of limitations. *See* 2008 WL 4444554, at *4 (finding equitable tolling inapplicable, even where defendant attempted to corrupt and erase evidence of the CFAA violation; plaintiff was still "fully armed" with the necessary information to sue defendant prior to the CFAA statute of limitations expiring).

Indeed, to conclude here that Plaintiff knew enough to bring a CFAA claim more than two years before it actually sued, the Court need look no further than Plaintiff's own July 11, 2022, letter expressly threatening that very claim.

## II.    PLAINTIFF'S DTSA CLAIMS (COUNTS I-II) SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

"To state a claim for trade secret misappropriation, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019) (internal quotation marks

and citations omitted); *see also* 18 U.S.C. § 1836(b)(1). Here, Plaintiff fails to sufficiently plead either element, and the DTSA claims should therefore be dismissed for failure to state a claim.

### A. Plaintiff Fails to Sufficiently Allege a Trade Secret

Under the DTSA, a "trade secret" is defined as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). The FAC fails to sufficiently plead any such trade secret here for *two* independent reasons.

*First*, insofar as the information underlying Plaintiff's DTSA claims concerns customer identities and customer preferences in the temporary employment industry, that information does not, as a matter of law, qualify as a trade secret. *See, e.g.*, *24 Seven, LLC v. Martinez*, No. 19-CV-7320 (VSB), 2021 WL 276654, at *7 (S.D.N.Y. Jan. 26, 2021) (dismissing trade secret misappropriation claims regarding a temporary staffing company's customer names and preferences); *MThree Corp. Consulting Ltd. v. Wascak*, No. 22 Civ. 7158 (AKH), 2022 WL 15524842, at *5 (S.D.N.Y. Oct. 27, 2022) (list of prospective temporary staffing clients was not a trade secret, as such customers are easily discoverable).[11]

*Second,* Plaintiff fails to sufficiently allege how it has "taken reasonable measures to keep such information secret," – an absolute requirement for a trade secret. *See* § 1839(3)(A). Although courts look at a number of factors when deciding what information constitutes a trade secret, "the most important consideration is whether the information was secret." *KT Grp. Ltd. v. NCR Corp.*, No. 15 Civ. 7482 (PGG), 2018 WL 11213091, at *13 (S.D.N.Y. Sept. 29, 2018) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)) (citation omitted). In making that

---

[11] Moreover, the customer agreements Plaintiff itself cites apparently all provide that customer-specific information belongs to customers (*See* FAC ¶ 81), who are therefore free to use that same information with other vendors.

determination, "courts in this Circuit generally look to whether confidentiality or nondisclosure agreements are in place and whether the information is guarded by physical- or cyber-security protections." *UrthTech LLC v. GOJO Indus., Inc.*, No. 22-cv-6727 (PKC), 2023 WL 4640995, at *12 (S.D.N.Y. July 20, 2023) (citations omitted).

Here, however, none of those protections were in place. The FAC pleads that the Individual Defendants were given access to the Worldwide Trade Secrets as part and parcel to their employment, and Workforce was given access to the Worldwide Trade Secrets pursuant to a business arrangement, all without ***any restrictions*** on the use of such information. The FAC does not plead that ***any*** of the Defendants were subject to written confidentiality agreement requiring them to keep this information confidential, or any other restrictive covenant.[12] This strongly militates against a finding of trade secret protection. *See, e.g.*, *Inv. Sci., LLC v. Oath Holdings Inc.*, No. 20 Civ. 8159, 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021) (concluding that the plaintiff did not employ reasonable measures to protect its claimed trade secrets because, among other reasons, the plaintiff "concede[d] that it did not require [the defendant] to sign a confidentiality agreement before sharing the contents of the [product]"); *Mintz v. Mktg. Cohorts, LLC*, No. 18-CV-4159 (ERK) (SIL), 2019 WL 3337896, at *6 (E.D.N.Y. July 25, 2019) (dismissing DTSA claim because plaintiff "did not require defendants to sign a non-disclosure agreement nor any sort of covenant to protect the passwords") (citation omitted).

In fact, the only safeguard alleged in the FAC is that Worldwide's Avionté account required "login credentials" and, supposedly, "[o]nly Worldwide employees had [such] login information for Avionté." FAC ¶¶ 71-72. But this is immediately contradicted by the FAC's own allegations that Worldwide also shared Avionté access with Workforce in furtherance of their mutual business

---

[12] In *Goldstein v. Glass*, Worldwide and Glass has admitted that "Goldstein's employment with Worldwide was . . . not subject to any written employment agreement." *See* Taber Decl. Ex. F, ¶ 34; Taber Decl. Ex. J, ¶ 34.

arrangement, and agreed to let Workforce continue its access to Avionté even after the Worldwide-Workforce business relationship concluded. *See supra* Factual Background Section D; Taber Decl. Ex. C at 2.

