

February 7, 2024

**Via ECF**

The Honorable Lorna G. Schofield
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

   Re: *Talenthub Worldwide, Inc. v. Talenthub Workforce, Inc.*, Case No. 24 Civ. 6264 (LGS)

Dear Judge Schofield:

  Your honor, counsel for Plaintiff Talenthub Worldwide Inc. seeks permission to file a motion, and respectfully submits the following in furtherance of that application.

## I. Introduction

  Plaintiff Talenthub Worldwide Inc. (Plaintiff or "Worldwide") writes the Court seeking permission to file a motion seeking all communications between defendants and their counsel regarding the possession and use of Plaintiff Worldwide's computers. For the reasons below, any assertion of attorney-client privilege to such communications is overcome by evidence of the Defendants' participation in crimes and fraud, which is an exception to such privilege. As a result, the Plaintiff is seeking an order compelling production of relevant communications.

  In essence, Defendants stole computer equipment, ignored multiple requests to return it, falsely claimed they discovered it 21 months later, falsely claimed they did not use any of it during that same period, returned it after its value was completely destroyed, and made false claims to a state court judge and Plaintiff's prior counsel after returning the computers. And in doing so, they furthered their fraudulent scheme to deprive Worldwide of its business operations. And because they used their unwitting attorneys to communicate these falsehoods, Defendants lose the shield of the attorney-client privilege as to communications related to the use and possession of Worldwide's computer equipment.

  To be clear at the outset, we are **not** accusing Defendants' counsel of any misconduct. Our position is that they are unwitting victims who relayed false information communicated to them by their clients at a time when they could not know the statements were false and likely had an ethical obligation to relate such statements as fact. As indicated below, Plaintiff is only filing this motion after having forensic computer experts search computer equipment that belonged to Plaintiff, something Defendants' counsel would not have had the authority to do at any time, even when the computer equipment was in the possession of Defendants.

Lewis
Baach
Kaufmann
Middlemiss
PLLC

Hon. Lorna G. Schofield
February 7, 2025
Page 2

Recently, Plaintiff has come into possession of information that it believes is sufficient to meet the appropriate burden of proof that Defendants have used their unwitting attorneys[1] to further a crime and/or fraud. Said information indicates that Defendants caused their attorneys to communicate their numerous false statements about the illegal and unauthorized possession and use of computers that belonged solely to Plaintiff. As a result, certain communications between Defendants and their attorneys should be discoverable to the Plaintiff and no longer subject to the attorney-client privilege.[2]

As will be explained below, beginning in 2022 and continuing through 2024, Defendants took computers that belonged to Worldwide and have both ignored demands to return the computers and, through their attorneys, presented numerous different – and false – statements about their possession and use of the computers. These computers include ones that make up the Computer Fraud and Abuse Act ("CFAA") claim that is alleged in Count 3 of the First Amended Complaint and will be referred to as the Server and Goldstein's Desktop, as they are in the First Amended Complaint ("FAC"). FAC ¶ 135.[3]

If the Court permits Plaintiff to file the motion and the motion is granted, Plaintiff intends to seek the following remedies:

1. That the Court issue an order requiring opposing counsel and Defendants to preserve all communications between them pending resolution of the motion;

2. That a hearing be held to resolve any factual disputes;

3. That, after any necessary fact-finding, the Court find that Defendants have used their unwitting attorneys to perpetrate a crime and/or fraud, thus vitiating the attorney-client privilege as to conversations between the Defendants and their counsel regarding the issue of the possession and use of Plaintiff's computers after January 6, 2022;

4. That the Court, if necessary, conduct an *in camera* review of such communications to determine which communications should be disclosed to Plaintiff; and

---

[1] Again, we emphasize that we do not suggest that counsel for the defendants in this matter had any knowledge of the fraud/crimes that the defendants were perpetrating at the time of the communications counsel made on their behalf that are discussed in this letter. As discussed further in this letter, the fact that their attorneys were unwitting participants is irrelevant to a decision to permit discovery of certain communications with counsel.

