UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TALENTHUB WORLDWIDE, INC.<br><br>                    Plaintiff,<br><br>        -against-<br><br>TALENTHUB WORKFORCE, INC.; ERIC GOLDSTEIN; STANDARD CONSULTING, INC.; DIANE POREMBSKI; PATRICIA KAMPEL; TANYA WILSON (WELLARD); JEANNINE TRIOLO; VALERIE WEST; JOSEPH LIPINSKI; and J COMPUTER PRO, INC.<br><br>                    Defendants. | Case No. 24 Civ. 6264 (LGS)<br><br>Hon. Lorna G. Schofield |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

                                                                                                                                              **Page**

PRELIMINARY STATEMENT ...................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

I.     PLAINTIFF'S CFAA CLAIM (COUNT III) IS TIME-BARRED ................................... 3

        A.     The CFAA Limitations Period Started Accruing, At the Latest, on July 11, 2022, More Than Two Years Before Suit was Commenced. ................................ 3

        B.     Plaintiff Fails to Sufficiently Allege Equitable Tolling Because Plaintiff (1) Clearly Knew of its CFAA Claim in July 2022, and (2) Waited Nearly a Year to File Suit even after Regaining Possession of the Computers. .................. 6

II.    PLAINTIFF'S DTSA CLAIMS (COUNTS I-II) SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ...................................................................................... 7

        A.     The Purported Worldwide Trade Secrets Were Voluntarily Disclosed to Defendants ................................................................................................................ 7

        B.     Plaintiff Fails to Sufficiently Allege it Implemented Reasonable Safeguards Protecting the Purported Worldwide Trade Secrets ............................. 9

III.   COUNTS I-III SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND ...................................................................................................... 10

IV.   THIS COURT LACKS SUBJECT-MATTER JURISDICTION TO HEAR THIS CASE ............................................................................................................................... 11

CONCLUSION ............................................................................................................................. 11

## TABLE OF AUTHORITIES

**Page**

### Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................6

*Clark v. Hanley*,
  89 F.4th 78 (2d Cir. 2023) ........................................................................................6

*Gates Corp. v. CRP Indus., Inc.*,
  No. 16-cv-01145-KLM, 2019 WL 10894029 (D. Colo. Nov. 13, 2019)...................4

*Glass v. Talenthub Workforce, Inc.*,
  Index No. 157302/2023 (Sup. Ct. N.Y. Cnty.) .........................................................1

*NXIVM Corp. v. Foley*,
  No. 1:14-cv-1375, 2015 WL 12748008 (N.D.N.Y. Sept. 17, 2015).........................4

*Sewell v. Bernardin*,
  795 F.3d 337 (2d Cir. 2015)..................................................................................3, 4

*Smartix Int'l Corp. v. MasterCard Int'l LLC*,
  No. 06 CV 5174(GBD), 2008 WL 4444554 (S.D.N.Y. Sept. 30, 2008), *aff'd*, 355 F.
  App'x 464 (2d Cir. 2009)......................................................................................6, 7

*Thea v. Kleinhandler*,
  807 F.3d 492 (2d Cir. 2015)......................................................................................6

*Turret Labs USA, Inc. v. CargoSprint, LLC*,
  No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022)............................................10

*Zabit v. Brandometry, LLC*,
  540 F. Supp. 3d 412 (S.D.N.Y. 2021).....................................................................11

### Statutes and Codes

United States Code,
  Title 18, Section 1030(e)(8)......................................................................................3
  Title 18, Section 1030(g) ..........................................................................................3

Rules and Regulations

Federal Rules of Civil Procedure,
    Rule 9(b) ...............................................................................................................6
    Rule 12(b)(2) ...................................................................................................3, 11
    Rule 12(b)(6) ...................................................................................................3, 11

## PRELIMINARY STATEMENT[1]

Following the individual Defendants' January 2022 departures, when they were no longer able to tolerate Mr. Glass's abusive behavior,[2] Plaintiff indisputably:

(1) abandoned its temporary employment clients, and the temporary employees staffed at those clients, refusing to continue paying their wages;[3]

(2) expressly told Defendants, through counsel, that Defendants could continue accessing the Avionté account containing the purported Worldwide Trade Secrets; and

---

[1] Capitalized terms otherwise not defined herein have their meaning as in Defendants' Motion to Dismiss the FAC (the "MTD"; Dkt. 48). Plaintiff's Opposition Brief to the MTD (Dkt. 52) is referenced herein as the "Opposition" or "Opp." All emphasis herein is added unless indicated otherwise.