The only other allegation in the FAC about Plaintiff's efforts to protect the purported "Worldwide Trade Secrets" is the wholly conclusory allegation that "Worldwide has taken reasonable measures to maintain the secrecy of Worldwide's Trade Secrets." FAC ¶ 227. But, as the Second Circuit has made clear, "[i]n the absence of nonconclusory allegations that it took reasonable measures to keep its information secret, [Plaintiff] has not plausibly alleged that Defendants[] misappropriated a 'trade secret' under the DTSA." *See Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *3 (2d Cir. Mar. 9, 2022) (citation omitted).

### B. Even if Plaintiff Had Sufficiently Alleged a Trade Secret, Any Such Protection Was Extinguished When Plaintiff Voluntarily Disclosed Its Trade Secrets to Workforce without Confidentiality Protections

Courts routinely deny trade secret protection on a motion to dismiss where the pleadings demonstrate that the owner "voluntarily disclose[d] the alleged secret" without confidentiality protections, even when, as here, that disclosure was in connection with a business relationship. *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 425 (S.D.N.Y. 2021) (finding no protectable trade secret existed where plaintiff voluntarily shared the algorithms in dispute with various co-venturers and business partners); *accord Inv. Sci.*, 2021 WL 3541152, at *5 (denying trade secret protection to information plaintiff "voluntarily disclosed" to potential business partner without entering into any confidentiality agreement).[13]

---

[13] *See also KT Grp.*, 2018 WL 11213091, at *13 (voluntary disclosure of technical drawings to third-party manufacturer without confidentiality restrictions rendered them non-protectable as trade secrets); *Nova Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 327–28 (3d Cir. 2009) (information disclosed to defendant distributor pursuant to a license "lost its trade secret status" because the license did not require defendant to "maintain the secrecy of any information it had acquired from [plaintiff]").

Here, Plaintiff voluntarily disclosed the purported "Worldwide Trade Secrets" to Workforce without any restrictions whatsoever on the use of such information. And, even after Worldwide and Workforce parted ways in January 2022, Workforce was permitted continued access to the Avionté data, as confirmed in the April 26, 2022, letter from Worldwide Counsel. *See* Taber Decl. Ex. C at 2.

The FAC does not plead, nor could it, that Worldwide instructed Workforce to return the Avionté software or data when the parties' business relationship concluded. *See Zabit*, 540 F. Supp. 3d at 425 (plaintiff's failure to take any efforts to stop alleged unauthorized use of information weighed against finding that such information constituted trade secrets). Moreover, the fact that Plaintiff waited *two and a half years* to bring its DTSA claims, though fully aware of its trade secret and misappropriation claims at least as early as July 11, 2022 (*see* Taber Decl. Ex. D), confirms Plaintiff failed to take measures to protect the claimed Worldwide Trade Secrets.[14]

Because Plaintiff voluntarily disclosed the purported "Worldwide Trade Secrets" to Workforce, Plaintiff also cannot sufficiently allege that Workforce "misappropriated" any such information, so as to state a DTSA claim. Plaintiff alleges in conclusory fashion that it gave Workforce access to the purported "Worldwide Trade Secrets . . . under circumstances giving rise to a duty to maintain their secrecy or limit their use" (FAC ¶ 235), but this is insufficient to plead "misappropriation" under DTSA. *See, e.g.*, *Inv. Sci.*, 2021 WL 3541152, at *5 (allegation that purported trade secrets voluntarily disclosed to defendant were given "under circumstances that

---

[14] Plaintiff's two and a half year delay also fatally undermines any showing of the sort of "irreparable injury" needed to secure DTSA injunctive relief. *See* § 1836(b)(2)(ii)(II); *see also Medike Int'l Corp. v. Giller*, No. 23-CV-8939 (JPO), 2024 WL 139575, at *6 (S.D.N.Y. Jan. 12, 2024) (finding no irreparable harm as required for injunctive relief under DTSA after a seven month delay); *TomGal LLC v. Castano*, No. 22-CV-9516 (JGK), 2022 WL 17822717, at *5 (S.D.N.Y. Dec. 19, 2022) (waiting seven months to bring suit after having knowledge of defendants' actions was "significant delay which suggests that there is no urgent need for speedy action to protect the plaintiffs' rights") (internal quotation marks and citation omitted). "Although a delay is excusable if the movant can provide a credible explanation for its inactivity" (*id.*) (internal quotation marks and citation omitted), Plaintiff offers no explanation for its delay here.

g[a]ve rise to a duty of secrecy" was insufficient, absent "factual details in the FAC regarding th[at] conclusory allegation").