[2] By service of this letter, we are requesting that opposing counsel and defendants preserve all correspondence and communications, electronic or otherwise, between them that would reasonably fall within the scope of the communications that Plaintiff seeks to obtain in this letter, including attorney work product.

[3] To be clear, the Server is the HP ProLiant Microserver and Goldstein's Desktop is the Dell OptiPlex 3020 Desktop Computer that were returned to Plaintiff approximately 21 months after they were taken without authorization from Worldwide's offices. (*see* FAC ¶137).

Lewis
Baach
Kaufmann
Middlemiss
PLLC

Hon. Lorna G. Schofield
February 7, 2025
Page 3

5. That the Court issue an order requiring Defendants to pay the costs of the forensic examination of the computers returned to Plaintiff and any other costs permitted by law.

Plaintiff reserves the right to make additional discovery demands authorized by law.

## II.    Legal Standard for the Crime/Fraud Exception to the Attorney-Client Privilege

It is a bedrock principle that communications between an attorney and their client are normally subject to privilege. But the privilege is not absolute and can be vitiated where a client has communicated with the attorney in a manner that furthers the commission of a crime or fraud. A party seeking to invoke the crime-fraud exception must demonstrate (1) that there is a factual basis demonstrating probable cause to believe that a fraud or crime has been committed and (2) that the communications in question were in furtherance of the crime(s) or fraud. *See, e.g.*, *In re New York City Asbestos Litig.*, 966 N.Y.S.2d 420, 422 (2013).

To determine the purpose of such communications, the pertinent intent is that of the client, not the attorney. *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006); *Knopf v. Sanford*, 106 N.Y.S.3d 777, 815 (N.Y. Sup. Ct. 2019). And the communication with counsel need only be reasonably related to the subject matter of the violation. *In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 101 (S.D.N.Y. 1993).

Again, the fact that counsel acted ethically and lawfully, with proper intent, is irrelevant – Plaintiff is not accusing opposing counsel of any misconduct – and their intent is totally irrelevant to the Court's evaluation of the motion.

## III.    Relevant Facts to the Crime/Fraud Legal Discussion

As described in the First Amended Complaint in this matter, on or about January 6, 2022, Defendants abandoned the office space of Worldwide's business operations. FAC ¶¶ 127-29. They subsequently began operating a business in competition with Worldwide, named Defendant Talenthub Workforce, Inc. ("Workforce") thereafter. FAC ¶ 131.

The owners of Worldwide did not become aware that the Defendants had abandoned Worldwide's office space until many months later, due to the fact that ongoing disputes between the parties had caused Worldwide's owners to avoid visiting the location.[4] FAC ¶ 135. It was

---

[4] On February 7, 2022, Plaintiff's then-counsel (who clearly did not know that Defendants had already abandoned Worldwide's offices) demanded access to Worldwide's books and records, including computer data, and told Defendants' counsel that "to avoid any unpleasant confrontations" at Worldwide's offices, counsel could send members of his office to Worldwide's offices to pick up the materials. On February 8, 2022, Defendants' Counsel responded by sending a selection of bank records but did not inform Plaintiff's then-counsel that Defendants had abandoned Worldwide's offices. On April 26, 2022, Plaintiff's then-counsel repeated its demand to access Worldwide's offices, making clear they remained unaware that Defendants had not abandoned Worldwide's offices. Again, Defendants did not inform Plaintiff's then-counsel that Worldwide's offices had been abandoned.



Hon. Lorna G. Schofield
February 7, 2025
Page 4

nearly 6 months later, in approximately June of 2022, that Worldwide learned that Defendants had abandoned the office, which was missing numerous computers that were purchased and owned by Worldwide.  FAC ¶¶ 135-40.

### A. First Demand for Return of Worldwide Computers

On July 11, 2022, then-counsel for Worldwide sent a letter to counsel for Defendants (the "July 11th Letter"), demanding, among other things, the return of Worldwide's computers, and informing them that they had no authority to either use the computers, because the Defendants had stopped working for Worldwide (either as employees or consultants), or possess the computers, which had been purchased by and were solely owned by Plaintiff (FAC ¶¶ 139-41).  *See* Exhibit A at 19-20 (highlighting relevant portions).