[2] Plaintiff's Opposition advances Glass's mental illness as the excuse for his abusive behavior. (*See* Opp. at 2; *see also* Dkt. 49-13 ¶ 45 ("[a]dmitt[ing] that Glass, while suffering from psychiatric illness, from May 2021 forward exhibited erratic behavior and sent or made the emails, text messages and phone calls alleged in the Complaint"); *see also id*. ¶¶ 46-47, 50, 55, 56. Whatever the trigger was for Glass' admitted racist, sexist and antisemitic slurs, it is undeniable that abuse triggered Defendants' decision to leave Worldwide.

That Defendants waited seven months to leave from when the abuse first began only underscores their attempted loyalty, hoping things would improve. But they never did – a fact underscored, most recently, by Plaintiff's counsel's disclosure, during a February 5, 2025 meet and confer, that Glass is now incompetent even to testify in this action.

As for Plaintiff's claim that Defendants "apparently never felt threatened enough to call authorities during this 6 month episode" (Opp. at 3), that is easily proven incorrect. Exhibit R to Mr. Goldstein's September 13, 2023 Affidavit in Support of his Memorandum of Law in the *Glass v. Workforce* action, Dkts. 49-9, 49-10 (of which the Court may now take judicial notice), is a police report showing Mr. Goldstein reaching out to the police because he was "fearful for his safety" when Glass told multiple people, in November 2021, that "when [Glass] gets out of the hospital he is going to go kill [Goldstein]." *See* 2/21/25 Declaration of Kenneth W. Taber, Exhibit A.

[3] In the *Glass v. Workforce* matter, Justice Moyne found especially egregious Plaintiff's conduct jeopardizing the livelihoods of hundreds of temporary employees. *See* Dkt. 49-11.

(3) beginning July 2022, turned instead to threats of legal action, advancing (by letter) the very same CFAA and DTSA claims now asserted here.

The problem for Plaintiff, however, is that the two-year limitations period has now run on those CFAA claims. And, by sharing the Avionté data and otherwise failing to protect its claimed trade secrets, Plaintiff has fatally undermined its DTSA claim as well.

More specifically, Plaintiff admits that, by June 2022, it was aware its Computers were missing (Opp. at 7 n.4), and, by July 11, 2022, Plaintiff had concluded Defendants "intentionally continued to *access* Worldwide's computer and e-mail systems" (Dkt. 49-4 at 20). Under controlling Second Circuit precedent then, by July 11, 2022, at the latest, Plaintiff was aware of the claimed "damage" to those Computers that triggered the accrual of its CFAA claim. That means the CFAA statute of limitations expired on July 11, 2024, more than five weeks before Plaintiff commenced this suit.

As detailed below, equitable tolling principles cannot save that CFAA claim. That's because (1) Plaintiff clearly knew of its CFAA claim by July 2022 and (2) the Computers in question were returned to Plaintiff in September 2023, fully ten months before the statute of limitations ran. Each dooms any claim of equitable tolling here.

Plaintiff's DTSA claim fares no better because there are no protected trade secrets at issue here. That's, first, because Plaintiff voluntarily disclosed the purported Worldwide Trade Secrets to Defendants when it gave them unrestricted access to the Avionté databases *even after* the Worldwide-Workforce business relationship ended. Second, Plaintiff did nothing thereafter to prevent Defendants' continued Avionté access. And third, Plaintiff failed to implement adequate safeguards to protect the purported Worldwide Trade Secrets. Indeed, Plaintiff admits the individual Defendants – including outside consultant Lipinski – had access to the purported

2

Worldwide Trade Secrets without any confidentiality restrictions.

Because Plaintiff's CFAA and DTSA claims each therefore fail as a matter of law, and because these pleading deficiencies are incapable of being cured through amendment, the Court should dismiss Counts I-III of the FAC with prejudice, and without leave to amend, pursuant to Rule 12(b)(6). The Court should then dismiss the remaining state law claims (Counts IV-XII) without prejudice to refiling them in New York State Court, pursuant to Rule 12(b)(2).