In sum, Plaintiff's admitted disclosure of the purported "Worldwide Trade Secrets" precludes any argument that Plaintiff's information was protected, or misappropriated.

## III. COUNTS I-III SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND BECAUSE AMENDMENT WOULD BE FUTILE

"[D]istrict courts may deny leave to amend 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 247 (2d Cir. 2021) (quoting *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014)). "A proposed amendment to a complaint is futile when it could not withstand a motion to dismiss." *Jordan v. Verizon Corp.*, No. 17 Civ. 9197 (LGS), 2019 WL 340715, at *7 (S.D.N.Y. Jan. 28, 2019) (Schofield, J) (quoting *F5 Cap. v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017)).

Here, Plaintiff should be denied leave to amend its CFAA claim yet again – having amended it once already in response to Defendants' initial October 16, 2024 Motion to Dismiss letter brief. The CFAA claim here is clearly time-barred as a matter of law, and any further amendment would be futile. *See, e.g.*, *Flaherty v. Dixon*, No. 22 CIV. 2642 (LGS), 2023 WL 2051861, at *8 (S.D.N.Y. Feb. 16, 2023) (Schofield, J) (denying leave to amend defamation, emotional distress and employment claims as futile because such claims were time-barred).

As for Plaintiff's DTSA claim, no revised pleading could cure the fundamental deficiencies that (1) Plaintiff voluntarily shared the information in question with Workforce even after the companies parted ways; (2) Plaintiff did so without putting any protections in place whatsoever; (3) Plaintiff affirmatively consented to continued use of the Avionté data by Defendants in the April 26, 2022, letter from Plaintiff's counsel; and (4) the customer identity and customer preference information does not qualify as trade secrets anyway.

Because further amendment of the CFAA and DTSA claims here cannot cure these deficiencies, and would be futile, the Court should dismiss those claims (Counts I-III) with prejudice, and without leave to amend again.

## IV.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION TO HEAR THIS CASE

Under 28 U.S.C. § 1447(c), "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." The Second Circuit has advised that, "[a]lthough this is not a mandatory rule, the Supreme Court has stated that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine – judicial economy, convenience, fairness and comity – will point toward declining jurisdiction over the remaining state-law claims.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). "It is well-established . . . that generally when the federal claims are dismissed the 'state claims should be dismissed as well.'" *Zabit*, 540 F. Supp. 3d at 427-28 (quoting *In re Merrill Lynch*, 154 F.3d at 61) (internal quotation marks and citation omitted).

Here, subject-matter jurisdiction is based solely on the Court's federal question jurisdiction under 28 U.S.C. § 1331. *See* FAC ¶ 18 (alleging that action "arises under United States federal laws, namely, the Defend Trade Secrets Act and the Computer Fraud and Abuse Act"). Because Plaintiff's CFAA and DTSA claims both fail as a matter of law, and because the pleading deficiencies detailed herein cannot be cured (*see supra* Argument Section III), this Court lacks subject matter jurisdiction, and the remainder of the case should be dismissed, without prejudice to refiling the state law claims in New York State Court, pursuant to Rule 12(b)(2).

In *Zabit*, this Court, after dismissing plaintiff's DTSA claim, declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed such claims without

prejudice to refiling in New York State Court. *Zabit*, 540 F. Supp. 3d at 427-28. The Court based its ruling on the holding that "the traditional values of judicial economy, convenience, fairness, and comity [did] not weigh in favor of exercising jurisdiction," because the case was at "an early stage, and discovery has not even begun." *Id.* (internal quotation marks and citation omitted). Here, the circumstances are identical: this case is in its infancy, and the parties have not engaged in any discovery at all. If anything, the traditional value of judicial economy is even more compelling here than in *Zabit*, because there are already two related state court actions pending, one of which is already in discovery.

Accordingly, Defendants respectfully request that, following dismissal of the CFAA and DTSA claims, the Court dismiss the case, without prejudice to refiling the state law claims in New York State Supreme Court, where the legal sufficiency of the remaining claims can then be addressed by Justice Moyne.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss Counts I-III of Plaintiff's FAC with prejudice, and without leave to amend, and dismiss the remaining claims without prejudice to refiling them in New York State Court, pursuant to Rule 12(b)(2).

Respectfully submitted,

Dated: January 10, 2025

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: <u>/s/ *Kenneth W. Taber*</u>
Kenneth W. Taber
Brian L. Beckerman
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
kenneth.taber@pillsburylaw.com
brian.beckerman@pillsburylaw.com
*Attorneys for Defendants*