Among the missing computers were (i) a desktop computer used by Eric Goldstein ("Goldstein's Desktop") and (ii) another computer that functioned as a computer server – in that it had significant local storage space (multiple terabytes of storage) and was accessible by multiple computers through a private computer network (the "Server"). FAC ¶¶ 90,135-37.

### B. Counsel Ignores Demand to Return Computers; Does Not Address Issue

From July 11, 2022 until September 27, 2023, then-counsel for Worldwide sent repeated communications to opposing counsel demanding they fully respond to the July 11th Letter with additional specificity. They included specific demands that Defendants return all of the computer equipment stolen from Worldwide, as evidenced in emails sent on July 15, 2022, August 10, 2022, August 11, 2022, August 12, 2022, August 15, 2022, September 2, 2022, and September 6, 2022. Gary Glass also demanded the return of the computers directly from the Defendants via email on October 3, 2022.[5]

Remarkably, these demands directed to Defendants' counsel were simply ignored by Defendants.  Notably, throughout the many months of communications, spanning more than a year, Defendants never addressed the issue of the location of Worldwide's computer equipment. There is also no indication of what, if any, due diligence was performed by Defendants to locate the missing computers.  If Defendants' story were true than you would conclude that little or no diligence was performed because they claim that two of the computers were "discovered" in a storage closet adjacent to their new office space.  FAC ¶ 137.

---

[5] As the correspondence involves ongoing discussions between counsel in this case, Plaintiff will provide counsel with an unredacted copy of this correspondence to opposing counsel with the possibility of reaching an agreement on redactions so only the relevant and necessary portions of the correspondence is filed with the court as expeditiously as possible.

Hon. Lorna G. Schofield
February 7, 2025
Page 5

### C. After Two Computers are Finally Returned, Defendants Falsely Assert that Defendants Did Not Steal or Operate Worldwide Computers

On September 27, 2023, after more than 18 months of stonewalling by Defendants, counsel for Defendant Goldstein sent an email (attached as Exhibit B, with relevant portions highlighted), claiming that "two pieces of computer equipment belonging to Talenthub Worldwide Inc." (the Server and Goldstein's Desktop) had been "discovered" in a storage closet "located outside Workforce's office rented space," and that both computers had "**not been operated for nearly two years, since January 2022**."[6] Exhibit B (emphasis added). As mentioned before, Plaintiff is now in possession of information that indicates that both of these claims are false – that 1) the computers were, in fact, operated, and 2) that they were operated between January 2022 and September 2023.

On September 28, 2023 (approximately 21 months after they were stolen), the Goldstein Computer and the Server were returned to Worldwide's owners.

On February 1, 2024, in a letter to the New York State judge handling a state civil proceeding in which Gary Glass was seeking books and records of Workforce, Defendant Goldstein re-asserted the false claim that the computers had been "discovered" in a "storage closet" and that the computers had not been operated "**for nearly two years, since January 2022**" – false arguments meant by Defendants to defraud the state court judge into taking action against Worldwide's owner, Gary Glass, who was the plaintiff in that particular litigation.[7] Exhibit C at 5 (emphasis added).[8]

On March 11, 2024, prior counsel for Plaintiff wrote a letter demanding the return of all "computer equipment, data, and other technological property" belonging to Worldwide because the Server and Goldstein's Desktop were not the only missing computer equipment. Exhibit D. On March 15, 2024, Defendant Goldstein's counsel responded in a letter stating that "clear instructions" had been given to all Workforce employees that they "were not to retain or use any Worldwide equipment or proprietary information." Exhibit E at 2. They repeated the false claim that Goldstein's Desktop and the Server were only discovered in September 2023, but added a new false claim, without any supporting evidence – that Goldstein had "sought to preserve the equipment from being discarded by Worldwide's then landlord" and placed the computers in a storage closet on the same day they abandoned Worldwide's offices on January 6. *Id*. at 2-3. The letter stated that neither Goldstein's Desktop nor the Server was "used or accessed by Goldstein or any other Workforce personnel or contractors (including but not limited to Porembski, Kampel,

---

[6] It is worth adding that the September 27th Letter is an implicit admission by Defendant Goldstein that he understood that accessing Worldwide's computers after January 6, 2022 would have been improper and illegal because counsel's letter, without prompting, asserted that such computers had not been used since January 2022.