## ARGUMENT

I. **PLAINTIFF'S CFAA CLAIM (COUNT III) IS TIME-BARRED**

   A. **The CFAA Limitations Period Started Accruing, At the Latest, on July 11, 2022, More Than Two Years Before Suit was Commenced.**

As set forth in the MTD, "[a] plaintiff bringing an action under the CFAA's civil enforcement provision must do so 'within 2 years of the date of the act complained of or the date of the discovery of the damage.'" *Sewell v. Bernardin*, 795 F.3d 337, 338 (2d Cir. 2015) (quoting 18 U.S.C. § 1030(g)). "Damage" is defined in the CFAA as "any impairment to the integrity *or availability* of data, a program, a system, or information." § 1030(e)(8).

Here, the *unavailability* of the Computers[4] was discovered by Plaintiff no later than June 2022, when Plaintiff admits it learned the "[C]omputers were missing" following an inspection of Plaintiff's offices. *See* Opp. at 7 n.4. That then started what the Second Circuit refers to as a two-year period to discover exactly what happened. *Sewell*, 795 F.3d at 342 ("[I]f a plaintiff cannot discover the hacker's identity within two years of the date she discovers the damage or violation, her claims under the CFAA and SCA will be untimely.").

---

[4] In the Opposition, Plaintiff clarifies that its CFAA claim is only based on the Computers (*i.e.*, the Server and Goldstein's Desktop), and that "Plaintiff is not asserting a CFAA claim as to the Avionté cloud system or cloud-based email systems." Opp. at 8 n.5. This further confirms Plaintiff's consent to Defendants' access to Avionté.

3

Plaintiff now argues the CFAA limitations period did not start to accrue until September 27, 2023, when Plaintiff regained "physical possession of the [C]omputers" and "actually discovered the damage and unauthorized access" thereto. Opp. at 6-7. In support, Plaintiff relies (exclusively, in fact) on *Gates Corp. v. CRP Indus., Inc.*, No. 16-cv-01145-KLM, 2019 WL 10894029, at *15 (D. Colo. Nov. 13, 2019) – a non-precedential opinion issued by the District of Colorado. *See* Opp. at 7.

But Plaintiff's argument that the CFAA limitations period is tolled until a plaintiff can conduct a thorough investigation was "squarely rejected" by the Second Circuit in *Sewell*. *See NXIVM Corp. v. Foley*, No. 1:14-cv-1375 (LEK/RFT), 2015 WL 12748008, at *6–8 (N.D.N.Y. Sept. 17, 2015); *see Sewell*, 795 F.3d at 340 (the CFAA limitations period began "when [plaintiff] learned that she could not log into her AOL e-mail account," even though plaintiff did not then know who had blocked her access or the extent of the unauthorized access).

As the Second Circuit has explained:

> Even after a prospective plaintiff discovers that an account has been hacked, the investigation necessary to uncover the hacker's identity may be substantial. In many cases, we suspect that it might take more than two years. But it would appear that if a plaintiff cannot discover the hacker's identity within two years of the date she discovers the damage or violation, her claims under the CFAA and SCA will be untimely.

*Sewell*, 795 F.3d at 342.

As *NXIVM Corp.* likewise confirmed, "[r]ather, a plaintiff is instructed to initiate a lawsuit against a Jane or John Doe defendant, but she must still discover the hacker's identity within two years of discovery or a reasonable opportunity to discover the violation to avoid dismissal." *NXIVM Corp.*, 2015 WL 12748008, at *7-8 (CFAA limitations period began to run when Plaintiff "first became suspicious" that its website had been hacked, *not* later, when "[p]laintiff conducted its internal investigation") (internal quotation marks and citation omitted). Accordingly, *Gates* is

4

plainly not Second Circuit law.

But, even if it were, and even if Plaintiff were correct that, "the fact that a computer is missing does not give rise to a CFAA claim [because] you must have some evidence from which to infer that the computer was accessed or damaged" (Opp. at 9) – Plaintiff's CFAA claim here would still be time-barred. That's because, on July 11, 2022, Plaintiff's prior counsel threatened to bring a CFAA claim *based on Defendants' access to the Computers*, writing:

> Porembski, Kampel and likely Goldstein, and perhaps others of the Workforce Personnel, including and especially Lapinski, **have intentionally continued to access** Worldwide's computer and e-mail systems, without authorization, with the value of the information **accessed, used, misdirected and/or destroyed** in excess of $5,000.