[7] In that letter, Defendants were attempting to undermine the credibility of claims by Gary Glass that Defendants had misappropriated information from Worldwide. Given the new computer forensic evidence, Defendants' argument in this letter was a complete falsehood because defendants were using the Server, one of Worldwide's computers, well after January 6, 2022.

[8] It goes without saying that the state civil judge was not presented with the evidence being presented in this letter.

Hon. Lorna G. Schofield
February 7, 2025
Page 6

or Jozef Lipinski) … following its removal from Worldwide's office. Rather, Defendant Goldstein represented that the Computer Equipment <u>sat in a storage closet, **forgotten about and collecting dust**, from January 6, 2022 to September 23, 2023."</u> *Id*. at 3 (emphasis added).

At the end of this discussion, Defendants stated: "That Computer Equipment was plainly not misappropriated. It was instead originally taken for safekeeping purposes. **<u>Workforce did not use or access it at any time thereafter</u>**. We encourage you to retain a computer forensic examiner to confirm that."[9] *Id*. (emphasis added).

Furthermore, Defendant Goldstein's new claim, that he was afraid Worldwide's landlord would take the equipment, was also false. Worldwide did not relinquish the office that the Defendants had used until June 30, 2022. Exhibit F at 12 (lease for Worldwide's offices at 52 Vanderbilt Avenue, New York, New York for 12/31/2019 to 6/30/2022).[10] This assertion is also strained, to say the least, given that Defendant Goldstein did not need to take Worldwide's computers – he could have had his counsel notify Worldwide that they had vacated Worldwide's office space and that the computers were locked safely inside. Rather, this appears to be an after-the-fact rationale for taking Worldwide's computers to Defendants' new offices to accomplish a smooth transition to Workforce and misappropriate Worldwide's entire business operations.[11]

As detailed below, the claim that the Goldstein Computer and the Server were "**<u>never used or accessed by Goldstein or any other Workforce personnel or contractors</u>** … following its removal from Worldwide's office [the computer equipment] sat in a storage closet, forgotten about and **collecting dust**, from January 6, 2022 to September 23, 2023." *Id*. at 3 (emphasis added) is verifiably false, and was intended to perpetuate a fraud both on the state court and Plaintiff.

The Defendants might have pulled off this fraudulent scheme, having left virtually no evidence available to the Plaintiff to contradict Defendants' claims about using Worldwide's computers after January 6, 2022. The Defendants had returned the Goldstein Computer and the Server to Worldwide in a state that a computer-savvy person would describe as two "bricks".[12] That is, both computers had been rendered inaccessible, and no data could be accessed or analyzed.

Since then, however, forensic computer experts hired by the owners of Worldwide have been able to access the Server's data, including certain logs maintained by the Server's operating

---

[9] Defendants stated that "Workforce will not agree to bear the costs of any such forensics examination." *Id*. at 3.
[10] The lease document appears to include several separate documents; the page number refers to page 12 of the entire exhibit, which Plaintiff has Bates Stamped for convenience.
[11] And if Defendant Goldstein had taken the computers only to safeguard them, there is no explanation why Defendants never made an effort to return them immediately after they were taken in January 2022 and totally ignored the demands to return all of Worldwide's computers beginning in July 2022.
[12] "The word "brick", when used in reference to consumer electronics, describes an electronic device such as a mobile device, game console, or router that, due to corrupted firmware, a hardware problem, or other damage, can no longer function, and thus is "bricked". https://encyclopedia.pub/entry/30199#:~:text=The%20word%20%22brick%22%2C %20when,and%20thus%20is%20%22bricked%22.

system.[13]  In addition, they have determined that the hard drive in Goldstein's Desktop that was installed by the original manufacturer of Goldstein's Desktop (Dell Computer, Inc.) had been replaced.[14]  Thus, access to the data on Goldstein's Desktop remains inaccessible, as the original hard drive (that belongs to Worldwide) may still remain in the possession of the Defendants.