*See* Dkt. 49-4 at 20.

That letter from prior counsel, incorporated into the FAC by reference (*see* MTD at 7 n.3), fatally undermines Plaintiff's argument now, in the Opposition, that it was "prevent[ed] … from discovering . . . the unauthorized access [to the Computers] until September 2023." Opp. at 2. To the contrary, Plaintiff's own prior counsel unequivocally stated in July 2022 he knew of that unauthorized access.[5]

In sum, Plaintiff's CFAA claim likely accrued in June 2022, when Plaintiff first knew the Computers were missing, but at the very latest accrued by July 11, 2022, when Plaintiff's counsel sent his letter asserting Defendants' unauthorized access to the Computers. Plaintiff's CFAA claim therefore expired on July 11, 2024 – more than five weeks before Plaintiff brought suit.

---

[5] Plaintiff's attempt to re-characterize the July 11, 2022, letter as "merely postulat[ing] possible, *hypothetical* claims" (Opp. at 8), is directly belied by the text of the letter itself.

5

**B.    Plaintiff Fails to Sufficiently Allege Equitable Tolling Because Plaintiff (1) Clearly Knew of its CFAA Claim in July 2022, and (2) Waited Nearly a Year to File Suit even after Regaining Possession of the Computers.**

Plaintiff argues, in the alternative, that even were the Court were to find that the CFAA claim started accruing in June or July 2022, the limitations period should still be equitably tolled here, because Plaintiff did not regain possession of the Computers until September 2023. Opp. at 10-12. It is well-settled, however, that "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing [his] rights diligently, and (2) that some extraordinary circumstance stood in [his] way. . ... The law prohibits a judge from exercising her discretion where these two elements are missing." *Clark v. Hanley*, 89 F.4th 78, 92 (2d Cir. 2023) (citations omitted); *accord Smartix Int'l Corp. v. MasterCard Int'l LLC*, No. 06 CV 5174(GBD), 2008 WL 4444554, at *4 (S.D.N.Y. Sept. 30, 2008), *aff'd*, 355 F. App'x 464 (2d Cir. 2009) (the doctrine of equitable tolling only applies in "rare and exceptional circumstances," "where the failure to timely sue is not attributable to any fault o[r] lack of diligence on the plaintiff's part") (citations omitted).[6]

Here, Plaintiff cannot satisfy either element. While Plaintiff argues that Defendants "fraudulently concealed" their "theft" of the Computers "for approximately 21 months," which supposedly "prevent[ed] [Plaintiff] from discovering the actual damage to the [C]omputers and the unauthorized access of them until September 2023" (s*ee* Opp. at 1-2), that hardly qualifies as an "extraordinary circumstance" that blocked filing suit. Indeed, the July 11, 2022 demand letter

---

[6] While Plaintiff is correct that it need not "affirmatively prove" equitable tolling at the pleading stage (Opp. at 5), Plaintiff still "must specifically plead facts that make entitlement to estoppel plausible (not merely possible)," pursuant to the heightened pleading standards of Rule 9(b). *See Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). As explained below, the FAC's own allegations, together with Plaintiff's July 11, 2022, letter, render any equitable tolling theory inherently *im*plausible.

demonstrates that Plaintiff *already by then* had knowledge of Defendants' purported unauthorized access to the Computers. Dkt. 49-4. The FAC also alleges that Plaintiff knew Defendants were servicing the business continuously from January 1, 2022, forward, and were using Plaintiff-generated data to do so. FAC ¶¶ 129-31. Accordingly, there was no "extraordinary circumstance" stopping Plaintiff from bringing a CFAA claim by mid-2022.

But, even disregarding those facts, Plaintiff admits the Computers at issue were returned in September 2023 – *nearly 10 months before* the CFAA limitations period lapsed on July 11, 2024. *See* Opp. at 2. Yet, Plaintiff inexplicably sat on its hands for nearly another year before finally filing suit, in August 2024. The Opposition offers no explanation for that nearly year-long delay in bringing suit following the return of the Computers.