### D. Evidence Now Establishes that Counsel's Claims Regarding the Server and Goldstein's Desktop are False

The Plaintiff has now received information recently communicated from a computer forensic expert that establishes, despite their repeated explicit assertions otherwise (through counsel), that Defendants used and accessed the Server that they wrongfully took and retained during the period between January 2022 until September 2023.

The forensic expert is preparing a more fulsome expert report that will be made available to the Court and opposing counsel as soon as it is available.  In the meantime, we point to the following exhibits that are sufficient to raise this serious issue with the Court.

#### 1. The Server Was Used by the Defendants Repeatedly in 2022[15]

The main underlying allegation in the First Amended Complaint is that the Defendants violated the law in the course of stealing the entire business operations of Plaintiff Worldwide (a temporary staffing agency).  FAC ¶ 1.  It does not require great business acumen to understand that moving an entire business operation from one company to another seamlessly in one day (January 6 to January 7, 2022) would be aided by having access to all of the data and programs that were being used by the original company.[16]

Computer forensic experts have recovered logs created by the Server's operating system that show that the Server was not "gathering dust" in a storage closet, but was being actively operated by the Defendants during much of 2022.

---

[13] When the Server and Goldstein's Desktop were originally returned, a computer expert was retained to gain access to the computers and successfully gained access to the Server.  Since current counsel was retained, a forensic expert has been retained who recently conducted a more in-depth forensic search and only recently produced evidence, some of which is being provided in this letter.

[14] On March 15, Defendants counsel stated that "Workforce denies that Goldstein or any other Workforce employee removed any drives" from Goldstein's Desktop or any other computer equipment.  Exhibit E at 4.

[15] The information relayed herein with regard to the computer forensic experts is not intended to constitute the totality of the information they have been able to obtain from the Server and Goldstein's Desktop.  We are in the process of getting a full image of the Server to be made available to counsel even though discovery in this matter has not commenced.

[16] While this motion focuses on the use of Worldwide's computers, we remind the Court that the First Amended Complaint establishes that the Defendant stole the entire business operations of Worldwide.  Defendants' new business entity, Workforce, had been created by Worldwide's owners to serve a single client but when the defendants left Worldwide in January 2022, they took all of Worldwide's clients, and at times, impersonated Worldwide in communications with the clients.  FAC ¶¶ 168-73.

Lewis
Baach
Kaufmann
Middlemiss
PLLC

Hon. Lorna G. Schofield
February 7, 2025
Page 8

One log indicates that multiple USB devices, which would provide a means for copying or removing data from the Server or running unauthorized software, were plugged into the Server on dates subsequent to January 6, 2022. Exhibit G.[17] USB devices included flash drives capable of transferring data from one computer to another. One entry shows that a USB flash drive named "Win Update," believed to be a Windows Update flash drive, which was first attached to the computer in January 2018, was last connected to the Server on August 5, 2022. And – to state the obvious – the Server would have had to have been turned on for the Server to log entries of USB drives being connected to it on August 5, 2022.

Another entry shows that a second USB device was attached to the Server on August 5, 2022, with the Volume Name is "ACRONIS." Exhibit G. While it is impossible to say what was on the USB drive without access to it, it is highly suspicious that ACRONIS is the name of a Swiss-based Cyber security company that advertises cyber-related services that include "Advanced Backup," "Email Archiving for Microsoft 365," "File Sync & Share," and "Acronis True Image." Such services include the ability of moving data to a "cloud" storage, which could move data to a location other than the Server (thus, once the Server was returned in 2023, Defendants could retain access to all the data that had been stored there).

Another suspicious entry shows that a 1-terabyte storage device was connected to the Server (capable of copying an enormous amount of data from the Server, up to 6.5 million documents[18]) on November 23, 2001, just weeks prior to the Defendants abandoning the Worldwide offices. Exhibit G.

Other logs show that the Server was being used to access files (Exhibit H) and various file directories (Exhibit I) on its hard drives on dates in 2022, including after January 6, 2022.