The fact that Plaintiff, "without any legal or equitable justification, chose to idly sit by, while the limitation clock continued to click down, rather than diligently pursue its legal recourse" by suing within the limitations period, bars equitable tolling here. Plaintiff's failure to "diligently pursu[e] its… rights" is fatal. *See Smartix,* 2008 WL 4444554, at *4 (equitable tolling doctrine inapplicable where plaintiff likewise waited a year to bring CFAA claim, until after the limitations period lapsed).

## II. PLAINTIFF'S DTSA CLAIMS (COUNTS I-II) SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

### A. The Purported Worldwide Trade Secrets Were Voluntarily Disclosed to Defendants

Plaintiff does not deny that all the Worldwide information in Avionté was voluntarily made available to Defendants even after Plaintiff and Workforce ceased working together. Indeed, Plaintiff offers no credible response to the language in the April 26, 2022 letter from Plaintiff's prior counsel proposing, with respect to continued Avionté access, that there simultaneously be "two passwords or separate accounts for Worldwide and Workforce." Dkt. 49-3 at 2.

7

Instead, Plaintiff now contends, first, that "Workforce was never envisioned to be a separate company from Worldwide." Opp. at 16. But the FAC says exactly the opposite: "In May 2021, Gary Glass, Kampel and Porembski formed Talenthub Workforce Inc. *as a separate company*" to obtain MWBE certification, as requested by a Worldwide client. FAC ¶¶ 101-05.[7] Second, Plaintiff argues the April 2022 letter from it prior counsel was merely a "good-faith effort[] to resolve" the parties' dispute. Opp. at 16. But, whether an early olive branch or otherwise, the fact is those claimed trade secrets were voluntarily disclosed to Workforce after the two companies split.

Plaintiff's agreement to that continued Avionté access eliminated trade secret protection as to *all* the purported trade secrets in the FAC, because Worldwide stored *all* its trade secrets in Avionté. *See* FAC ¶ 45 ("Goldstein . . . had access to all information related to Temporary Employees and Clients, and other Worldwide Trade Secrets, *through his access to Avionté*."); *id.* ¶ 56 ("West . . . had access to Worldwide Trade Secrets including but not limited to Temporary Employee and Client information *because* she, like Goldstein, *had complete access to Avionté*.").

The FAC confirms that all the purported trade secrets specifically identified by Plaintiff in the Opposition – "Worldwide's business model, client lists, list of temporary employees [and] pricing strategies" (Opp. at 14)[8] – were stored in Avionté. *See* FAC ¶ 59(a) ("Worldwide's business model and Client lists . . . was stored on . . . its cloud-based software program, Avionté); *id.* ¶ 59(b) ("Lists of the Temporary Employees that Worldwide recruited and provided to Clients

---

[7] Workforce was, in fact, an "outside business partner" of Worldwide (Opp. at 16), making the cases Defendants cite for the proposition that voluntarily sharing trade secrets with outside business partners extinguishes trade secret protection (*see* MTD at 21-22), squarely on point.

[8] Plaintiff also fails to refute Defendants' separate argument that, as a matter of law, "customer identities and customer preferences" in the temporary employment industry do not qualty as trade secrets. MTD at 19.

. . . was stored in the Avionté system."); *id.* ¶ 59(c) ("Worldwide's pricing strategy . . . was generated from the Avionté system.").[9] And, it obviously makes no difference that some such information may have also been held on Worldwide's Server. By giving Defendants unrestricted access to Avionté, Plaintiff extinguished any trade secret protection with respect to all claimed Worldwide Trade Secrets, irrespective of whether those trade secrets were also stored somewhere else.

### B. Plaintiff Fails to Sufficiently Allege it Implemented Reasonable Safeguards Protecting the Purported Worldwide Trade Secrets

Plaintiff's allegations intended to demonstrate that reasonable safeguards were implemented to protect the purported Worldwide Trade Secrets are equally deficient. Plaintiff's Opposition does not dispute that: (1) none of the individual Defendants were subject to written employment agreements or restrictive covenants of any kind; (2) Plaintiff made no attempt to block Defendants' post-split Avionté access; and (3) Plaintiff made no attempt to block the temporary employees at issue from working for, and being paid by, Workforce, in and after January 2022.