Other evidence shows that the computer files on the server have been tampered with, including the deletion of all Worldwide contracts it held with its clients, a crucial set of documents. *See* FAC ¶¶145-51, 154-58 (examples of data found on the Server indicating usage after January 6, 2022 and before September 2023, and deletion of folder containing Worldwide Contracts).

Strong corroborating evidence, as described in the First Amended Complaint, can be found in the more than 1,600 files[19] that were found on the Server and were created and saved on the Server by the Defendants during many months in 2022, well after January 6, 2022, and even during

---

[17] Printouts of the logs (in the form of spreadsheets) are being filed as exhibits. The native spreadsheet will be provided to opposing counsel via email contemporaneously with the filing of this letter. Such native file can be made available to the Court upon request.
[18] *See* https://www.dropbox.com/features/cloud-storage/how-much-is-1tb#:~:text=One%20 terabyte%20 gives%20you%20the,files%2C%20PDFs%2C%20and%20presentations.
[19] The more than 1,600 files were previously produced to Defendants' counsel as part of discovery in the state court proceedings although such documents were not requested in Defendant Goldstein's state court discovery demands. They can be made available to the Court upon request, a sample of such documents will be presented if the Court grants Plaintiff permission to file the motion as requested in this letter.

Lewis
Baach
Kaufmann
Middlemiss
PLLC

Hon. Lorna G. Schofield
February 7, 2025
Page 9

July and August of 2022, when counsel for Plaintiff had made a specific demand for the return of computer equipment–a demand that Defendants suspiciously ignored for approximately 15 months (July 2022 until September 2023) until they claimed that such computers had been "discovered" in September 2023. *See* FAC ¶150 (the Server contains up to "hundreds" of pdf files that appear to have been created well after January 6, 2022).

The content of these files is self-authenticating, because they contain data that could only have been known to the Defendants and was obviously unknown to the Plaintiff. For example, some of the files appear to be new contracts between Workforce and new temporary employees that were hired by Workforce after January 2022 – something Plaintiff could not have known. Thus, the only source of the files is from the Defendants, who were using the Server after January 6, 2022. FAC ¶ 151 (recovery of a scanned employment contract with Temporary Employee 1 that was signed on March 23, 2022).

And there is no explanation for how more than 1,600 files supposedly created by Workforce employees or consultants, on new Workforce computers (if you accept Defendants' version of events), could have been saved to the hard drive of the Server if it had been turned off and sitting in a closet "gathering dust" during all of the relevant time period. It is important to note that the Server was not a modern "cloud" server; it was an older server on which computer users who wanted to access files shared on the network needed to access the Server's physical hard drives contained on the Server itself.

### 2. Evidence Indicates That Goldstein's Desktop Was Used by the Defendants After January 2022 and Defendants Swapped Out the Only Hard Drive

As stated above, a physical inspection of Goldstein's Desktop (a Dell-branded desktop computer) revealed that after it was returned to Plaintiff in 2023 it had installed a single Kingston brand hard drive. Plaintiff's computer forensic expert is informed by Dell Computer, Inc. that Goldstein's Desktop, identified by a unique serial number, was manufactured and sold with a different hard drive – a different brand and type, and with a different serial number.

After its return to Worldwide in September 2023, Goldstein's Desktop was found to be in "Bitlocker Mode." When in Bitlocker Mode, a computer requires a user to input a lengthy alphanumeric code called a Bitlocker "key," which is supposed to unlock access to the computer and hardware, including hard drives. Without the Bitlocker "key," there is virtually no way to access data on the hard drive because it is encrypted. One way a computer of this type can enter Bitlocker Mode is for someone to change the computer's hardware, which can include changing the hard drive. It can also be put into that mode by a person with knowledge of how the Bitlocker program works. To date, the Defendants have not provided the Bitlocker key to Plaintiff that would provide access to the new Kingston hard drive now installed on Goldstein's Desktop. While access to Goldstein's Desktop would not permit access to the data on the missing hard drive, it would permit computer experts to examine logs created in the operating system that would likely

Lewis
Baach
Kaufmann
Middlemiss
PLLC

Hon. Lorna G. Schofield
February 7, 2025
Page 10

have evidentiary value, and that might provide some information about the dates and times the Goldstein Computer was accessed prior to its return to Plaintiff in 2023.