Moreover, Plaintiff's conclusory claim that it did implement appropriate safeguards ("Worldwide has taken reasonable measures to maintain the secrecy of Worldwide's Trade Secrets"; FAC ¶ 227),[10] is directly contradicted by the FAC itself. For example, while Plaintiff now attempts to argue that "login credentials for Avionté were restricted within Worldwide" (Opp. at 15-16), Plaintiff undeniably agreed to Defendants Avionté access even after the companies split. Plaintiff's contention that, "[a]ny and all trade secrets were shared with employees on a need-to-

---

[9] The FAC also expressly alleges that each of the categories of information in FAC paragraphs 59(a)-(e) "was stored in the Avionté system." *See* FAC ¶¶ 59(a)-(e).

[10] Such conclusory allegations are insufficient as a matter of law. *See* MTD at 21 (quoting *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *3 (2d Cir. Mar. 9, 2022)).

9

know basis" (*id.* at 16), is likewise directly contradicted by the allegations in the FAC that non-employee and outside consultant "Lipinski also had access to Worldwide Trade Secrets" (FAC ¶ 57), without restrictions.[11]

### III.  COUNTS I-III SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND

Plaintiff argues it is not yet possible to determine whether amendment is futile because the Court must first render its ruling on the MTD. But, if the Court rules, as we respectfully request, that the CFAA claim is time-barred because it began accruing in June or July 2022, no amendment could possibly cure that defect. Similarly, no amendment could cure the DTSA pleading deficiencies here, if the Court rules, as we respectfully request, that (1) Plaintiff voluntarily shared the information in question with Workforce after the companies parted ways; (2) Plaintiff did so without putting any protections whatsoever in place; and (3) the customer identity and customer preference information cannot qualify as trade secrets in this industry.

Moreover, Plaintiff has already amended its Complaint once, having done so with the benefit of a roadmap for amendment following the Initial Pretrial Conference and Defendants' pre-motion conference letter outlining its motion to dismiss the initial Complaint. *See* Dkts. 35-39. Having already had two opportunities to state a DTSA or CFAA claim, but still failing to do so, Plaintiff's DTSA and CFAA claims should be dismissed with prejudice, and without leave to amend.

---

[11] Plaintiff argues that "Defendants wrongfully suggest that the FAC states that each of the Defendants had full access to Worldwide's Trade Secrets." Opp. at 4. In fact, that's exactly what the FAC alleges. *See* FAC ¶ 41 ("Goldstein . . . had direct, regular and continuous access to all of Worldwide's trade secrets."); *id.* ¶¶ 52-57 (alleging that Kampel, Porembski, Triolo, Wilson, West, Lipinski "had access to Worldwide Trade Secrets").

### IV. THIS COURT LACKS SUBJECT-MATTER JURISDICTION TO HEAR THIS CASE

Plaintiff does not dispute that, if this Court dismisses the CFAA and DTSA claims, it would lack subject-matter jurisdiction over this dispute. While Plaintiff alleges this issue is not yet "ripe" (*see* Opp. at 19), this Court has expressly held otherwise. In *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 425 (S.D.N.Y. 2021), after dismissing plaintiff's DTSA claim, this Court declined to exercise supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice to refiling in New York State Court. *See* MTD at 24-25. The same result is appropriate here.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Counts I-III of Plaintiff's FAC pursuant to Rule 12(b)(6), with prejudice and without leave to amend, and dismiss the remaining claims (Counts IV-XII) without prejudice to refiling them in New York State Court, pursuant to Rule 12(b)(2).

Respectfully submitted,

Dated: February 21, 2025    **PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:   /s/ *Kenneth W. Taber*
Kenneth W. Taber
Brian L. Beckerman
31 West 52nd Street
New York, NY 10019-6131
Tel: (212) 858-1000
Fax: (212) 858-1500
kenneth.taber@pillsburylaw.com
brian.beckerman@pillsburylaw.com

*Attorneys for Defendants*

11

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule III(B)(1) of Your Honor's Individual Rules of Practice in Civil Cases and Local Civil Rule 7.1(c), the undersigned hereby certifies that, exclusive of the exempted portions of the brief specified in Local Civil Rule 7.1(c), this brief contains **3,412** words. The undersigned has relied upon the word count feature of Microsoft Word in preparing this certification.

*/s/ Kenneth W. Taber*
Kenneth W. Taber