But the fact that the hard drive on Goldstein's Desktop was replaced, by itself, does not establish that Defendants replaced it after stealing it, because the forensic experts cannot obtain data like that found on the Server that could establish the date that the hard drive was installed. But significantly, on September 13, 2022, Defendant Goldstein submitted an exhibit to the same New York State judge referenced above.  That exhibit was, in fact, a printout of a general ledger spreadsheet from Worldwide's accounting software, Quickbooks.  Exhibit J. The only copy of Quickbooks was known to exist on Goldstein's Desktop (and was not stored on the Server). FAC ¶ 164. The document bears the date "8/19/2022" and the time "3:00 PM," indicating that the document was generated from Quickbooks less than a month before the exhibit was filed in court. *Id*. This document provides strong evidence that Defendant Goldstein had access to Quickbooks on Goldstein's Desktop after January 6, 2022, and further demonstrates Defendants' assertions through counsel that Worldwide's computers were not operated, or accessed (and were "gathering dust") were false.

### 3. The Information Recently Obtained About the Server and Goldstein's Desktop Prove that Defendants Caused their Counsel to Make False Statements in Furtherance of Crime(s) or Fraud Committed by Defendants

The evidence discovered after the return of the Goldstein Computer and the Server demonstrates unequivocally that the Defendants caused their counsel to relate false claims that the Defendants did not wrongfully take and retain the computers that belonged to Worldwide.  The evidence also proves that the Defendants caused Counsel to make false denials to the effect that the Defendants had never accessed either Goldstein's Desktop or the Server after January 6, 2022.  And the statements also furthered the theft of the hard drive from Goldstein's Desktop that was replaced with a Kingston hard drive and helped fraudulently conceal these actions.

The Defendants caused these false statements to be made by their unwitting counsel, upon information and belief, to further crimes and fraud that the Defendants were engaged in.  Illegally taking, retaining, using and damaging the Server and Goldstein's Desktop was a way of successfully carrying out the torts alleged in the First Amended Complaint.  Further, the wrongful taking, retention, and use of the computers (and theft of the original Goldstein Desktop hard drive) would likely constitute larcenies under New York state law, among other crimes.[20]  The false

---

[20] New York Penal Law § 155.05 provides that a "person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof."  Defendants, in the past, have claimed that either they had authority to take Worldwide's computers or took them to protect them from Worldwide's landlord.  In any event, they had no authority to withhold the computers from Worldwide and use them for their own benefit to the detriment of their owner Worldwide, particularly after July 11, 2022, when counsel for Worldwide demanded their return and Defendants, through counsel's communications, initially ignored the requests and then later falsely claimed they "discovered" the computers but falsely stated that the computers were never used for the nearly two years they held them.



Hon. Lorna G. Schofield
February 7, 2025
Page 11

statements furthered the wrongful possession of the Server and Goldstein's Desktop, allowing the Defendants to fraudulently conceal and prevent the investigation by the Plaintiff of evidence necessary to allege violations of the CFAA.

**IV.  Application of Law to the Facts: The Provably False Statements by Defendants' Counsel Mean that Communications Between the Defendants and Counsel on the Issue of the Possession and Use of the Computers is Not Protected by the Attorney-Client Privilege**

As the above discussion demonstrates, Counsel for Defendants repeatedly made false statements that furthered Defendants' theft of Plaintiff's business operations, theft of Worldwide's physical computers and data (needed to carry out the theft of the business), and obstruction of any investigation into the theft of Worldwide's computers and the unauthorized damage caused to them.

As such, first, one needs to determine if some of the communications are privileged at all. While it is clear that Eric Goldstein was a client at the time the disputed communications by counsel were made (as he is the sole Plaintiff in the New York State litigation), it is not clear when attorney-client relationships were established between each of the Defendants in this matter. Communications between Counsel and the Defendants other than Goldstein prior to the formation of the attorney-client relationship may not be privileged and should be disclosed. Any such work product, such as notes related to these topics, should also not be privileged. We ask the Court to instruct counsel to indicate in its response to this letter the date when an attorney-client relationship was established between each of the Defendants they represent in this matter. *See, e.g., Shahinian v. Tankian*, 242 F.R.D. 255, 258 (S.D.N.Y. 2007) (Court finding "much of the information sought" was likely not even covered by attorney-client privilege).

Of course, it hardly bears noting that the communications, if false, were clearly in furtherance of crimes and/or a fraud. Each time counsel repeated the Defendants' unequivocal (and false) statement that the Defendants did not knowingly take possession of, nor had been using, Worldwide's computers, they were furthering the fraud that by representing that they had not stolen the computers (they had), that they had not stolen the data on the computers (they had), that they had not stolen the Goldstein Computer's original hard drive (they had), and that they were not using Worldwide's computer data without the permission of its owner (they had). And of course, by perpetuating the fraud that they did not take or use the computers, they furthered the ongoing and continuing fraud and crimes of having stolen the entire business operations of Worldwide, beginning in January 2022, as the First Amended Complaint alleges.

The caselaw is filled with examples where the attorney-client privilege was pierced so an opposing party could gain access to communications between counsel and client on the issue related to the crime or fraud. Here, Plaintiff seeks the production of all communications, written or oral, and any work product between counsel and the Defendants in which they discussed with



counsel the possession or use of any computer equipment belonging to Worldwide.  This would also include any discussions about the purchase of replacement computer equipment.

In *Meyer v. Kalanick*, 212 F.Supp. 3d 437 (S.D.N.Y. 2016), Judge Rakoff pierced the attorney-client privilege as to communications and work product regarding attempts by defendant-clients to investigate an opposing plaintiff-party and his attorney using clandestine methods that involved criminal acts and fraud.  The court noted that when the plaintiff-party sought to question defendant-clients about the clandestine investigation, when they became suspicious of its existence, the Court noted that it was met "first, in false denials."  *Id.* at 443.  Here too, when Plaintiff realized that Defendants had stolen its computers, it was met initially by stonewalling, and then outright lies when two of the computers were returned as bricks.  Such false denials obstructed Plaintiff's ability to investigate the unauthorized use and damage defendants did to its computers and the larger theft of its business operations.

Another example is found in *Nowlin v. People of State of New York*, 1 A.D.3d 172, 172–73, 767 N.Y.S.2d 77, 78 (2003), where an individual was believed to have provided her attorney with documents falsely back-dated to create a defense to charges for which she was indicted.  The Court held that as "for the originals of the subject documents (assuming the ones produced in court were copies), and as to any oral communications that [were made to her counsel], the People have persuasively shown that the crime-fraud exception applies, since the record demonstrates that there exists a factual basis for a showing of probable cause to believe that a fraud or crime has been committed, and that the communications in question were in furtherance of such fraud or crime."  *Id.* at 172-73 (citing *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997)).

As mentioned above, it is irrelevant that counsel for Defendants were unaware that the statements in their letters and filings were false – it is sufficient to come within the exception that the client intended to use an attorney's services in furtherance of a crime or fraud even if the attorney was unaware of this purpose. *See Clark v. United States*, 289 U.S. 1 at 15 ("The attorney may be innocent, and still the guilty client must let the truth come out."); *Shahinian v. Tankian*, 242 F.R.D. 255, 258 (S.D.N.Y. 2007) ("It is not necessary to show that the attorney was aware of the improper purpose.").



Hon. Lorna G. Schofield  
February 7, 2025  
Page 13

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court grant permission to file a motion seeking discovery and other remedies as specified herein.

Dated: New York, New York  
      February 7, 2025

Respectfully submitted,

<u>/s/ Anthony M. Capozzolo</u>  
Anthony M. Capozzolo  
SDNY Bar No. AC-8633  
LEWIS BAACH KAUFMANN MIDDLEMISS PLLC  
10 Grand Central  
155 East 44th Street, 25th Floor  
New York, New York 10017  
Tel: (212) 897-1970; Fax: (212) 826-7146  
anthony.capozzolo@lbkmlaw.com

*Counsel for Plaintiff Talenthub Worldwide, Inc.*